*[handwritten:]* U.S. Attorney
District of Anyone
Gary Restaino
Arizona Bar No. 017450
40 N. Central, Suite 1200
Phoenix, AZ 85004

*[handwritten:]* Chief, Criminal Division, Public Integrity Section
Andrew Levchuk
Massachusetts Bar Member
Senior Trial Attorney
USDOJ
1400 New York Ave., NW
Washington, DC 20530

*[stamps, handwritten:]* ___FILED ___LODGED
___RECEIVED ___COPY
2008 NOV 13 P 3:46
CLERK US DISTRICT COURT
DISTRICT OF ARIZONA

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | **CR08-212-TUC-DCB (BPV)** |
| Plaintiff, | **SUPERSEDING INDICTMENT** |
| v. | Violations: |
| 1. Richard G. Renzi (Counts 1-43) | 18 U.S.C. § 371 (Conspiracy: Counts 1, 28 and 29) |
| 2. James W. Sandlin (Counts 1-27, 44) | 18 U.S.C. §§ 1343 and 1346 (Wire Fraud: Counts 2-10) |
| 3. Andrew Beardall (Counts 28, 39-41) | 18 U.S.C. § 1956(h) (Money Laundering Conspiracy: Count 11) |
| 4. Dwayne Lequire (Counts 29, 34-38) | 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering: Count 12) |
| Defendants. | 18 U.S.C. § 1957 (Transactions With Criminally Derived Funds: Counts 13 -25) |
| | 18 U.S.C. § 1951(a) (Extortion: Counts 26-27) |
| | 18 U.S.C. § 1033(a)(1) and (b)(1) (Insurance Fraud: Counts 30-41) |
| | 18 U.S.C. § 1962(c) (Racketeering: Count 42) |
| | 26 U.S.C. § 7206(1) (False Statement in Tax Return: Count 43) |
| | 2 U.S.C. §§ 441f and 437g(d)(1)(A)(ii)(Campaign Contribution in the Name of Another: Count 44) |
| | 18 U.S.C. § 982, 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 1963 & 28 U.S.C. § 2461 (Criminal Forfeiture) |

## THE GRAND JURY CHARGES:

### The Defendants

1. RICHARD G. RENZI ("RENZI") was a Member of the United States House of Representatives as Representative for Arizona's First Congressional District. He was first elected in November 2002, and was reelected in 2004 and 2006. RENZI maintained congressional offices in both Washington, D.C., and in the District of Arizona. At all times relevant to this Superseding Indictment, RENZI was a member of the House of Representatives Natural Resources Committee. RENZI received a Juris Doctor degree from the Columbus School of Law, Catholic University of America, in 2001.

2. JAMES W. SANDLIN ("SANDLIN") was a real estate investor and business associate of RENZI. SANDLIN was an active supporter of RENZI's 2002 congressional campaign as well as subsequent campaigns. For example, on two occasions in 2002, SANDLIN caused the issuance of $121,000.00 in corporate checks to RENZI, who then transferred $111,000.00 from those checks to his 2002 congressional campaign account.

3. ANDREW BEARDALL ("BEARDALL") was an attorney admitted to practice in the State of Maryland. From approximately November 2002 through December 2003, BEARDALL served as President and General Counsel of an insurance agency owned by RENZI.

4. DWAYNE LEQUIRE ("LEQUIRE") was an accountant who worked at an insurance agency owned by RENZI.

### Renzi and Company/Patriot Insurance Agency

5. In or about 2001, RENZI owned and operated Renzi and Company, Inc. ("Renzi and Company"), an insurance agency that provided a range of coverage specifically developed for nonprofit organizations. On or about December 31, 2002, Renzi and Company changed its name to Patriot Insurance Agency, Inc. ("Patriot Insurance") but continued to serve the same clients as Renzi and Company. Commencing no later than 2001 and continuing through at least 2007, RENZI enriched himself and others through the misappropriation of insurance premium moneys that were paid to Renzi and Company/Patriot Insurance as fiduciary. RENZI also used Patriot Insurance as a conduit for illegal proceeds. In particular:

2

a. Between December 2001 and March 2002, RENZI transferred more than $400,000.00 out of Renzi and Company's insurance premium trust account, then through other bank accounts, and ultimately to his congressional campaign account.  As a result, insurance policies of hundreds of RENZI's clients were cancelled on or about August 11, 2002, and were not reinstated until November 2002 when RENZI repaid the embezzled funds with money received from a family member.

b. In 2005, RENZI and SANDLIN engaged in an extortion scheme in which they induced an investment group to purchase real estate owned by Sandlin, and then shared the proceeds of the sale. RENZI ultimately received approximately $733,000.00 from SANDLIN, part of which he used to repay a Patriot Insurance debt. RENZI also used Patriot Insurance bank accounts to conceal his relationship with SANDLIN from the investment group.

c. In 2006 and 2007, RENZI through his control of Patriot Insurance diverted premium funds legally owed to Spirit Mountain Insurance Company Risk Retention Group, Inc. ("Spirit Mountain"), funds which Patriot Insurance held as fiduciary, to RENZI's personal accounts for payment of RENZI's personal expenses.

6.  Although he was assisted at various times by BEARDALL, LEQUIRE and others, RENZI was in fact the principal leader, organizer and manager of Renzi and Company and its corporate successor, Patriot Insurance. Patriot Insurance was nominally owned by Renzi's spouse, but RENZI exercised *de facto* control of Patriot Insurance. RENZI's control of Renzi and Company and Patriot Insurance allowed him to misappropriate insurance premium monies to pay for business expenses, political campaign expenses, and personal expenses.

### Business Entities Owned by Renzi and Sandlin

7. From June 26, 1995 to June 26, 2003, RENZI was an owner of Renzi Investments, which was principally engaged in developing real estate in Kingman, Arizona. From in or around 2001 through in or about June 2003, RENZI and SANDLIN were co-owners of Renzi Investments, which was renamed Fountain Realty & Development, Inc. ("Fountain Realty"). In 2003 SANDLIN acquired the remaining interest from RENZI. SANDLIN remitted a cashier's check for $200,000.00 to RENZI, and gave RENZI an $800,000.00 note, promising to pay RENZI that

1    amount in the future.  On or around June 1, 2004, RENZI filed with the Clerk of the House of

2    Representatives an amended Financial Disclosure Statement for calendar year 2003

3    memorializing his agreement with SANDLIN to share in future proceeds. As of January 1, 2005,

4    SANDLIN still owed RENZI $700,000.00 in principal, and SANDLIN did not make the final

5    payment to RENZI under their agreement until on or about September 30, 2005.

### The Congress of the United States and Responsibilities of Members of the United States House of Representatives

8.  RENZI and other Members of the House of Representatives were required to take the following oath of office at the beginning of each new Congress:

I, [Member's Name], do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter: So help me God.

9.  In addition to the above oath, the Rules of the United States House of Representatives provided that:

a.  a Member of the House of Representatives was prohibited from receiving outside compensation as a result of the improper exercise of influence from the Member's position in Congress; and

b.  a Member was required to file truthful annual Financial Disclosure Statements with the Clerk of the House.

10.  RENZI also had a specific statutory duty each year, under Title I of the Ethics in Government Act of 1978, as amended (5 U.S.C. app. 4, §101 et seq.), to file annual Financial Disclosure Statements.

11.  Consistent with his oath of office and the duties of the office he held, RENZI owed the citizens of the United States and the United States House of Representatives a duty to perform the responsibilities of his office free from deceit, self-dealing, bias, and concealment.

### Federal Land Exchanges

12.  A federal public land exchange is a real estate transaction in which a property owner exchanges its privately owned land for federal public land.  Before an exchange occurs, the

4

1   federal parcel and the non-federal land must be appraised to ensure that they are of equal value.

2   In addition to appraisals, land exchanges require compliance with the National Environmental

3   Protection Act and other environmental statutes.  Acquisition of the private land must serve the

4   public interest.  Public interest considerations include protection of fish and wildlife habitats,

5   cultural resources, watersheds and wilderness.

6       13.  The Secretary of the Interior has authority to approve certain land exchanges.  Some

7   land exchanges, such as those involving land in different states or land managed by different

8   federal agencies, require legislative approval.  In the United States House of Representatives,

9   land exchanges fall under the jurisdiction of the Natural Resources Committee, of which RENZI

10  was a member.

11      14.  Investment groups and private companies customarily acquire options to purchase

12  private real estate parcels of potential interest to the federal government in order to exchange

13  those private parcels of potential interest with existing federal land.  Investment groups and

14  private companies customarily use options to purchase because of the uncertainty involved in

15  the approval process.

16              **Two Federal Land Exchange Proposals Presented to RENZI**

17      15.  In 2004 and 2005, Company A owned the mineral rights to a large copper deposit

18  located near Superior, Arizona (the "Superior Property"), within RENZI's congressional district.

19  Company A was preparing to extract the copper from the Superior Property, but sought

20  ownership of the surface rights. The United States Government owned the surface rights.

21      16.  In order to obtain the surface rights via a land exchange with the federal government,

22  Company A hired a consulting firm to assist in the process.  The consulting firm's primary

23  function was to assist Company A to acquire private property that would be attractive to the

24  federal government, and then exchange these private parcels for the surface rights to the Superior

25  Property.  The land exchange would need legislative approval by Congress.  The Natural

26  Resources Committee would need to approve the proposed legislation prior to a floor vote in the

27  House of Representatives.

28  / / /

1    17. In April 2005, a separate group of investors, Investment Group B, approached RENZI

2  to discuss the possibility of RENZI sponsoring a federal land exchange (unrelated to Company

3  A's proposal) on its behalf.  As with Company A's proposal, Investment Group B's proposal

4  would require legislative approval and undergo scrutiny by the Natural Resources Committee.

5                                         **COUNT ONE**

6                                     **THE CONSPIRACY**

7    18. Beginning no later than January 2005 and continuing until in or about October 2006,

8  in the District of Arizona and elsewhere, defendants RICHARD G. RENZI and JAMES W.

9  SANDLIN, and others both known and unknown to the grand jury, did knowingly and

10  unlawfully conspire, confederate, and agree together and with each other:

11   (A)    to obstruct, delay, and affect commerce and the movement of any article and

12           commodity in commerce by extortion, that is, to unlawfully obtain and attempt to

13           obtain under color of official right money or other property from Company A and

14           Investment Group B, with their consent, not due RENZI, SANDLIN, or RENZI's

15           official office, in agreement for the performance of official acts, in violation of

16           Title 18, United States Code, Section 1951(a);

17   (B)    to devise, intend to devise, and attempt to devise a scheme and artifice to defraud

18           the United States of its intangible right to the honest services of RENZI, free from

19           deceit, bias, self-dealing and concealment, and for the purpose of executing the

20           scheme and artifice, to knowingly transmit and cause to be transmitted writings,

21           signs, signals and sounds by communications in interstate commerce by means of

22           wire, and to knowingly send and cause to be sent communications in the United

23           States mails, in violation of Title 18, United States Code, Sections 1341, 1343, and

24           1346.

25                              **OBJECTS OF THE CONSPIRACY**

26    It was an object of the conspiracy that:

27    19. RENZI would enrich SANDLIN and personally benefit himself by compelling

28  Company A, and later, Investment Group B, to include real property owned by SANDLIN in

their respective land exchange proposals, in order to receive his support for the necessary legislation.

20. RENZI and SANDLIN would conceal SANDLIN's substantial outstanding financial debt to RENZI from Company A, Investment Group B, the United States House of Representatives and the public.

21. SANDLIN and RENZI would conceal the payment to RENZI of a substantial portion of the proceeds from the sale of Sandlin's real property, because RENZI was having financial difficulty throughout 2005 and needed a substantial infusion of funds to keep his insurance business solvent and to maintain his personal lifestyle.

## MANNER AND MEANS OF THE CONSPIRACY

22. RENZI would and did direct Company A to purchase the Sandlin Property and include it in their land exchange proposal in order to obtain RENZI's support for their proposal in Congress. When Company A failed to purchase the Sandlin Property, RENZI would and did tell Company A, "no Sandlin Property, no bill."

23. RENZI would and did direct Investment Group B to purchase the Sandlin Property and include it in their land exchange proposal in order to obtain RENZI's support for their proposal in Congress.

24. RENZI and SANDLIN would and did conceal from Company A and Investment Group B the fact that Sandlin owed Renzi $700,000.00 in principal on the $800,000.00 note.

25. Investment Group B paid SANDLIN approximately $2.6 million for the sale of the Sandlin Property, and gave him a note for an additional $2 million.

26. As a result of the contract to sell the Sandlin Property to Investment Group B, SANDLIN would and did pay $733,000.00 to RENZI in 2005. SANDLIN first paid RENZI $200,000.00 from the proceeds of the sale of the Sandlin Property to Investment Group B. SANDLIN then paid RENZI an additional $533,000.00 days prior to the closing on the sale of the Sandlin Property. RENZI and SANDLIN used a variety of means to conceal the nature and purpose of these transactions.

///

27. RENZI would and did conceal from Congress and the public his receipt of more than $733,000.00 from SANDLIN in 2005.

## OVERT ACTS

28. In furtherance of the aforesaid conspiracy, and to effect the objects of the conspiracy, the defendants performed and caused to be performed, among others, the following overt acts, in the District of Arizona and elsewhere.

a. Between January 2005 and April 2005, in the District of Arizona and elsewhere, RENZI told Company A's representatives that they should purchase the Sandlin Property and include it in the land exchange proposal.

b. At a meeting on or about January 11, 2005, in the District of Arizona, RENZI did not disclose, and Company A and its consulting firm did not know, that SANDLIN owed RENZI $700,000.00 in principal on the $800,000.00 note.

c. In February 2005, RENZI met in his congressional office with representatives of Company A and its consulting firm and insisted that the Sandlin Property must be included in the land exchange proposal if he was to be a sponsor.

d. During the February 2005 meeting, RENZI did not disclose, nor did he ever disclose, to Company A or its consulting firm that SANDLIN owed RENZI $700,000.00 in principal on the $800,000.00 note even though a member of Company A's consulting firm expressly asked RENZI about any business relationship with SANDLIN.

e. In or about March 2005, SANDLIN rejected reasonable requests and terms in relation to the sale of the Sandlin Property, thereby causing Company A to advise RENZI that Company A was unlikely to be able to reach an agreement with SANDLIN for the purchase of the Sandlin Property.

f. On March 18, 2005, RENZI spoke by telephone with a representative of Company A in Arizona, stating, in substance, that SANDLIN would be more cooperative in future discussions and urging the representative to conclude successful negotiations with SANDLIN.

g. On or about March 18, 2005, shortly after the telephone conversation between RENZI and the Company A representative, SANDLIN faxed a letter to Company A's Arizona offices

8

1  in which he stated, "I just received a phone call from Congressman Renzi's office.  They have

2  the impression that I haven't been cooperative concerning this water issue.  I feel I have been

3  very cooperative. . . .  I still want to cooperate."

4      h.  In the March 18, 2005, letter, SANDLIN did not disclose, nor did he ever disclose, to

5  Company A or its consulting firm that SANDLIN owed RENZI $700,000.00 in principal on the

6  $800,000.00 note.

7      i.  On or about April 12, 2005, after the Vice President and General Manager of Company

8  A informed RENZI that Company A would not acquire the property from SANDLIN because

9  they had not been able to reach a financial agreement, RENZI replied, "no Sandlin Property, no

10  bill",  meaning that RENZI would not sponsor Company A's legislative proposal unless

11  Company A included the Sandlin Property in the land exchange.

12      j.  On or about April 16, 2005, RENZI met in the District of Arizona with a separate

13  group of investors, Investment Group B, to discuss the possibility of RENZI sponsoring a federal

14  land exchange on its behalf.

15      k.  During the April 16, 2005, meeting between RENZI and Investment Group B, RENZI

16  insisted that Investment Group B purchase the Sandlin Property as part of its land exchange

17  proposal and told Investment Group B that it would receive a "free pass" through the House of

18  Representatives Natural Resources Committee.

19      l.  During the April 16, 2005, meeting, RENZI did not disclose, nor did he ever disclose,

20  and Investment Group B did not know, that SANDLIN owed RENZI $700,000.00 in principal

21  on the $800,000.00 note.

22      m.  On April 17, 2005, as result of the meeting between RENZI and Investment Group

23  B, RENZI and SANDLIN caused a representative from Investment Group B to send the

24  following email to RENZI's congressional office:

25  / / /

26  / / /

27  / / /

28  / / /

9

I have the funds committed for the purchase of the Sandlin Conservation Easement. We now can fund on 3 days notice. Please let me know how to proceed with you and [a non-profit group]. Please be sensitive to the fact that we are going way out on a limb at the request of Congressman Renzi. I am putting my complete faith in Congressman Renzi and you that this is the correct decision. I stand waiting for your instructions.

> Very Truly Yours,
>
> [Investment Group B Representative]

n. In or about April 2005, SANDLIN rejected Investment Group B's request for an option to purchase the property, thus causing Investment Group B to agree to purchase 480 acres of the Sandlin Property from SANDLIN for $4.6 million.

o. During SANDLIN's April 2005 contact with Investment Group B, SANDLIN did not disclose, nor did he ever disclose, and Investment Group B did not know, that SANDLIN owed RENZI $700,000.00 in principal on the $800,000.00 note.

p. On or about May 5, 2005, RENZI and SANDLIN caused Investment Group B to wire SANDLIN a total of $1 million via two wire transfers into SANDLIN's bank account at The Stockmen's Bank in Kingman, Arizona.

q. On or about May 5, 2005, SANDLIN wrote a $200,000.00 check payable to Renzi Vino, Inc. ("Renzi Vino"), an Arizona company owned by RENZI.

r. On or about May 20, 2005, RENZI deposited the $200,000.00 check into a Patriot Insurance bank account.

s. On or about July 6, 2005, SANDLIN sent from Texas to Arizona a fax containing both a signed addendum extending escrow and deposit instructions for an extension-of-escrow fee.

t. In or around September 2005, prior to closing on the Sandlin Property, a representative from Investment Group B sought and received assurances from RENZI that the Sandlin Property was an important part of the land exchange and that RENZI would introduce Investment Group B's legislative proposal.

u. On or about September 30, 2005, RENZI caused a Patriot Insurance letter, which was addressed to SANDLIN and dated August 30, 2005, to be faxed to the Pioneer Title Company in Sierra Vista, Arizona that falsely stated in part:

This letter is informing you of Mr. Renzi 'calling' in the note for the Kingman property. It is his understanding you have recently sold this land, therefore the balance of the note plus interest, is due and payable. Patriot Insurance Agency, Inc. is handling this part of the former Renzi Investments.

v.  On or about September 30, 2005, SANDLIN paid $533,000.00 to Patriot Insurance through a transaction conducted by SANDLIN at the Pioneer Title Company in Sierra Vista, Arizona.

w.  On or about September 30, 2005, RENZI transferred the $533,000.00 received by Patriot Insurance into a bank account in the name of Rick Renzi Rain Whisper Account ("Rain Whisper"), which was opened on that same day.

x.  On or about October 7, 2005, RENZI and SANDLIN caused Investment Group B to transfer approximately $1.6 million to SANDLIN through escrow along with a $2 million note payable to SANDLIN, thus completing the purchase of the Sandlin Property by Investment Group B.

y.  Between October 11, 2005 and January 5, 2006, RENZI transferred $200,000.00 from Rain Whisper to RENZI's personal checking account to pay personal expenses.

z.  On or about January 10, 2006, RENZI transferred $324,287.05 from the Rain Whisper account to a Patriot Insurance account at Bank One, N.A.

aa.  On or about February 10, 2006, RENZI transferred $325,000.00 out of Patriot Insurance's account to his personal checking account for use as payment of unpaid federal and state income taxes on his 2001 federal and state amended tax returns.

bb.  On or about May 31, 2006, RENZI filed a false Financial Disclosure Statement for Calendar Year 2005 in which RENZI did not disclose, among other things, the $700,000.00 note from SANDLIN and the $733,000.00 in payments made by SANDLIN.

All in violation of Title 18, United States Code, Section 371.

/ / /

/ / /

/ / /

## COUNTS TWO THROUGH TEN

## HONEST SERVICES WIRE FRAUD

## (18 U.S.C. §§ 1343 and 1346 and § 2)

29. Paragraphs 1-17 and 19-28 are realleged and incorporated by reference as though fully set forth herein.

### The Scheme

30. Between in or about January 2005 and in or about February 2006, in the District of Arizona and elsewhere, the defendants, RICHARD G. RENZI and JAMES W. SANDLIN, aided and abetted by one another, devised, attempted to devise, and intended to devise a scheme and artifice to defraud and deprive the United States of its intangible right to the honest services of RENZI performed free from deceit, self-dealing, bias, and concealment.

### The Purposes of the Scheme

31. The purpose of the scheme was to enrich both RENZI and SANDLIN by using the promise of RENZI's exercise of his official authority in their favor to compel Company A and Investment Group B to purchase the Sandlin Property.

32. It was also a purpose of the scheme to conceal RENZI's financial relationship with SANDLIN from Company A, Investment Group B, the United States House of Representatives, and the public.

### Use of Interstate Wires

33. For the purpose of executing the scheme and artifice to defraud, in the District of Arizona and elsewhere, RENZI and SANDLIN did knowingly transmit and cause to be transmitted certain writings, signs, signals and sounds by means of interstate wire, as set forth below:

/ / /

/ / /

/ / /

/ / /

12

| Count | Date (on or about) | Location | Description of Wire |
|---|---|---|---|
| 2 | May 3, 2005 | Henderson, Nevada to Tucson, Arizona | $500,000.00 initial deposit by Investment Group B toward purchase of Sandlin Property |
| 3 | May 5, 2005 | Henderson, Nevada to Tucson, Arizona | $500,000.00 deposit by Investment Group B toward purchase of Sandlin Property |
| 4 | July 6, 2005 | Henderson, Nevada to Tucson, Arizona | Additional payment of $264,653.39 into escrow toward purchase of Sandlin Property |
| 5 | July 6, 2005 | Texas to Arizona | Escrow addendum and wire instructions |
| 6 | Sept. 26, 2005 | New York to Arizona | $445,000.00 wire transfer to Pioneer Title, Sierra Vista, Arizona |
| 7 | Sept. 26, 2005 | New York to Arizona | $551,000.00 wire transfer to Pioneer Title, Sierra Vista, Arizona |
| 8 | Sept. 27, 2005 | Texas to Arizona | Payout instructions for $533,000.00 to Patriot Insurance Agency, Inc. |
| 9 | October 7, 2005 | Las Vegas, Nevada to Tucson, Arizona | Second half of purchase payment at closing on Sandlin Property in the amount of $827,413.03 |
| 10 | October 7, 2005 | Tucson, Arizona to McKinney, Texas | Seller proceeds of $1,549,104.92 to SANDLIN |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT 11

## CONSPIRACY TO COMMIT MONEY LAUNDERING

34.     The factual allegations in paragraphs 1-17 and 19-28 of the Superseding Indictment are incorporated herein by reference and re-alleged as though fully set forth herein.

13

35.     Beginning on or about January 2005 through in or about February 2006, in the District of Arizona and elsewhere, defendants, RICHARD G. RENZI and JAMES W. SANDLIN, did knowingly and willfully conspire and agree with each other and with other persons known and unknown to the Grand Jury:

(A) knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct financial transactions affecting interstate and foreign commerce, which in fact involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, and extortion, in violation of 18 U.S.C. § 1951,  knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(B) to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000.00, that is deposit, withdrawal, transfer and exchange of U.S. currency, funds and monetary instruments, such property having been derived from said specified unlawful activity in violation of Title 18, United States Code, Section 1957.

## OBJECTS OF THE CONSPIRACY

36.  It was an object of the conspiracy for RENZI and SANDLIN to distribute the proceeds of the financial transactions with Investment Group B without detection and in a manner designed to facilitate. RENZI's and SANDLIN's use of the proceeds in financial transactions to pay personal expenses and business debts.

## MANNER AND MEANS OF THE CONSPIRACY

37. SANDLIN paid RENZI using the names of corporate entities, even though under an agreement entered into in May 2004, the debt was owed from SANDLIN personally to RENZI personally.

14

38. SANDLIN and RENZI used the services of escrow companies to distribute the proceeds, making the transactions more difficult to trace for tax authorities, investigators and others.

39. RENZI caused to be faxed a letter addressed to SANDLIN dated August 30, 2005, to the title company handling the transaction. The letter stated in part, "This letter is informing you of Mr. Renzi 'calling' in the note for the Kingman property. It is his understanding you have recently sold this land, therefore the balance of the note plus interest, is due and payable. Patriot Insurance Agency, Inc. is handling this part of the former Renzi Investments." The transaction was conducted in this manner, that is, the false statements regarding the sale of the Kingman property and the "calling" of the note, to hide the source of the money and thus the connection between SANDLIN and RENZI.

40. RENZI made false statements in his annual Financial Disclosure Statements and in his 2005 personal tax returns to further conceal the nature of his transactions with SANDLIN.

41. On or about September 30, 2005, RENZI opened a bank account at Bank One, N.A. in the name of "Rick Renzi Rain Whisper Account" using the Patriot Insurance employer identification number. On the same date, RENZI made the only deposit of money into the Rain Whisper account, that is, a transfer of $533,000.00 from Patriot Insurance to the newly-opened Rain Whisper account. RENZI then transferred funds out of the Rain Whisper account into his personal account at Bank One as follows:

**2005**

| | |
|---|---|
| October 11 | $50,000.00 |
| November 10 | $20,000.00 |
| November 22 | $20,000.00 |
| November 29 | $20,000.00 |
| December 8 | $45,000.00 |
| December 15 | $10,000.00 |
| December 19 | $15,000.00 |

**2006**

| | |
|---|---|
| January 3 | $10,000.00 |
| January 5 | $10,000.00 |
| Total | $200,000.00 |

42.   On or about November 18, 2005, SANDLIN wrote a check in the amount of $242,250.00 on an account at Independent Bank to pay off a separate personal debt owed by RENZI.

43.   On or about December 8, 2005, RENZI paid his third quarter estimated taxes to the Internal Revenue Service through a $45,000.00 check written on his personal account at Bank One, N.A.

44.   On or about January 10, 2006, RENZI transferred $324,287.05 from the Rain Whisper account to a Patriot Insurance account at Bank One, N.A.

45.   On or about February 10, 2006, RENZI transferred $325,000.00 from a Patriot Insurance account to his personal account for the purpose of writing checks for the payment of amended state and federal taxes for calendar year 2001.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 12

### CONCEALMENT MONEY LAUNDERING

46.   The factual allegations of paragraphs 1-17 and 19-28 of the Superseding Indictment are incorporated by reference and re-alleged as though fully set forth herein.

47.   On or about May 5, 2005, in the District of Arizona and elsewhere, defendants RICHARD G. RENZI and JAMES W. SANDLIN, and others known and unknown to the Grand Jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct a financial transaction affecting interstate commerce, that is, a transfer of funds in the amount of $200,000.00 by check drawn on The Stockmen's Bank, Kingman, AZ (account number xxxx8797 in the names of SANDLIN and his wife) from SANDLIN to Renzi Vino, Inc., which RENZI deposited into a Patriot Insurance trust account, and which in fact involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, and extortion, in violation of 18 U.S.C § 1951, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and 2.

## COUNTS 13-25

### TRANSACTIONS IN CRIMINALLY DERIVED FUNDS

48. Paragraphs 1-17 and 19-28 of this Superseding Indictment are re-alleged as if fully set forth herein.

49. On or about the dates and in the amounts set forth below, defendants RICHARD G. RENZI and JAMES W. SANDLIN, in the District of Arizona and elsewhere,  did knowingly engage and attempt to engage in the following monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000.00, that is deposit, withdrawal, transfer and exchange of U.S. currency, funds and monetary instruments, such property having been derived from a specified unlawful activity, wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, and extortion, in violation of 18 U.S.C. § 1951:

| Count | Date | Amount | Item | Transaction |
|-------|------|--------|------|-------------|
| 13 | May 12, 2005 | $77,357.42 | Cashier's Check from SANDLIN to The Slalom Shop | Purchase of Cashier's Check used to obtain a boat |
| 14 | May 20, 2005 | $200,000.00 | Check from SANDLIN to Renzi Vino | Deposit into Patriot Insurance Agency, Inc. Trust Account at Bank One, N.A. |
| 15 | July 7, 2005 | $100,000.00 | Intra-state wire transfer Fidelity National Title Agency to The Stockmen's Bank | Transfer of funds for extension of escrow agreement |
| 16 | September 30, 2005 | $533,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Patriot Insurance Agency, Inc. to "Rick Renzi Rain Whisper Account" |
| 17 | October 11, 2005 | $50,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to RENZI's personal account |

| 18 | November 10, 2005 | $20,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to RENZI's personal account |
|---|---|---|---|---|
| 19 | November 22, 2005 | $20,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to RENZI's personal account |
| 20 | November 29, 2005 | $20,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to RENZI's personal account |
| 21 | December 8, 2005 | $45,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to RENZI's personal account |
| 22 | December 19, 2005 | $15,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to RENZI's personal account |
| 23 | January 10, 2006 | $324,287.05 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to Patriot Insurance Agency, Inc. |
| 24 | February 10, 2006 | $325,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Patriot Insurance Agency, Inc. account # xxxxx2558 to Patriot Insurance account # xxxxx7952 |
| 25 | February 10, 2006 | $325,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Patriot Insurance Agency account # xxxxx7952 to RENZI personal account |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT 26

## HOBBS ACT EXTORTION UNDER COLOR OF OFFICIAL RIGHT

50.  Paragraphs 1-17 and 19-28 of this Superseding Indictment are re-alleged as if fully set forth herein.

18

51. From on or around January 2005 through April 2005, in the District of Arizona and elsewhere, RICHARD G. RENZI and JAMES W. SANDLIN knowingly, willfully, and unlawfully obstructed, delayed, and affected interstate commerce and the movement of articles and commodities in such commerce, by extortion, as those terms are defined in 18 U.S.C. § 1951(b), and attempted to do so, in that RENZI and SANDLIN attempted to unlawfully obtain from Company A, with its consent, money not due to RENZI, RENZI's official office, or SANDLIN from Company A under color of official right by using RENZI's position as a United States Representative to promise to take official action to assist Company A, and to threaten to withhold official action to disrupt the business of Company A.

All in violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT 27

## HOBBS ACT EXTORTION UNDER COLOR OF OFFICIAL RIGHT

52. Paragraphs 1-17 and 19-28 of this Superseding Indictment are re-alleged as if fully set forth herein.

53. From on or around April 2005 through October 2005, in the District of Arizona and elsewhere, RICHARD G. RENZI and JAMES W. SANDLIN knowingly, willfully, and unlawfully obstructed, delayed, and affected interstate commerce and the movement of articles and commodities in such commerce by extortion, as those terms are defined in 18 U.S.C. § 1951(b), and attempted to do so, in that RENZI and SANDLIN attempted to unlawfully obtain, and did unlawfully obtain, from Investment Group B, with its consent, money not due to RENZI, RENZI's official office, or SANDLIN from Investment Group B under color of official right by using RENZI's position as an Arizona Congressman to promise to take official action that would assist Investment Group B, and to threaten to withhold official action to disrupt the business of Investment Group B.

All in violation of Title 18, United States Code, Sections 1951 and 2.

/ / /

/ / /

19

## COUNT 28

## CONSPIRACY TO COMMIT INSURANCE FRAUD-
### Renzi and Company

54.  Renzi and Company was a licensee of the Commonwealth of Virginia and was registered with the Virginia Department of Insurance as a firm authorized to do business as an insurance agency and brokerage firm as required by the laws and rules of the Commonwealth of Virginia to do insurance-related business in Virginia.  Renzi and Company was also a licensee of the State of Arizona, and was registered with the Arizona Department of Insurance as a firm authorized to do business as an insurance agency and brokerage firm as required by the laws and rules of the State of Arizona to do insurance-related business in Arizona.

55.  As an insurance agency, Renzi and Company did not itself insure its customers. Instead, Renzi and Company acted as its customers' agent in obtaining property and liability insurance coverage that met their respective needs.  To accomplish this, Renzi and Company contracted with North Island Facilities, Ltd ("NIF"), an insurance broker located in the State of New York.  NIF, in turn, contracted with Safeco Insurance Company ("Safeco") to insure RENZI's non-profit clients. Any premium monies received by Renzi and Company from clients were required to be held in trust to be passed on, minus Renzi and Company's 10% commission, to NIF and Safeco.

## THE CONSPIRACY

56.  Beginning in or about December 2001 and continuing until in or about June 2003, in the District of Arizona and elsewhere, defendants RICHARD G. RENZI, ANDREW BEARDALL and others both known and unknown to the grand jury, being engaged in the business of insurance and whose activities affect interstate commerce, and being an officer, director and agent in the business of insurance, did knowingly and unlawfully conspire, confederate, and agree together and with each other to: 1) knowingly and with intent to deceive, make a false material statement in connection with documents presented to insurance regulatory officials and agencies for the purpose of influencing the actions of such officials or agencies, in violation of Title 18, United States Code, Section 1033(a)(1); and 2) willfully embezzle and misappropriate moneys, funds and premiums, in violation of 18 U.S.C. Section 1033(b)(1).

## OBJECTS OF THE CONSPIRACY

It was an object of the conspiracy that:

57.   RENZI would embezzle and misappropriate client premiums to fund his congressional campaign.

58.   RENZI, BEARDALL and others would conceal RENZI's embezzlement and misappropriation of those funds by making false statements to insurance regulators, in RENZI's annual Financial Disclosure Statements, and to the Federal Election Commission.

## MANNER AND MEANS OF THE CONSPIRACY

59. RENZI misappropriated more than $400,000.00 of insurance premiums. As a result, RENZI failed to pay NIF $236,655.90, invoiced in April 2002, which represented the price of the premiums minus the 10% brokerage fee for Renzi and Company.  Based on Renzi and Company's failure to pay the invoice, NIF in July 2002 sent notices to the insureds canceling their coverage on or about August 11, 2002. NIF then proceeded to notify insurance departments in the insureds' respective states of RENZI's nonpayment and of the policy cancellations.

60. To conceal his use of client funds, in late July 2002, RENZI approved and sent letters to customers via the United States Postal Service from Arizona, falsely claiming that the insureds' liability coverage with Safeco had been moved to a company known as "Jimcor," and attached a false certificate of general and professional liability insurance in the name of "Jimcor Insurance Company."  In fact, Jimcor was simply another insurance broker and unlike Safeco, did not issue insurance policies.

61. Commencing in November 2002, RENZI and BEARDALL made a series of false representations to state insurance regulators who had commenced investigations of the cancellations. RENZI and BEARDALL falsely told insurance regulators, among other things, that the fake Jimcor insurance certificates were issued due to a clerical error. This was done to conceal the fact that Renzi and Company's nonpayment was caused by RENZI's misappropriation of insurance premiums.

62.   RENZI also concealed his misappropriation and embezzlement by filing Federal Election Commission Form 3, REPORT OF RECEIPTS AND DISBURSEMENTS, on or about

January 24, 2002, for the final quarter of 2001. During the period December 11, 2001 through December 31, 2001, RENZI claimed total receipts of $404,090.00, all of which he claimed to be loans from himself to the campaign. In fact, as RENZI well knew, more than $300,000.00 of those funds constituted insurance premiums that were neither the property of RENZI nor of Renzi and Company.

## OVERT ACTS

63. In furtherance of the aforesaid conspiracy, and to the effect the objects of the conspiracy, the defendants performed and caused to be performed, among others, the following overt acts:

a. On or about December 11-18, 2001, RENZI directed an employee to move $30,000.00 in insurance premiums held in trust from the Renzi and Company insurance premium Trust Account, to the operating account, to his personal account and finally to the Rick Renzi for Congress campaign account.

b. On or about December 19-20, 2001, RENZI directed an employee to move $50,000.00 in insurance premiums held in the insurance premium Trust Account, to the operating account, to his personal account and finally to the Rick Renzi for Congress campaign account.

c. On or about December 28, 2001, RENZI directed an employee to move $272,000.00 in insurance premiums held in trust in the insurance premium Trust Account, to the operating account, to his personal account and finally to the Rick Renzi for Congress campaign account.

d. On or about March 12-28, 2002, RENZI directed an employee to move $70,000.00 in insurance premiums held in trust from the insurance premium Trust Account, to the operating account, to his personal account and finally to the Rick Renzi for Congress campaign account.

e. On or about October 2, 2002, RENZI approved and signed check number 7804, in the amount of $7,108.00, sent via the U.S. Postal Service and payable to an insured in Texas, and with a memo field including "Donation Towards Claim Expenses."

f. On or about October 4, 2002, RENZI approved and signed check number 2979, in the amount of $4,600.00, sent via the U.S. Postal Service and payable to an insured in Missouri, and with a memo field including "Donation Towards Claim Settlement."

g. On or about November 7, 2002, BEARDALL sent a mail-merged letter by U.S. mail to RENZI clients again falsely claiming that the insureds' liability coverage with Safeco (through NIF) had been moved to another company.

h. On or about November 25, 2002, RENZI approved and ordered the payment of a cashier's check in the amount of $236,655.90 to NIF, following the receipt of a wire transfer in the amount of $230,000.00 from RENZI's father.

i. On or about December 10, 2002, BEARDALL falsely told an investigator with the Virginia Bureau of Insurance that Renzi and Company withheld claims payments due to a dispute with the underwriter.

j. On or about March 3, 2003, BEARDALL signed and mailed, via the United States Postal Service, a letter to the Virginia Bureau of Insurance on Renzi & Company letterhead falsely claiming that an administrative error caused Renzi and Company to issue certificates of insurance from Jimcor.

k. On or about March 24, 2003, BEARDALL signed and mailed, via the United States Postal Service, a letter to the Florida Department of Insurance on Renzi & Co. letterhead falsely claiming  that an administrative error caused Renzi and Company to issue certificates of insurance from Jimcor.

All in violation of Title 18, United States Code, Section 371.

## COUNT 29

## CONSPIRACY TO COMMIT INSURANCE FRAUD-
### Spirit Mountain Insurance Company

64. At all times relevant to this Superseding Indictment, Spirit Mountain Insurance Company ("Spirit Mountain") was a licensee of the District of Columbia and was registered with the District of Columbia Department of Insurance, Securities and Banking as a firm authorized to do business as a Risk Retention Group.  Spirit Mountain was also a licensee of the State of Arizona, and was registered with the Arizona Department of Insurance as a firm authorized to do business in the state as a Risk Retention Group

65. As a Risk Retention Group, Spirit Mountain operated differently than a traditional insurance company.  Risk Retention Groups are owner-controlled insurance companies

authorized by the Federal Liability Risk Retention Act of 1986. A Risk Retention Group allows members who engage in similar businesses – in this case certain non-profits - to write liability insurance for all or any portion of the exposures of group members. To be insured by Spirit Mountain, each non-profit became a member of the International Association of Community Service Organizations ("IACSO"), and IACSO was the owner of Spirit Mountain. Authorization under the federal statute allowed Spirit Mountain be chartered in the District of Columbia but also to engage in the business of insurance in all states, subject to certain restrictions. The centers through their membership in IACSO essentially self-insured their risks, backed up by a reinsurance policy to cover claims between $250,000.00 and $1,000,000.00 per occurrence.

66. Patriot Insurance acted as Program Administrator for Spirit Mountain pursuant to a Program Administrator Agreement. As Program Administrator, Patriot Insurance collected all premiums paid by insureds of Spirit Mountain. According to the Program Administrator Agreement, Patriot was to "hold all funds received by it in connection with this Agreement as a fiduciary" of Spirit Mountain. The Agreement further provided that Patriot Insurance "shall, under no circumstances, make any personal or corporate use of such funds not authorized by this Agreement." It also stated that "[n]o later than twenty-five (25) days after the close of each month, [Patriot Insurance] shall transfer all amounts due to [Spirit Mountain]."

67. In fact, commencing in August 2005 and continuing through 2007, Patriot Insurance's cash on hand from all sources was insufficient to cover its past-due debt to Spirit Mountain for insurance premiums collected.

## THE CONSPIRACY

68. Beginning in or about May 2006 and continuing through at least December 2007, in the District of Arizona and elsewhere, defendants RICHARD G. RENZI, DWAYNE LEQUIRE and others both known and unknown to the grand jury, being engaged in the business of insurance and whose activities affect interstate commerce, and being an officer, director and agent in the business of insurance, did knowingly and unlawfully conspire, confederate, and

/ / /

1   agree together and with each other to willfully embezzle and misappropriate moneys, funds and

2   premiums from Spirit Mountain, in violation of Title 18, United States Code, Section 1033(b)(1).

3                                **OBJECTS OF THE CONSPIRACY**

4        It was an object of the conspiracy that:

5        69. RENZI would embezzle and misappropriate client premiums to pay his substantial

6   personal expenses.

7        70.  RENZI, LEQUIRE and others would conceal RENZI's embezzlement and

8   misappropriation of those funds by transferring other funds into Patriot Insurance accounts,

9   including proceeds from a line of credit and the proceeds of the SANDLIN/Investment Group

10  B real estate deal (*See* ¶¶ 28p-28aa).

11                          **MANNER AND MEANS OF THE CONSPIRACY**

12       71.  Commencing in January 2006, RENZI misappropriated Spirit Mountain insurance

13  premiums by transferring funds to his personal account instead of to Spirit Mountain's account.

14  Patriot Insurance was therefore substantially behind in paying Spirit Mountain what was owed

15  to it.

16       72.  To conceal Spirit Mountain's financial condition, RENZI and LEQUIRE approved

17  and sent letters to customers via the United States Postal Service from Arizona, falsely claiming

18  that Spirit Mountain was solvent and "successful," when in fact it was consistently owed money

19  by Patriot Insurance.

20       73.  In or about April 2007, RENZI and LEQUIRE made false representations to their

21  management services company (which had primary responsibility for communicating with

22  regulators) concerning Patriot Insurance's failure to pay to Spirit Mountain the premiums due

23  and owing. This was done to conceal the fact that Patriot Insurance's nonpayment was caused

24  by RENZI's misappropriation of insurance premiums.

25                                     **OVERT ACTS**

26       74. In furtherance of the aforesaid conspiracy, and to effect the objects of the conspiracy,

27  the defendants performed and caused to be performed, among others, the following

28   overt acts:

a. In or about February 2006, RENZI and LEQUIRE withdrew approximately $355,000 from Patriot Insurance accounts for RENZI's personal use, at a time when Patriot Insurance owed Spirit Mountain approximately $673,346.63 in past-due premium monies.

b. In or about April 2006, LEQUIRE sent an e-mail to RENZI advising that Patriot Insurance was substantially in arrears on its payments to Spirit Mountain.

c. In or about June 2006, RENZI and LEQUIRE withdrew approximately $308,000.00 from Patriot Insurance accounts for RENZI's personal use, at a time when Patriot Insurance owed Spirit Mountain approximately $405,929.79 in past-due premium monies.

d. In or about November 2006, RENZI and LEQUIRE withdrew approximately $230,000.00 from Patriot Insurance accounts for RENZI's personal use, at a time when Patriot Insurance owed Spirit Mountain approximately $699,007.16 in past-due premium monies.

e. In or about January 2007, RENZI and LEQUIRE caused Patriot Insurance to open a line of credit with J.P. Morgan Chase Bank, NA, to cover the shortfalls in Patriot Insurance accounts caused by RENZI's misappropriation of premium funds.

f. On or about April 24, 2007, LEQUIRE sent an electronic mail message to its outside management company, falsely claiming that Patriot Insurance's failure to pay premium monies to Spirit Mountain was due to "timing" and delay in opening a line of credit.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 30-33

## INSURANCE FRAUD
### (Renzi and Company)

75. Paragraphs 54-55 and 57-63 of this Superseding Indictment are re-alleged as if fully set forth herein.

76. On or about the dates hereinafter set forth, RICHARD G. RENZI, an officer and director of Patriot Insurance Agency, Inc., and a broker of North Island Facilities, Ltd., being engaged in the business of insurance, did willfully embezzle, abstract, purloin and misappropriate moneys, funds, premiums, credits, and other property of his insureds and of NIF. In each case, the funds were ultimately converted to use by Rick Renzi for Congress.

（）

| Count | Date | Amount | Description |
|---|---|---|---|
| 30 | December 11, 2001 | $55,000.00 | Transfer from Renzi and Company Trust Account to Operating Account |
| 31 | December 19, 2001 | $60,000.00 | Transfer from Renzi and Company Trust Account to Operating Account |
| 32 | December 28, 2001 | $255,000.00 | Transfer from Renzi and Company Trust Account to Operating Account |
| 33 | March 28, 2002 | $95,000.00 | Check payable to "Renzi and Co." from Trust Account |

All in violation of Title 18, United States Code, Sections 1033(b) and 2.

### COUNTS 34-38

### INSURANCE FRAUD
### (Spirit Mountain Insurance Company)

77. Paragraphs 64-67 and 69-74 of this Superseding Indictment are re-alleged as if fully set forth herein.

78. On or about the dates hereinafter set forth, RENZI and LEQUIRE, officers and directors of Patriot Insurance Agency, Inc., being engaged in the business of insurance, did willfully embezzle, abstract, purloin and misappropriate moneys, funds, premiums, credits, and other property of his insureds and of Spirit Mountain. In each case, the funds were ultimately converted to use by RENZI to pay his substantial personal expenses.

| Count | Date | Amount | Description |
|---|---|---|---|
| 34 | April 5, 2006 | $111,000.00 | Transfers from Patriot Insurance Account to RENZI personal account |
| 35 | June 6, 2006 | $263,000.00 | Withdrawal from Patriot Insurance Account and deposit to RENZI personal account |

| 36 | October 23, 2006 | $53,000.00 | Transfer from Patriot Insurance Account to RENZI personal account |
| 37 | November 22, 2006 | $150,000.00 | Transfer from Patriot Insurance Account to RENZI personal account |
| 38 | September 18, 2007 | $55,000.00 | Transfer from Patriot Insurance Account to RENZI personal account |

All in violation of Title 18, United States Code, Sections 1033(b) and 2.

## FALSE STATEMENTS TO INFLUENCE INSURANCE REGULATORY INVESTIGATIONS

### COUNT 39

79. Paragraphs 54-55 and 57-63 of this Superseding Indictment are re-alleged as if fully set forth herein.

80. On or about November 7, 2002, RICHARD G. RENZI and ANDREW BEARDALL, individuals engaged in the business of insurance within the District of Arizona and elsewhere, whose activities affect interstate commerce, knowingly, with intent to deceive, made materially false statements and reports, in connection with financial reports and documents presented to any insurance regulatory official or agency (or an examiner appointed by such official or agency to examine the affairs of such person), for the purpose of influencing the actions of such official, agency, appointed agent or examiner, that is, following the submission of complaints of withheld premiums by NIF to state insurance regulators, including the Texas Department of Insurance, RENZI and BEARDALL arranged for a mail-merged letter to be sent by United States mail to a Texas insured and others noting the existence of an insurance investigation and falsely claiming that the insured's liability coverage with Safeco (through NIF) had been moved to "companies that will better represent your needs."

All in violation of Title 18, United States Code, Sections 1033(a)(1) and 2.

///

28

## COUNT 40

81. Paragraphs 54-55 and 57-63 of this Superseding Indictment are re-alleged as if fully set forth herein.

82. On or about March 3, 2003, RICHARD G. RENZI and ANDREW BEARDALL, individuals engaged in the business of insurance within the District of Arizona and elsewhere, whose activities affect interstate commerce, knowingly, with intent to deceive, made materially false statements and reports, in connection with financial reports and documents presented to any insurance regulatory official or agency (or an examiner appointed by such official or agency to examine the affairs of such person), for the purpose of influencing the actions of such official, agency, appointed agent or examiner, that is, following the submission of complaints of withheld premiums by NIF to state insurance regulators, including the Virginia Bureau of Insurance, RENZI and BEARDALL signed and mailed, via the United States Postal Service, a letter to the Virginia Bureau of Insurance on Renzi & Co. letterhead falsely contesting allegations of false statements. In particular, RENZI and BEARDALL falsely claimed that an administrative error caused Patriot Insurance to issue a general liability policy for coverage from Jimcor, when in fact RENZI and BEARDALL knew that RENZI intentionally falsified the coverage declaration.

All in violation of Title 18, United States Code, Sections 1033(a)(1) and 2.

## COUNT 41

83. Paragraphs 54-55 and 57-63 of this Superseding Indictment are re-alleged as if fully set forth herein.

84. On or about March 24, 2003, RICHARD G. RENZI and ANDREW BEARDALL, individuals engaged in the business of insurance within the District of Arizona and elsewhere, whose activities affect interstate commerce, knowingly, with intent to deceive, made materially false statements and reports, in connection with financial reports and documents presented to any insurance regulatory official or agency (or an examiner appointed by such official or agency to examine the affairs of such person), for the purpose of influencing the actions of such official, agency, appointed agent or examiner, that is, following the submission of complaints of withheld

premiums by NIF to state insurance regulators, including the Florida Department of Insurance, RENZI and BEARDALL signed and mailed, via the United States Postal Service, a letter to the Florida Department of Insurance on Renzi & Co. letterhead falsely contesting allegations of false statements. In particular, RENZI and BEARDALL falsely claimed that an administrative error caused Patriot Insurance to issue a general liability policy for coverage from Jimcor, when in fact RENZI and BEARDALL knew that RENZI intentionally falsified the coverage declaration.

All in violation of Title 18, United States Code, Sections 1033(a)(1) and 2.

## COUNT 42

85. Paragraphs 1-17 of this Superseding Indictment are realleged and incorporated by reference.

## RACKETEERING

### The Renzi and Company/Patriot Insurance Enterprise

86. At various times material to this Count of the Superseding Indictment, defendant RICHARD G. RENZI owned and/or controlled Renzi and Company and Patriot Insurance Agency, Inc. Patriot Insurance Agency, Inc., and its predecessor company, Renzi and Company, constituted an "enterprise" (hereafter referred to as "Renzi and Company/Patriot Insurance" or "enterprise"), as defined by Title 18, United States Code, Section 1961(4). This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### The Purposes of the Defendant

87. The purposes of the defendant included the following:

a. Enriching defendant RICHARD G. RENZI and the partners, employees, and agents of the enterprise through, among other things, mail fraud and wire fraud through the misappropriation of insurance premium moneys that were paid to Renzi and Company/Patriot Insurance as fiduciary.

b. Preserving and protecting the power and wealth of defendant RICHARD G. RENZI and the enterprise, and by using the enterprise as a conduit for other criminally derived proceeds.

/ / /

c. Concealing RENZI's financial relationship with SANDLIN from Company A, Investment Group B, the United States House of Representatives, and the public.

### Role of the Defendant RICHARD G. RENZI

88.   The principal leader, organizer and manager of the enterprise was defendant RICHARD G. RENZI, who participated in the operation and management of the enterprise, by being the principal decision maker for the enterprise and by directing other partners, employees, and agents of the enterprise to do acts that assisted him in carrying out his unlawful and other activities in furtherance of the conduct of the enterprise's affairs. In conducting and participating in the affairs of the enterprise, it was defendant RICHARD G. RENZI'S objective to engage in an ongoing and continuous fraud scheme in which (1) funds in trust not due and owing to Renzi and Company and Patriot Insurance were unlawfully withdrawn and disbursed to pay for the expenses of the enterprise, political campaign expenses, RENZI's personal state and federal taxes and RENZI's campaign expenses, even though defendant RENZI knew and believed that the premium funds were not his to spend; (2) RENZI committed other criminal activity to provide funds to the enterprise; and (3) funds that should have been promptly refunded to customers, paid over to carriers, and paid to Spirit Mountain, were kept by RENZI for his own and the enterprise's use and benefit. RENZI also used the enterprise as a conduit for criminally derived funds generated by other criminal offenses.

### Means and Methods

89.   Among the means and methods by which the defendant RICHARD G. RENZI and other partners, employees, and agents of the enterprise conducted and participated in the conduct of the affairs of the enterprise were the following:

a. Paragraphs 1-17, 19-21, 22-27, 28a-28bb, 54-55, 57-58, 59-62, 63a-63k, 64-67, 69-70, 71-73 and 74a-74f of this Superseding Indictment are re-alleged as if fully set forth herein.

b. Defendant RENZI and other partners, employees, and agents of the enterprise used the facilities and bank accounts of the enterprise to facilitate other crimes and the movement of the financial proceeds of those crimes.

31

c. Defendant RENZI and other partners, employees, and agents of the enterprise used his economic strength and resources and the financial resources available to him through his ownership and control of the enterprise and his continuous misappropriation of funds entrusted to Patriot Insurance as fiduciary to instill in others the fear of retaliation and retribution by defendant RICHARD G. RENZI, and to deter others from exposing the unlawful and unethical activities of defendant RICHARD G. RENZI.

d. Defendant RENZI and other partners, employees, and agents of the enterprise committed other criminal activity to provide funds for the enterprise.

## The Racketeering Violation

90.  From a time unknown, but at least as early as in or about 2001 and continuing through in or about 2007, in the District of Arizona and elsewhere,

### RICHARD G. RENZI,

defendant herein, together with others known and unknown, being persons employed by and associated with the Renzi and Company/Patriot Insurance Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did conduct and participate, directly and indirectly, in the conduct of   the affairs of the Renzi and Company/Patriot Insurance Enterprise through a pattern of racketeering activity set forth below:

## The Pattern of Racketeering Activity

91.  The pattern of racketeering activity, as defined in Title 18, United States Code, Section 1961(1) and 1961(5), consisted of the following acts:

## Racketeering Act One

### *Use of Insurance Premiums Held in Trust to Fund First Congressional Campaign*

### The Scheme

92.  Between in or about December 2001 and in or about June 2003, in the District of Arizona and elsewhere, the defendant, RICHARD G. RENZI devised, attempted to devise, and intended to devise a scheme and artifice to defraud by misappropriating insurance premium funds held in trust by Renzi and Company and diverting those funds to his own benefit and that of his congressional campaign.

**The Purposes of the Scheme**

93.  The purpose of the scheme was to enrich RENZI by diverting insurance premium funds which were not the property of RENZI or Renzi and Company and using those funds to fund Renzi's congressional campaign.

94.  It was also a purpose of the scheme to conceal RENZI's misappropriation of the insurance premium funds from insurance clients as well as state insurance regulators.

95.  The defendant, RICHARD G. RENZI, committed the following acts, any one of which alone constitutes Racketeering Act One.

**Racketeering Act 1A- Use of Interstate Wires**

96.  For the purpose of executing the scheme and artifice to defraud, in the District of Arizona and elsewhere, RENZI on January 24, 2002, filed FEC Form 3 by wire, containing the false statement that the money Renzi embezzled from the insureds was instead a loan of his personal money to the campaign, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

**Racketeering Acts 1B through 1F - Use of Interstate Mailings**

97.  For the purpose of executing the scheme and artifice to defraud, in the District of Arizona and elsewhere, RENZI did knowingly transmit and cause to be transmitted certain writings by means of the United States postal service, on or about the dates set forth below, in violation of Title 18, United States Code, Sections 1341 and 2.

| Act | Date | From | To |
|-----|------|------|-----|
| **1B** | July 26, 2002 | Renzi and Company | Mail merged letter to customers containing false certificate of insurance |
| **1C** | October 2, 2002 | Renzi and Company | Check number 7804, for $7,108.00, payable to an insured in Texas. |
| **1D** | October 4, 2002 | Renzi and Company | Check number 2979, for $4,600.00, payable to an insured in Missouri |

33

| 1E | November 7, 2002 | Renzi and Company | Mail-merged letter to RENZI clients claiming that insureds' liability coverage had been moved to another company |
|---|---|---|---|
| 1F | November 25, 2002 | Renzi and Company | Cashier's check for $236,655.90 from Renzi & Co. to NIF |
| 1G | March 3, 2003 | Renzi and Company | Letter to Virginia Bureau of Insurance claiming that administrative error caused Renzi and Company to issue false certificates of insurance |
| 1H | March 24, 2003 | Renzi and Company | Letter to the Florida Department of Insurance claiming that administrative error caused Renzi and Company to issue false certificates of insurance |

## Racketeering Act Two

### *Scheme to Deprive the United States of Honest Services, and to Extort Constituents*

98.    The defendant, RICHARD G. RENZI, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Two.

### Racketeering Act 2A and 2B - Attempted Extortion and Extortion

99.  Paragraphs 1-17, 19-21, 22-27 and 28a-28bb of this Superseding Indictment are re-alleged as if fully set forth herein.

### Racketeering Act 2A – Attempted Extortion of Company A

100.  From on or around January 2005 through April 2005, in the District of Arizona and elsewhere, RICHARD G. RENZI knowingly, willfully, and unlawfully obstructed, delayed, and affected interstate commerce and the movement of articles and commodities in such commerce, by extortion, as those terms are defined in 18 U.S.C. § 1951(b), and attempted to do so, in that RENZI attempted to unlawfully obtain from Company A, with its consent, money not due to RENZI, RENZI's official office, or SANDLIN from Company A under color of official right

34

1   by using RENZI's position as a United States Representative to promise to take official action

2   to assist Company A, and to threaten to withhold official action to disrupt the business of

3   Company A, in violation of Title 18, United States Code, Sections 1951 and 2.

4              **Racketeering Act 2B – Extortion of Investment Group B**

5        101. From on or around April 2005 through October 2005, in the District of Arizona and

6   elsewhere, RICHARD G. RENZI knowingly, willfully, and unlawfully obstructed, delayed, and

7   affected interstate commerce and the movement of articles and commodities in such commerce

8   by extortion, as those terms are defined in 18 U.S.C. § 1951(b), and attempted to do so, in that

9   RENZI attempted to unlawfully obtain, and did unlawfully obtain, from Investment Group B,

10  with its consent, money not due to RENZI, RENZI's official office, or SANDLIN from

11  Investment Group B under color of official right by using RENZI's position as an Arizona

12  Congressman to promise to take official action that would assist Investment Group B and to

13  threaten to withhold official action to disrupt the business of Investment Group B, in violation

14  of Title 18, United States Code, Sections 1951 and 2.

15             **Racketeering Act 2C-Honest Services Wire Fraud**

16       102.   Paragraphs 1-17, 19-21, 22-27 and 28a-28bb are realleged and incorporated by

17  reference as though fully set forth herein.

18                            **The Scheme**

19       103. Between in or about January 2005 and in or about February 2006, in the District of

20  Arizona and elsewhere, the defendant RICHARD G. RENZI devised, attempted to devise, and

21  intended to devise a scheme and artifice to defraud and deprive the United States of its intangible

22  right to the honest services of RENZI performed free from deceit, self-dealing, bias, and

23  concealment.

24                      **The Purposes of the Scheme**

25       104. The purpose of the scheme was to enrich RENZI by using the promise of RENZI's

26  exercise of his official authority in favor of Company A and Investment Group B to compel

27  Company A and Investment Group B to purchase the Sandlin Property.

28  / / /

105. It was also a purpose of the scheme to conceal RENZI's financial relationship with SANDLIN from Company A, Investment Group B, the United States House of Representatives, and the public.

## Use of Interstate Wires

106. For the purpose of executing the scheme and artifice to defraud, in the District of Arizona and elsewhere, RENZI on or about September 27, 2005, did knowingly transmit and cause to be transmitted payout instructions for $533,000.00 to Patriot Insurance Agency, from Texas to Arizona, in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## Racketeering Act 2D through 2H-Transactions in Criminally Derived Funds

107. On or about the dates and in the amounts set forth below, defendant RICHARD G. RENZI, in the District of Arizona and elsewhere, did knowingly engage and attempt to engage in the following monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000, that is deposit, withdrawal, transfer and exchange of U.S. currency, funds and monetary instruments, such property having been derived from a specified unlawful activity, wire fraud in violation of Sections 1343 and 1346, Title 18, United States Code, and extortion in violation of Title 18, United States Code, Section 1951, all in violation of Title 18, United States Code, Sections 1957 and 2.

| Act | Date | Amount | Item | Transaction |
|-----|------|--------|------|-------------|
| 2D | May 20, 2005 | $200,000.00 | Check from SANDLIN to Renzi Vino | Deposit into Patriot Insurance Agency, Inc. Trust Account at Bank One, N.A. |
| 2E | September 30, 2005 | $533,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Patriot Insurance Agency, Inc. to "Rick Renzi Rain Whisper Account" |

| | | | | |
|---|---|---|---|---|
| **2F** | January 10, 2006 | $324,287.05 | Intra-bank transfer within Bank One, N.A. | Transfer from Rick Renzi Rain Whisper Account to Patriot Insurance Agency, Inc. |
| **2G** | February 10, 2006 | $325,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Patriot Insurance Agency, Inc. account # xxxxx2558 to Patriot Insurance account # xxxxx7952 |
| **2H** | February 10, 2006 | $325,000.00 | Intra-bank transfer within Bank One, N.A. | Transfer from Patriot Insurance Agency account # xxxxx7952 to RENZI personal account |

## Racketeering Act Three

### *Misappropriations from Spirit Mountain Insurance Company*

107.   The defendant, RICHARD G. RENZI, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Three.

### The Scheme

108.   Paragraphs 64-66, 69-70, 71-73 and 74a-74f are realleged and incorporated by reference as though fully set forth herein.

109.   Beginning in or about January 2006 and continuing through December 2007, in the District of Arizona and elsewhere, defendant RICHARD G. RENZI and others both known and unknown to the grand jury, devised, attempted to devise, and intended to devise a scheme and artifice to defraud by misappropriating insurance premium funds held in a fiduciary capacity by Patriot Insurance and diverting those funds to RENZI's own benefit.

///

///

1

### Purpose of the Scheme

2    110.   It was a purpose of the scheme to defraud for RENZI to embezzle and

3   misappropriate client premiums to pay his substantial personal expenses.

4    111. It was further a purpose of the scheme to defraud for RENZI and others to conceal

5   RENZI's embezzlement and misappropriation of those funds by transferring other funds into

6   Patriot Insurance accounts, including proceeds from a line of credit and the proceeds of the

7   SANDLIN/Investment Group B real estate deal  (*See* ¶¶ 28p-28aa).

8    ### Racketeering Act 3A - Use of Interstate Mailings

9    112. For the purpose of executing the scheme and artifice to defraud, in the District of

10   Arizona and elsewhere, RENZI did knowingly transmit and cause to be transmitted certain

11   writings by means of the United States postal service from Arizona, to wit, a letter dated May

12   11, 2006, falsely claiming that Spirit Mountain was solvent and a "magnificent success," when

13   in fact it was owed substantial funds by Patriot Insurance, in violation of Title 18, United States

14   Code, Sections 1341 and 2.

15    ### Racketeering Act 3B - Use of Interstate Mail

16    113. For the purpose of executing the scheme and artifice to defraud, in the District of

17   Arizona and elsewhere, RENZI did knowingly transmit and cause to be transmitted certain

18   writings by means of the United States postal service from Arizona, to wit, a letter dated May

19   15, 2007, falsely claiming that Spirit Mountain was solvent and a "glorious success," when in

20   fact it was consistently owed substantial funds by Patriot Insurance, in violation of Title 18,

21   United States Code, Sections 1341 and 2.

22    ### Racketeering Act 3C - Use of Interstate Wires

23    114. For the purpose of executing the scheme and artifice to defraud, in the District of

24   Arizona and elsewhere, RENZI on or about April 24, 2007, directed Dwayne Lequire to send

25   an electronic mail message from Arizona to its management firm in Virginia, falsely claiming

26   that in response to a regulatory inquiry that Patriot Insurance's failure to pay premium monies

27   to Spirit Mountain was due to "timing" and delay in opening a line of credit, in violation of Title

28   18, United States Code, Sections 1343 and 2.

All in violation of Title 18, United States Code, Section 1962(c)

## COUNT 43

### FALSE STATEMENT IN A FEDERAL TAX RETURN

115. Paragraphs 1-17 to 19-28 of this Superseding Indictment are re-alleged as if fully set forth herein.

116. On or about October 13, 2006, in the District of Arizona, RENZI did willfully make and subscribe a federal Form 1040 Individual Income Tax Return for calendar year 2005, which was verified by a written declaration that it was made under the penalties of perjury and was mailed from Arizona to the Internal Revenue Service Center in Fresno, California, and which RENZI did not believe to be true and correct as to every material matter in that he did not report $700,000.00 received from SANDLIN on line 13 of Form 1040 even though he then there well knew and believed that the $700,000.00 was reportable as a capital gain.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT 44

### CAMPAIGN CONTRIBUTIONS IN THE NAME OF ANOTHER

117. Paragraphs 1-2 of this Superseding Indictment are re-alleged as if fully set forth herein.

118. The Federal Election Commission (FEC) was an agency of the United States government responsible for enforcing and administering the Federal Election Campaign Act of 1971 (the "Election Act"). This statute imposes duties on the FEC, political committees, and contributors, including the following:

a.   To limit the impact and influence that any one individual can have on a federal election, the Election Act established that the most an individual could contribute to any candidate for federal office (or to his or her authorized political committees) was $2,100 per election in 2006.

b.   To prevent individuals from circumventing this prohibition, the Election Act also made it illegal for any individual to make political contributions in the name of another person.

c.      To enforce these prohibitions, the Election Act required each treasurer of a political committee to file periodic reports of receipts and disbursements with the FEC. In these reports, the political committees were required to identify each person who made a contribution during the relevant reporting period, whose contribution or contributions for that election cycle aggregated more than $2,100.00 to the committee during the election cycle.

d.      The FEC was responsible for providing accurate information to the public about the amounts and sources of campaign contributions, and it used its quarterly reports to administer and enforce the Election Act.

119. On or about September 29, 2006, the defendant, JAMES W. SANDLIN, and his spouse together contributed the maximum allowable sum of $4200.00 to Rick Renzi for Congress for the November 2006 general election.

120. On or about October 1, 2006, SANDLIN approached "John Doe" and asked him to do SANDLIN "a favor." Specifically, SANDLIN requested that John Doe and his spouse make a contribution of $4000.00 to Renzi for Congress for the upcoming November 2006 general election. SANDLIN told John Doe that he wanted to "swap checks," and promised to simultaneously reimburse the entire $4000.00 to John Doe and his spouse with a check from SANDLIN to him. SANDLIN further stated: "If anyone were to ask you about this, just tell them that I am repaying a loan."

121. John Doe and his spouse agreed. They wrote a check dated October 1, 2006, for $4000.00 payable to "Rick Renzi for Congress." The same day, SANDLIN wrote check number 1174 in the amount of $4000.00 payable to John Doe. The check was drawn on the account of SANDLIN and his spouse at Independent Bank, Sherman, Texas.

122. In or about October 2006, in the District of Arizona and elsewhere,

JAMES W. SANDLIN,

knowingly and willfully violated the Federal Election Campaign Act by making contributions in the names of others that aggregated $2,000.00 or more within the 2006 calendar year; to wit, the defendant knowingly and willfully caused other persons to contribute a total of $4,000.00

1  to Renzi for Congress and reimbursed those persons $4,000.00 for their contributions in the
2  manner described above.

3       All in violation of Title 2, United States Code, Sections 441f and 437g(d)(1)(A)(ii).

4  **NOTICE OF FORFEITURE**

5  I.    <u>Honest Services Fraud and Hobbs Act</u>

6       123. The violations alleged in Counts One through Ten and Twenty Six through Twenty
7  Seven of this Superseding Indictment are realleged and incorporated by reference herein for the
8  purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title
9  18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461, and
10 under the procedures set forth in Fed. R. Crim. P. 32.2.

11      124. Upon conviction of one or more of the Wire Fraud, Mail Fraud and Hobbs Act
12 offenses alleged in Count One through Ten and Twenty-Six through Twenty Seven of this
13 Superseding Indictment , the defendants, RICHARD G. RENZI and JAMES W. SANDLIN,
14 shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c)
15 and Title 28, United States Code, Section 2461, and under the procedures set forth in Fed. R.
16 Crim. P. 32.2:

17      (a) All property, real and personal, that constitutes or is derived from proceeds traceable
18 to the commission of the offenses, including but not limited to the  following:

19      The proceeds of account number xxxxx3649 at Independent Bank in Sherman, Texas,
20 and/or a sum of money in United States currency representing the amount of proceeds obtained
21 as a result of the offenses, 18 U.S.C. §§ 1341, 1343, and 1951(a),  for which the defendants are
22 jointly and severally liable.

23      125. If any of the property described above, as a result of any act or omission of the
24 defendants:

25      a.    cannot be located upon the exercise of due diligence;

26      b.    has been transferred or sold to, or deposited with, a third party;

27      c.    has been placed beyond the jurisdiction of the court;

28      d.    has been substantially diminished in value; or

1      e.      has been commingled with other property which cannot be divided without
2              difficulty,

3   the United States of America shall be entitled to forfeiture of substitute property pursuant to Title
4   21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section
5   2461(c).

6   II.      Money Laundering

7          126. The violations alleged in Counts Eleven through Twenty Five of this Superseding
8   Indictment are realleged and incorporated by reference herein for the purpose of alleging
9   forfeiture to the United States of America pursuant to the provisions of Title 18, United States
10  Code, Section 982 and under the procedures set forth in Fed. R. Crim. P. 32.2.

11         127.  Upon conviction of one or more of the money laundering offenses alleged in
12  Counts Eleven through Twenty-Five of this Superseding Indictment, the defendants, RICHARD
13  G. RENZI and JAMES W. SANDLIN, shall forfeit to the United States, pursuant to the
14  provisions of Title 18, United States Code, Section 982 and under the procedures set forth in
15  Fed. R. Crim. P. 32.2:

16  any property, real or personal, involved in, or traceable to such property involved in money
17  laundering, in violation of Title 18, United States Code, Sections 1956 or 1957; including, but
18  not limited to the following:

19      a.      The sum of money equal to the total amount of property involved in, or traceable
20              to property involved in those violations;

21      b.      All commissions, fees and other property constituting proceeds obtained as
22              result of those violations; and

23      c.      all property used in any manner or part to commit or to facilitate the commission
24              of those offenses.

25         128.  If more than one defendant is convicted of an offense, the defendants so convicted
26  are jointly and severally liable for the amount derived from such offense. By virtue of the
27  commission of the felony offenses charged in Counts Eleven through Twenty Five of this
28  Superceding Indictment, any and all interest that the defendant has in the property involved in,

42

1  or traceable to property involved in money laundering is vested in the United States and hereby

2  forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(1).

3      129. Pursuant to 21 U.S.C. § 853(p), as incorporated by Title 18, United States Code,

4  Section 982(b)(1), each defendant shall forfeit substitute property, up to the value of the amount

5  described above, if, by any act or omission of said defendant, the property identified above as

6  subject to forfeiture.

7  III.    RICO Forfeiture Allegation

8      130. The allegations contained in Count 42 of this Indictment are hereby repeated, realleged,

9  and incorporated by reference herein as though fully set forth at length for the purpose of

10 alleging forfeiture pursuant to Title 18, United States Code, Section 1963, and Title 28, United

11 States Code, Section 2461(c).

12     131. Pursuant to Rule 32.2(a), Fed. R. Crim. P., the defendant, RICHARD G. RENZI is hereby

13 notified that, upon conviction of the violation of Title 18, United States Code, Section 1962, as

14 charged in Count 42 of this Indictment, the defendant shall forfeit, pursuant to Title 18, United

15 States Code, Section 1963:

16      a)   all interests acquired and maintained in violation of Title 18, United States

17           Code, Section 1962;

18      b)   all interests in, securities of, claims against, and property and contractual rights

19           of any kind affording a source of influence over, the enterprise named and

20           described herein which the defendant established, operated, controlled,

21           conducted, and participated in the conduct of, in violation of Title 18, United

22           States Code, Section 1962; and

23      c)   all property constituting and derived from proceeds obtained, directly and

24           indirectly, from racketeering activity in violation of Title 18, United States

25           Code, Section 1962.

26     132. The property subject to forfeiture to the United States pursuant to Title 18, United States

27 Code, Section 1963(a)(1), (a)(2), and (a)(3), includes, but is not limited to, the following assets:

28 / / /

1      a)    At least $1,797,000.00, said amount being the total of the interests acquired

2          and the gross proceeds charged and obtained through the violation of Title 18,

3          United States Code, Section 1962:

4      b)    All right, title, and ownership interest, to include but not limited to any

5          ownership of stock, held by RICHARD G. RENZI, in Patriot Insurance

6          Agency, Inc.

7   133. Pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States

8   Code, Section 853(p), as incorporated by 28 U.S.C. § 2461(c), the defendant shall forfeit

9   substitute property up to the value of the property described in the previous paragraph if that

10  property, as a result of any act or omission of the defendant:

11      (a)   cannot be located upon the exercise of due diligence;

12      (b)   has been transferred or sold to, or deposited with, a third party;

13      (c)   has been placed beyond the jurisdiction of this Court;

14      (d)   has been substantially diminished in value; or

15      (e)   has been commingled with other property which cannot be divided without

16          difficulty.

17  (All in accordance with Title 18, United States Code, Section 1963; Title 28, United States Code,

18  Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

19                         A TRUE BILL

20            REDACTED FOR
               PUBLIC DISCLOSURE

21                       FOREPERSON OF THE GRAND JURY

22                       Date: November 13, 2008

23  DIANE J. HUMETEWA            WILLIAM M. WELCH II

24  United States Attorney            Chief, Public Integrity Section

     District of Arizona               Criminal Division

25                            Department of Justice

26

27  GARY M. RESTAINO           ANDREW LEVCHUK

28  Assistant U.S. Attorney         Senior Trial Attorney