6          IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9    UNITED STATES OF AMERICA,        )
                                      )    NO.   CR 08-00212-TUC-DCB (BPV)
10             Plaintiff,             )
                                      )
11        vs.                         )    **REPORT AND RECOMMENDATION**
                                      )
12   RICHARD RENZI, JAMES SANDLIN,)
     ANDREW BEARDALL, and DWAYNE)
13   LEQUIRE,                         )
                                      )
14             Defendants.            )
     _____)

15

16        On October 15, 2008, Defendant Renzi filed a motion to dismiss the indictment for

17   Speech or Debate Clause violations. (Doc. No. 89.) The Government filed a timely response

18   (Doc. No. 157) and a reply memorandum was filed (Doc. No. 193).

19        On January 15, 2009, Defendant Renzi filed a motion to dismiss the superseding

20   indictment for Speech or Debate Clause violations before the grand jury.  (Doc. No. 264.)

21   The Government filed a timely response (Doc. No. 287) and a reply memorandum was filed

22   (Doc. No. 310).

23        On April 14, 2009, Defendant Renzi filed a motion to dismiss the superseding

24   indictment for Speech or Debate clause violations in the grand jury testimony.  (Doc. No.

25   327.) The Government filed a timely response (Doc. No. 332) and a reply memorandum was

26   filed (Doc. No. 346).

27        Additionally, the Court accepted *amicus curiae* briefs from Citizens for Responsibility

28   and Ethics in Washington in support of the position of the United States (Doc. No. 154) and

from the Bipartisan Legal Advisory Group of the United States House of Representatives (Doc. No. 198).

The matter came on for Oral Argument before the Court on December 4, 2008 and April 30, 2009.

The Court, having considered the briefing, arguments, and evidence presented, recommends that the motions to dismiss the indictment for Speech or Debate Clause violations be DENIED for the reasons discussed below.

Procedural Background

The Indictment in this case was filed on February 21, 2008, charging Defendants with essentially two sets of charges: the charges arising out of events related to two federal land exchange proposals ("the land exchange counts" - Counts 1-27) and the insurance fraud charges ("the insurance fraud counts" - Counts 28-35). (Doc. No. 1.) Defendant Renzi was named in all counts of the Indictment. (*Id.*) Defendant James Sandlin was named in Counts 1-27, and Defendant Andrew Beardall was named in Counts 28, and 33-35. (*Id.*)

On November 13, 2008, the Government filed a Superseding Indictment. (Doc. No. 178.) The new indictment named an additional defendant, Dwayne Lequire, added additional counts, and renumbered some of the counts charged in the first indictment. The nature and number of the first 28 counts are essentially unchanged in the Superseding Indictment. The additional counts and the additional defendant were added and interspersed among the last 29-44 counts, resulting in a renumbering of the charges in the Superseding Indictment. Altogether, the Superseding Indictment charges one count of conspiracy to commit extortion and wire fraud, nine counts of wire fraud, one count of conspiracy to commit money laundering, one count of concealment money laundering, thirteen counts of transactions with criminally derived funds, two counts of extortion, two counts of conspiracy to commit insurance fraud, nine counts of insurance fraud, three counts of false statements to influence insurance regulatory investigations, one count of racketeering, one count of false statement

in a federal tax return, one count of campaign contributions in the name of another.[1]

Factual Background

Defendant Richard Renzi was elected to the United States House of Representatives as Representative for Arizona's First Congressional District in November 2002. (Superseding Indictment, ¶ 1.) He was reelected in 2004 and 2006. (*Id.*)

Renzi began his tenure as a Member of the House of Representatives in January 2003, and served on the Natural Resources Committee ("NRC"). (Superseding Indictment, ¶¶ 1, 13.) In 2004 and 2005, Resolution Copper Corporation[2] ("RCC") owned the mineral rights to a large copper deposit located near Superior, Arizona, known as the "Superior Property." RCC was preparing to extract the copper, but sought ownership of the surface rights. The United States Government owned the surface rights. (*Id.*, ¶ 15.) RCC sought a land exchange with the federal government. (*Id.*, ¶ 16.) A federal public land exchange is a real estate transaction in which a property owner exchanges its privately owned land for federal public land. Before an exchange occurs, the federal parcel and the non-federal land must be appraised to ensure that they are of equal value, the exchange must comply with the National Environmental Protection Act, and must serve the public interest[3]. (*Id.*, ¶ 12.) Although the Secretary of the Interior has authority to approve certain land exchanges, some land exchanges, such as both of the land exchanges at issue in this case, require legislative

_____

[1]Defendant Renzi was named in all counts of the indictment except Count 44, campaign contributions in the name of another.

[2]Resolution Copper Corporation is referred to as "Company A" in the indictment. The group of investors led by Philip Aries, sometimes also known as the Aries Group or the Preserve Petrified Forest Land Investors ("PPFLI") Group is referred to as "Investment Group B" in the indictment.

[3]While there are many reasons why Congress might choose - and why private parties and public entities might seek - to effectuate particular land exchanges through direct legislation, the apparent reason direct legislation was sought in these two instances is because Congress, in legislating land exchanges, is not subject to these three requirements, and they are therefore less cumbersome than administrative exchanges. *See* Memorandum of Points and Authorities as *Amicus Curiae* of the Bipartisan Legal Advisory Group of the U.S. House of Representatives (Doc. No. 198, at 10).

approval.  (*Id.*, ¶ 13, 16, 17.)  In the United States House of Representatives, land exchanges fall under the jurisdiction of the NRC.  (*Id.*, ¶ 13.)

RCC sought the assistance of a consulting firm, the Western Land Group, whose primary function was to assist RCC in acquiring private property that would be attractive to the federal government, and then exchange these private parcels for the surface rights to the Superior Property.  (*Id.*, ¶ 16.)  The NRC would need to approve the proposed legislation prior to a floor vote in the House of Representatives.  (*Id.*)

Congressman Renzi directed RCC to purchase property owned by James Sandlin ("the Sandlin Property") and include that in the land exchange proposal in order to obtain the Congressman's support for their proposal in Congress.  (*Id.*, ¶¶ 22, 28(a), 28(c).)  Neither Renzi nor Sandlin disclosed the fact that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 note.  (*Id.*, ¶¶ 24, 28(b), 28(d), 28(h).)   On April 12, 2005, when RCC failed to purchase the Sandlin Property, Congressman Renzi told RCC "no Sandlin Property, no bill", meaning that Congressman Renzi would not sponsor RCC's legislative proposal unless RCC included the Sandlin Property in the land exchange.  (*Id.*, ¶ 22, 28(i).)

Shortly thereafter, on April 16, 2005, a group of investors led by Philip Aries approached Congressman Renzi to discuss the possibility of the Congressman sponsoring a federal land exchange on its behalf.  (*Id.*, at 17.)  Congressman Renzi directed the Aries' group to purchase the Sandlin Property and include that in the land exchange proposal in order to obtain the Congressman's support for their proposal in Congress.  (*Id.*, ¶ 23.)  Congressman Renzi insisted that the group purchase the Sandlin Property as part of its land exchange proposal and told that group that it would receive a "free pass" through the NRC. (*Id.*, ¶ 28(k).)  Neither Renzi nor Sandlin disclosed to the Aries' group the fact that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 note. (*Id.*, ¶¶ 24, 28(l),28(o).)  After Sandlin rejected the Aries' group's request for an option to purchase the property, the customary practice for federal land exchanges because of the uncertainty involved in the approval process (*Id.*, ¶ 14), the Aries' group contracted to purchase the property for $4.6 million, placing a $1 million escrow payment into Sandlin's bank account within a month.

(*Id.*, ¶ 28(n),28(p).) Sandlin immediately paid $200,000.00 of this money to Renzi. (*Id.*, ¶ 28(q).) Sandlin and Renzi concealed Renzi's financial gain from the transaction. Sandlin paid Renzi $200,000.00 out of the initial earnest money in May 2005, which Renzi deposited into Patriot Insurance. (Id. ¶¶ 28 (q), 28(r).) On September 30, 2005, prior to closing on the property, a representative from the Aries group sought reassurances from Congressman Renzi that the Sandlin Property was an important part of the land exchange and that the Congressman would introduce the investment group's legislative proposal. (*Id.*, ¶ 28(t).) On that same date, Sandlin also paid into a Patriot Insurance account the remaining $533,000.00 he owed to Renzi, which Renzi ultimately transferred to his personal checking account to pay for personal expenses and unpaid federal and state income taxes. (Id., ¶¶ 28(u)-(w), 28(y)-(aa).)

Motions to Dismiss

Defendant Renzi moved to dismiss the original indictment (1) based on violations of the Speech or Debate Clause before the grand jury, and (2) because the government based the charges in the indictment on Renzi's legislative acts and must necessarily introduce evidence of legislative acts to prove its case at trial. (Doc. No. 86.) After the superseding indictment was filed, Defendant Renzi moved to dismiss Counts One through Twenty-Seven of the Superseding Indictment for the reasons stated in the motion to dismiss the original indictment for Speech or Debate Clause violations. (Doc. No. 268.) The Court allowed Defendant Renzi to incorporate and apply the arguments presented in the original motions to dismiss the indictment to the counts of the superseding indictment. (Doc. No. 304.) Renzi also moved to dismiss the Superseding Indictment for Speech or Debate Clause violations in the grand jury testimony (Doc. No. 264). Because the Court also granted Defendant Renzi's request to produce grand jury transcripts from the second grand jury proceeding after the motion was filed, Defendant Renzi thereafter filed an additional motion to dismiss the Superseding Indictment based on violations of the Speech or Debate Clause before the second grand jury (Doc. No. 327). The Court will limit the discussion in the first motion to dismiss to the second allegation of error above, namely, that the government based

the charges in the indictment on Renzi's legislative acts and must necessarily introduce evidence of legislative acts to prove its case at trial. The Court will address all violations of the Speech or Debate Clause before the grand jury in the second discussion section below.

Speech or Debate Clause

*History and Construction of the Clause*

The Speech or Debate Clause provides that "for any Speech or Debate in either House, they [the Senators and Representatives] shall not be questioned in any other Place." U.S. Const. Art. I, § 6, cl. 1. Unlike so many of our Constitutional privileges which safeguard our individual rights and personal liberties, the "Speech or Debate Clause was designed neither to assure fair trials nor to avoid coercion." *United States v. Helstoski*, 442 U.S. 477, 490 (1979). The privilege has been recognized as an important protection of the independence and integrity of the legislature in both British and United States history. *United States v. Johnson*, 383 U.S. 169, 178-79 (1966) (citations omitted). In the American governmental structure, the privilege serves the additional function of reinforcing the separation of powers and ensuring the independence of the legislature by protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary. *Id*.

In *United States v. Brewster*, 408 U.S. 501 (1972), the Supreme Court acknowledged the historical background provided by Justice Harlan in the *Johnson* ruling, but emphasized that the Clause must be interpreted in light of the American experience and in the context of the American constitutional scheme of government rather than the English parliamentary system, bearing in mind that the English system differs from ours in that in the English system, Parliament is the supreme authority, not a coordinate branch; whereas our speech or debate privilege was "designed to preserve legislative independence, not supremacy." *Brewster*, 408 U.S. at 508.

The *Brewster* Court considered that executive abuse might occur as a remote possibility, but, balanced against the potential danger flowing from either the absence of a bribery statute applicable to Members of Congress or a holding that the bribery statute violated the Constitution, noted that the purpose of the Speech or Debate Clause is:

> ...to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process. But financial abuses by way of bribes, perhaps even more than Executive power, would gravely undermine legislative integrity and defeat the right of the public to honest representation. Depriving the Executive of the power to investigate and prosecute and the Judiciary of the power to punish bribery of Members of Congress is unlikely to enhance legislative independence.

*Id.*, at 525.

*What is "Speech or Debate?"*

In the Supreme Court's first ruling interpreting the Speech or Debate Clause in the context of a criminal charge against a Member of Congress, the Court held that, in addition to proscribing inquiry into the preparation and content of a speech given on the floor of the House of Representatives by a United States Congressman in exchange for financial compensation, the Speech or Debate Clause also prohibited inquiry into the motives underlying the making of the speech. *United States v. Johnson*, 383 U.S. 169 (1966). The Supreme Court noted that early case law indicated that the legislative privilege was to be read broadly to effectuate its purposes, and the privilege extended at least as far as to foreclose executive and judicial inquiry into the essence of the charge in *Johnson*, that the Congressman's speech was improperly motivated[4]. *Id.*, at 180.

The Supreme Court later considered *Johnson* in a discussion of the definition of "legislative act," which it found had been consistently defined as "an act 'generally done in Congress in relation to the business before it...or things 'said or done ... as a representative, in the exercise of the functions of that office...'" *United States v. Brewster*, 408 U.S. 501, 512 (1972)(internal citations omitted). The Court in *Brewster* noted that, while Members of Congress may engage in many activities other than the purely legislative activities protected by the Speech or Debate clause, they are political in nature rather than legislative. *Id*. at 512. Among the activities considered "political" rather than "legislative," the Court included a "wide range of legitimate 'errands' performed for constituents, the making of appointments

---

[4]The Court specifically left open for consideration the question whether a narrowly drawn statute passed by Congress in exercise of its legislative power to regulate the conduct of its members might draw in question the legislative acts of members of Congress or a Congressperson's motives for performing them. *Johnson*, 383 U.S. at 185.

with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside Congress." *Id.* The Court explained that these types of activities are performed in part because they have come to be expected by constituents and because they are a means of developing support for future elections, but that it has "never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause." *Id.*, at 512.

In *Brewster*, the Court rejected the appellee's argument for a broader test for the coverage of the Speech or Debate Clause based on language in *Johnson* suggesting that the Court held that the Clause protected from executive or judicial inquiry all conduct "related to the due functioning of the legislative process." *Id.*, at 513. The *Brewster* Court explained that appellees were taking this language out of context, that not "everything that 'related' to the office of a Member was shielded by the Clause." *Id.*, at 513-514. Rather, the contrary was true. The *Johnson* opinion cited *Kilbourn v. Thompson*, 103 U.S. 168 (1881) for the holding that only acts done in the course of the process of enacting legislation were protected. Chief Justice Burger canvassed the language of *Kilbourn*, *supra*, along with a litany of other cases construing the privilege[5], and found that "[i]n no case has [the Supreme Court] ever treated the Clause as protecting all conduct relating to the legislative process. [] In every case thus for before this Court, the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process-the due functioning of the process. Appellee's contention for a broader interpretation of the privilege draws essentially on the

---

[5]Summarized in *Brewster*, at footnote 2: *Kilbourn v. Thompson*, 103 U.S. 168 (1881) (voting for a resolution); *Tenney v. Brandhove*, 341 U.S. 367 (1951) (harassment of witness by state legislator during a legislative hearing; not a Speech or Debate Clause case); *United States v. Johnson*, 383 U.S. 169 (1966) (making a speech on House floor); *Dombrowski v. Eastland*, 387 U.S. 82 (1967) (subpoenaing records for committee hearing); *Powell v. McCormark*, 395 U.S. 486 (1969), (voting for a resolution).In *Coffin v. Coffin*, 4 Mass. 1 (1808), the state equivalent of the Speech or Debate Clause was held to be inapplicable to a legislator who was acting outside of his official duties.

flavor of the rhetoric and the sweep of the language used by courts, not on the precise words used in any prior case, and surely not on the sense of those cases, fairly read." *Brewster*, 408 U.S. at 515-516.

The Court commented that extending the privilege beyond its scope would be unwise, that the Court had no doubt that there were few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process, but that the purpose of the Clause was not to make Members of Congress "supercitizens, immune from criminal responsibility." *Id.*, at 516. The Court concluded that "if the Executive may prosecute a Member's attempt, as in *Johnson*, to influence another branch of the Government in return for a bribe, its power to harass is not greatly enhanced if it can prosecute for a promise relating to a legislative act in return for a bribe." *Id.*, at 524.

In *Brewster*, in the context of a criminal charge of bribery, the Court considered whether "it is necessary to inquire into how [defendant] spoke, how he debated, how he voted, or anything he did in the chamber or in committee in order to make out a violation of [the bribery] statute." *Id.*, at 526. The Court held that:

> Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act. It is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator. It is not an 'act resulting from the nature, and in the execution, of the office.' Nor is it a 'thing said or done by him, as a representative, in the exercise of the functions of that office,'.... Nor is inquiry into a legislative act or the motivation for a legislative act necessary to a prosecution under this statute or this indictment. When a bribe is taken, it does not matter whether the promise for which the bribe was given was for the performance of a legislative act as here or, as in *Johnson*, for use of a Congressman's influence with the Executive Branch. And an inquiry into the purpose of a bribe 'does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them.'

> Nor does it matter if the Member defaults on his illegal bargain. To make a prima facie case under this indictment, the Government need not show any act of appellee subsequent to the corrupt promise for payment, for it is taking the bribe, not performance of the illicit compact, that is a criminal act. If, for example, there were undisputed evidence that a Member took a bribe in exchange for an agreement to vote for a given bill and if there were also undisputed evidence that he, in fact, voted against the bill, can it be thought that this alters the nature of the bribery or removes it from the area of wrongdoing the Congress sought to make a crime?

*Id.*, at 526-527 (internal citations omitted). The Court concluded that "[t]he only reasonable

reading of the Clause, consistent with its history and purpose, is that it does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Id.*, at 528.

The Speech or Debate Clause applies not only to a Member of Congress but also to his or her aide, insofar as the aide's conduct would be a protected legislative act if performed by the Member. *United States v. Gravel*, 408 U.S. 606 (1972). Further, in addressing the scope of the Clause, the Court in *Gravel* explained that "[m]embers of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies - - they may cajole, and exhort with respect to the administration of a federal statute - - but such conduct, though generally done, is not protected legislative activity." *Id.*, at 625.

> Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberation.'

*Id.*, at 625 (citations omitted). Neither does the Clause provide the privilege to "violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Id.*, at 626.

In *United States v. Helstoski*, 442 U.S. 477 (1979), the Supreme Court further defined the scope of the Clause in considering the admission of evidence at a trial on charges that a former Member of the House had, while a Member, accepted money in return for promising to introduce, and introducing, private bills. The government had argued that it sought to introduce evidence of discussions and correspondence which described and referred to legislative acts if the discussions and correspondence did not occur during the legislative process, asserting that it sought to introduce the evidence to show the Member's motive for taking money, not to show his motive for introducing bills. *Id.*, at 486. The Court clarified that the Clause protects "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts" and "precludes any showing of how [a legislator] acted, voted, or decided" but that "[p]romises by a Member to perform an

act in the future are not legislative acts." *Id.*, at 489 (citations omitted). While references to past legislative acts could not be admitted without undermining the values protected by the Clause, the Court found it clear from the language of the Clause that "protection extends only to an act that has already been performed. A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate." Likewise, a promise to introduce a bill is not a legislative act." *Id.*, at 489-90.

Collectively then, these Supreme Court cases cited above require a court to ask, in order to determine if an activity is protected: 1) Does the conduct or act involve inquiry into how the Member spoke, debated, voted, or anything else done on the floor or in committee, or the motivation therefore? If so, the activity or conduct is "pure" speech or debate, a protected legislative act; if not, the court must ask: 2) Is the activity an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House, or the motivation therefore? If so, the activity or conduct may be a protected legislative act, when the privilege is necessary to prevent indirect impairment of pure speech or debate. Furthermore, simply talking about performing a legislative act or promising to perform a legislative act is not enough, the Clause protects only activities which involve references to actual legislative acts of a Member. Activity which involves a promise by a Member to perform an act in the future, to deliver a speech, to vote, or to solicit other votes at some future date is not "speech or debate." While much is often made of this holding, it is not actually necessary to go this far to reach the same result. A Member who is talking about how they will perform a legislative act in the future is simply not performing a legislative act; a promise to do something is, of course, not the same thing as doing it.[6]

---

[6]This is not to say that the Court does not envision that, during the course of performing a purely legislative act a Member might make a promise regarding a future legislative act which would thus be protected. The protection would not be as a result of the reference to the future legislative act, which would be irrelevant, but as a result of the reference being contained within a privileged performance of a legislative act.

The Ninth Circuit has formulated a two part test that activity other than pure speech or debate must meet to qualify for the privilege. *Miller v. Transamerican Press*, 709 F.2d 524, 529 (9th Cir. 1983). First, it must be "an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings." *Id.* Second, "the activity must address proposed legislation or some other subject within Congress' constitutional jurisdiction." *Id.,* (citations omitted).

While neither the limits expressed in Supreme Court case law nor the Ninth Circuit's test in *Miller* has resulted in any definitive boundary for the lower courts to apply to establish whether an activity involves speech or debate, the contours of the privilege have been tested through various practical applications and several themes have emerged to establish what type of acts or conduct are or are not protected by the privilege.

*Examples of Protected Legislative Acts:*

In *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 505 (1975), the Supreme Court considered a civil complaint brought by a servicemen's organization against the Chairmen of the Senate Subcommittee on Internal Security, nine other Senators, and the Chief Counsel of the Subcommittee to enjoin the implementation of a subpoena to a bank where the organization held its accounts charging that the authorizing resolutions were an unconstitutional abuse of power and that the 'sole purpose' of the subpoena was to harass, chill, punish and deter the organization's members in their exercise of their rights and duties under the First Amendment. *Id.*, at 495.

In determining whether particular activities other than literal speech or debate fell within the 'legitimate legislative sphere' the Court first directed an inquiry into whether the activities took place 'in a session of the House by one of its members in relation to the business before it.' *Id.*, at 503-504 (citing *Kilbourn*, *supra*.) Specifically, the Court examined the activity to determine whether it was "'an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either

House.'" *Id.*, at 504 (citing *Gravel*, 408 U.S., at 625.) The Court found the power to investigate and to do so through compulsory process plainly fell within that definition, noting that the power to investigate is inherent in the power to make laws. *Id.*, at 504. The Supreme Court concluded that the issuance of subpoenas as an exercise of the power of inquiry is an integral part of the legislative process, and thus Members of Congress are protected for issuing a subpoena in exercise of the authority to investigate if the particular investigation is related to and in furtherance of a legitimate task of Congress. The Court considered the propriety of the actions of the subcommittee, noting that they were acting under an unambiguous resolution from the Senate authorizing the investigation, and that such authority was sufficient to show that the investigation upon which the Subcommittee had embarked concerned a subject on which legislation could be had. *Id.*, at 506. The Court cautioned, however, that the power to investigate is not unlimited, rather, its boundaries are defined by its source, and Congress is not invested with a "general" power to inquire into private affairs, and that the subject of any inquiry must be one "on which legislation could be had." *Id.*, at 504, n.15 (citations omitted).

In *United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973), the Fourth Circuit considered the presentation of overt acts, such as conferences with government officials and the procurement of various government documents, which, by themselves were proper non-legislative acts under *Johnson, supra*, but, read in the light of facts adduced at trial, might be interpreted as preparation for a subcommittee meeting, authorized by House Resolution, and as such, found them to be protected legislative acts under *Gravel, supra*. *Dowdy*, 479 F.2d at 223-224. Acknowledging that the Congressman's motives in communicating with government officials and obtaining the documents could have been for improper non-legislative purposes, the Fourth Circuit maintained that the Clause constrained inquiry into the motivation for the acts, determining that the Clause "...does not simply protect against inquiry into acts which are manifestly legislative. In our view it also forbids inquiry into acts which are purportedly or apparently legislative, even to determine if they are legislative in fact. Once it was determined, as here, that the legislative function [investigation of a

complaint to determine if formal subcommittee hearings should be held] was apparently being performed, the propriety and the motivation for the action taken, as well as the detail of the acts performed, are immune from judicial inquiry." *Id.*, at 226.

In *United States v. Swindall*, 971 F.2d 1531 (11th Cir. 1992), the Eleventh Circuit found that the government's inquiry into a member of Congress's committee assignments amounted to an inquiry into legislative acts even if the member's specific legislative acts were not mentioned because the government was allowed to argue a permissive inference that Swindall knew the details of specific statutes because of his status as a member of the committee. *Id.*, at 1543; *But see United States v. McDade*, 28 F.3d 283 (3rd Cir. 1994), discussed, *infra*.

In determining whether a non-party Congressman was entitled to invoke the privilege to prevent disclosure of the identity of the source of an article that the Congressman had inserted into the Congressional Record, the Ninth Circuit concluded that obtaining information pertinent to potential legislation or investigation is one of the "things generally done in a session of the House ... concerning matters within the legitimate sphere..." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) (internal citations omitted). The Ninth Circuit expressed its concern with: (1) practical difficulty with separating the acts of a noncongressional source from the responsive communication of congressional staff, and (2) intrusion into realms protected by the Speech or Debate Clause in that a congressman's active or passive role in legislation would necessarily be revealed in response to such questions. *Id.*, at 530. Accordingly, the Ninth Circuit held the Speech or Debate Clause prevented questioning of a non-party, former Congressman about his sources of information. *Id.*

The D.C. Circuit recently enumerated a nonexhaustive list of legislative processes protected by the Clause, which "at least includes 'delivering an opinion, uttering a speech or haranguing in debate'; proposing legislation; voting on legislation making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and 'introducing material at Committee hearings.'" *Fields v. Office of*

*Eddie Bernice Johnson*, 459 F.3d 1, 10-11, (D.C. Cir.,2006)(internal citations omitted).

The D.C. District Court reviewed this list and found that, because it was nonexhaustive, it omitted other acts that were "indisputably legislative in nature, such as the actual drafting of legislation or negotiating with *other Members* over it." *Jewish War Veterans of the United States of America v. Gates,* 506 F.Supp.2d 30, 53 (D. D.C. 2007)(emphasis added). The district court considered whether a member's gathering of information beyond the formal investigative setting is protected, and found the distinction between "formal" investigation, which is protected, and "informal" investigation, which is not, to be an "illusory"concept. The court found explained fiction thus:

> ...at the end of every protected information gathering venture is a legislative act that could in some sense be deemed "formal": a piece of draft legislation, a hearing before or investigation by a committee, a meeting to help push through a pending bill. The terms "formal" and "informal" refer only to the method by or through which information is acquired. (internal citations omitted)...Put another way, neither "method" warrants protected status unless the information is being gathered as part of, in connection with, or in aid of a legitimate legislative act.

*Id.*, at 56-57 (citations omitted). The controlling principle, explained the court, is "that a Member's gathering of information beyond the formal investigative setting is protected by the Speech or Debate Clause so long as the information is acquired in connection with or in aid of an activity that qualifies as "legislative" in nature." *Id.*, at 57 (citations omitted). The court went on to find that the Members had indisputably engaged in a series of legislative acts, most obviously the sponsorship of a bill, and, accordingly information gathering in connection with or in aid of those legislative acts were protected by the Speech or Debate Clause. *Id.*, at 57.

*Examples of Legislative Acts Not Protected*

In *Dowdy*, the Fourth Circuit considered several categories of evidence offered at trial and found two categories of evidence not protected under the speech or debate clause: 1) conversations between a Congressman and conspirators as evidence that the Congressman solicited, received, or agreed to receive, money with knowledge that the donor was paying him compensation for an official act, and 2) voluntary grand jury testimony before a federal grand jury. *Id.*, at 224.

The Second Circuit considered the presentation of a video tape of a United States Senator in the process of discussing a proposed immigration bill with an undercover agent, and ruled that the district court correctly found that the Speech or Debate Clause did not extend to discussions of this sort which "involve only the possible future performance of legislative functions." *United States v. Williams*, 644 F.2d 950, 952 (2nd Cir. 1981) (citing *United States v. Myers*, 635 F.2d 932, 937 (2nd Cir. 1980)).

In *United States v. McDade*, 28 F.3d 283 (3rd Cir. 1994), the Third Circuit held that the Speech or Debate Clause does not require dismissal of any count of an indictment simply because it refers to the defendant's status as a member of a congressional committee. *Id.*, at 291. The Third Circuit distinguished *Swindall*, *supra*, stating that "[w]hile the *Swindall* opinion contains language that may be read out of context to mean that the Speech or Debate Clause flatly prohibits proof of legislative status, we believe that a close examination of the *Swindall* opinion and its reasoning suggests that the court did not intend to adopt such a broad holding." *Id.*, at 292. "[T]he *Swindall* court rested on a much narrower argument, namely, that the legislative process and legislative independence would be undermined if prosecutors could inquire into a member's committee status *for the purpose of showing that the member had acquired knowledge of the contents of the bills considered by his or her committees.*" *Id.*, at 293 (emphasis in original). The Third Circuit found that the prohibition on legislative act evidence did not extend to promises to perform a legislative act in the future or even that "a member was thought to have performed a legislative act in the past and was paid in exchange for or because of it," and that an indictment relying on committee status to show that he was thought by those offering him bribes and illegal gratuities to have performed such acts and to have the capacity to perform other similar acts was permissible. *Id.*, at 293 (citing *Brewster*, 408 U.S. at 526-27.).

After a thorough survey of Supreme Court opinion of the Speech or Debate Clause, the Tenth Circuit, in *Bastien v. The Office of Senator Ben Nighthorse Campbell,* recognized several themes in the interpretation of the mandate. *Id.*, 390 F.3d 1301, 1314-15 (10th Cir. 2004). One important theme the court recognized was that the "broad" construction of the

clause has always been confined within the limits of formal, official proceedings. *Id.*, at 1315. The Tenth Circuit concluded that, in particular, informal contacts with constituents and other sources of information and opinion were not legislative in nature. *Id.*, at 1305-06. Relying on the want of Supreme Court opinion indicating that Speech or Debate Clause immunity extends to informal information gathering by individual members of Congress, and by the opinion in *Gravel,* 408 U.S. at 620-21, emphasizing the importance of the formality of information gathering in cases where immunity was found, the Tenth Circuit rejected the suggestion that meetings with constituents or other members of the public - either by the Senator himself or by his aides - are legislative acts to the extent that information is gathered that could affect his votes or his efforts to craft proposed legislation. *Id.*, at 1316. The Tenth Circuit analogized that extending protection to informal information gathering "would be the equivalent of extending Speech or Debate Clause immunity to debates before local radio stations or Rotary Clubs." *Id.*, at 1316.

With these guidelines and examples in mind, the Court turns to the Defendant's motions, and will first identify, from each of the motions proposing Speech or Debate Clause violations, which, if any, of the allegations are in fact protected legislative acts. The Court will then proceed to address the appropriate means, if necessary, of vindicating the privilege in each instance.

Motions To Dismiss The Indictment And The Superseding Indictment For Speech Or Debate Clause Violations (Doc. Nos. 86, 268.)

Defendant Renzi alleges that the Superseding Indictment contains three categories of allegations in violation of the clause: (1) factual allegations about what Congressman Renzi said to the proponents of land exchange legislation regarding the development of land exchange legislation, including whether specific parcels of land should be included in the exchange, Superseding Indictment ¶¶ 19, 22-23, 28(a) -(d), 28(f)-(g), 28(i)-(k), 28(t); (2) references to and descriptions of meetings between Congressman Renzi and the proponents of land exchange legislation concerning the development of that legislation, *Id.*, ¶¶ 28(b)-(d), 28(j)-(k); and (3) alleged quotes from discussions and correspondence which refer to the

development of land exchange legislation, *Id.*,¶¶ 22, 28(g), 28(i), 28(m).

Additionally Renzi noted by footnote in his reply that the racketeering count (Count 42) is also based on Congressman Renzi's legislative acts in violation of the Speech or Debate Clause, citing ¶¶ 89(a), 98, 99, 100, 101, 102, 103,104, 107 of the Superseding Indictment. For the reasons stated below, the Magistrate Judge finds and recommends to the District Court that, on its face, the superseding indictment does not violate the Speech or Debate Clause.

The government avows that its proof at trial will not include any legislative acts. (Doc. No. 157, at 8.) The Court does not pass on the government's offers of proof now, limiting this review only to the issue of whether or not the government based the charges in the indictment on Congressman Renzi's legislative acts and whether the government must *necessarily* introduce evidence of legislative acts to prove its case at trial. *See Rostenkowski,* 59 F.3d at 1300-1301 (as long as the indictment is valid, "the Speech or Debate Clause does not require pre-trial review of the evidence to be presented at trial"). Contrary to Defendant's arguments, the Court finds no basis for concluding that the government will be unable to prove the charges in the superseding indictment without proving that Renzi or staff members acting under his direction performed legislative acts. The Court finds that the government may establish the allegations with proof involving promises to vote and solicit other votes for the respective land swap proposals in return for the purchase of the Sandlin property; such promises are promises to perform future legislative acts, and as such, under *Helstoski,* are not protected. 442 U.S. at 490.

First, none of the three categories of allegations described by Defendant involve any inquiry into "pure" speech or debate: they do not involve any inquiry into how Renzi spoke, debated, voted, or anything else done on the floor or in committee, or the motivation therefore. Neither has Renzi demonstrated that any of the charges or allegations are based on conduct or activities that are an "integral part" of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other

matters which the Constitution places within the jurisdiction of either House, or the motivation therefore. Much of Defendant Renzi's contention relies on the bald allegation that "[i]n the context of land exchange development, directing a private landholder to include property in an exchange in return for a congressman's support for the legislation is a routine, manifestly legislative act akin to negotiating an amendment to draft legislation." (Doc No. 86, at 36.) Renzi's conduct alleged in the indictment *may* be routine, it *may* be "procedurally" akin to negotiating an amendment to draft legislation, and some day communication between private landholders drafting legislation in the hopes their local representative might support it, and a representative who might at some future time support such legislation *may* be provided constitutional protections befitting that relationship, but presently this Court does not find that it is protected under the Speech or Debate Clause of the Constitution. Presumably, Renzi makes this argument to convince the Court that the privilege should apply in this instance because the activity is correspondent "to things generally done" in a session of the House, as stated in *Kilbourn*, 103 U.S. 168, 204 (1881 ) and quoted as part of the two part test in *Miller*. 709 F.2d at 529. Renzi has presented no evidence aside from his assertions, and the assertions from *amicus*, that, in fact, this activity is routine. Even if it were a routine activity, however, the allegations in the indictment would not be enough, under Supreme Court precedent, or the two part test of *Miller*, to render the activity privileged.

During oral argument, counsel for Renzi directed this Court to review the *amicus* brief filed by the House of Representatives for a better understanding of the context of the particular activity at issue. (Reporter's Transcript, Arpil 30, 2009, at 11.) The *amicus* brief explains that the land exchange process resembles the negotiation of a commercial contract, and extensive negotiations between the private landholder and Members of the House or Senate are a normal and routine part of the process. (Doc. No. 198, at 11 (citing portions of testimony found in *Wash. County Growth and Conservation Act of 2006 and White Pine County Conservation Recreation and Dev. Act of 2006: Hearing on S.3636 and S.3772 Before the Subcomm. on Public Lands and Forests of the S. Comm. on Energy and Natural*

*Res.*, 109th Cong. 8 (2007)).  The brief further parenthetically describes the negotiations that took place in one particular instance between two Senators and their staff in Washington and staff from their representative state, sitting down "with all of the stakeholders, everybody from the environmental groups, the local governments, developers, power companies, water companies, Federal, state and local governments . . . ." and that it is "not unusual for a Member to negotiate regarding the parcels of private property to be included in the exchange proposal." *Id*.  Significantly, *amicus* fails to point out that the boundary negotiations referred to in that instance took place when feedback was received *after* introduction of the bill. *Id.*, at 14.  Regardless, it is not clear what legal significance Renzi places on the regularity of these negotiations.  The Supreme Court has acknowledged that "many non-legislative activities are an established and accepted part of the role of a Member, and are indeed 'related' to the legislative process," yet are non-legislative acts. *Brewster*, 408 U.S. at 524.

Relying largely on *Miller*, *supra*, Renzi states that "with respect to *land exchange legislation*, negotiations, discussions and fact-finding activities with land exchange proponents are protected as a necessary and integral predicate to effective legislating." (Doc. No. 193, at 4.)  Renzi states that in the context of land exchange legislation a Member must "necessarily engage in negotiations with land exchange proponents before legislation can be drafted and introduced" and protection for legislative fact-finding applies with particular force in this context.  (*Id*., at 4, n.3.)  Additionally, Renzi submits that at least one court has relied on *Miller* and held that the Speech or Debate Clause barred the questioning of a third party, informal advisor to a Congressman regarding the Congressman's motivations, strategies and purposes behind legislative activities. *Trunk v. San Diego*, 2007 WL 2701356 *6 (S.D. Cal. Sept 13, 2007)  The Ninth Circuit noted in *Miller* that while Congress' jurisdiction is broad, it is not unlimited, citing to the Supreme Court case *Watkins v. United States*, 354 U.S. 178 (1957).  709 F.2d 524.  In *Watkins*, the Supreme Court stated that Congress' jurisdiction certainly did not reach as far as investigations conducted solely for the personal aggrandizement of the investigator. *Id.*, at 1187.  Similarly, Congress' jurisdiction in this instance certainly does not reach as far as the illegal conduct alleged to take place in

the negotiations between the landowners and Renzi solely for the personal enrichment of Renzi. *Gravel*, 408 U.S. at 622 (Speech or Debate Clause "does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts.")

Even if Renzi's negotiations with RCC and the Aries Group were not criminal, his conduct would still not be privileged. Paragraph 19 of the Superseding Indictment alleges that it was the object of the conspiracy for Renzi to compel Company A and later Investment Group B to include the Sandlin Property in their respective land exchange proposals, in order to receive his support for the necessary legislation. The significance of this assertion is that there is a distinction between the land exchange proposal, and the actual legislation required to enable the exchange. As no evidence regarding the process of land exchange proposals in general, and these exchanges specifically was presented, very little light has been shed on the actual procedure of land exchange legislation; it is clear, however, from the demonstrative evidence before the Court that a land exchange proposal by a private party is not a "manifestly legislative act." If words mean anything, the act, by landowners, of drafting and submitting a land exchange *proposal,* even with the hope that it would result in the introduction of legislation, discussion in committee, debate on the floor and ultimately actual legislation, does not make the initial act of advancing the proposal a legislative act, even if the proposal was formulated with input by Representatives regarding what lands each Representative would find attractive if included in the proposal. Subsequent to the introduction of the legislation, if a Representative is negotiating with a land proponent, to assist the landowner in drafting a proposal, the Representative is aiding the landowner politically, in an analogous manner to aiding a constituent in securing a government contract, which the *Brewster* court considered a political activity and thus not protected. *See Brewster*, 408 U.S. at 512. Once a proposal is formally introduced, Renzi may, in fact, be correct - actions taken by the committee "negotiations, formal discussions, and fact-finding activities with land exchange proponents" - (not *potential* land exchange proponents) - are probably protected as a necessary and integral predicate to effective legislating. It is not necessary for

the government to rely upon either the introduction of the legislation itself, or any actions taken after the acts were introduced, if they were introduced, to prove its charges against the Defendant.

Renzi argues that the government erroneously suggests that the protection of the Speech or Debate Clause does not apply until legislation is introduced in Congress. The Court wants to make clear that this is not the finding it is making today. The Court is simply finding that, what is clear *in this case*, in the context of land exchange legislation, is that after the introduction of legislation, negotiations with land exchange proponents, investigations and fact finding conducted by committee members for the purposes of preparing for hearings or amending legislation or preparing speeches, or preparing to vote, *etc*., would be clearly protected. Renzi is correct that there is no artificial line drawn at the introduction of legislation. It is equally correct to state, however, that not all conduct related to legislation, or "potential" legislation, is protected. It is a matter of determining, on a case by case, conduct by conduct, basis whether the activity in question, if it is not pure speech or debate, requires an impermissible inference, or, in other words, if the privilege is necessary to prevent indirect impairment of pure speech or debate.

Comparing *Swindall*, *supra*, with *McDade*, *supra*, it becomes evident that, outside of pure speech or debate, acts that are by themselves not privileged should be protected if they require the questioner to reach an impermissible inference regarding privileged matters. Similarly, in *Miller*, the Ninth Circuit was concerned that a congressman's active or passive role in legislation would necessarily be revealed in response to otherwise innocuous questions. *See Miller, supra*. For instance, Renzi's membership on the House Resources Committee, an integral part of his participation in Congress, is not, by itself, a protected act because it is not pure speech or debate. It becomes a protected act when an attempt to draw an impermissible inference from his membership status is made. Similarly, as discussed in *Miller*, Steiger could not be questioned about the source of material he received and placed into the Congressional record because any answer he gave would reflect on whether or not his own activity was active or passive and would be tantamount to indirect questioning about

his legislative activity.

Factual allegations about what Congressman Renzi said to the proponents of land exchange legislation regarding the development of land exchange legislation, including whether specific parcels of land should be included in the exchange, references to and descriptions of meetings between Congressman Renzi and the proponents of land exchange legislation concerning the development of that legislation, and alleged quotes from discussions and correspondence which refer to the development of land exchange legislation are not protected because none of these exchanges are themselves legislative acts. Neither is it necessary, for the purpose of supporting the charges in the indictment, to draw any inference about privileged legislative acts from the challenged allegations. Like *Swindall* and *McDade*, both permissible and impermissible inferences can be drawn from the same conduct. For instance, the allowable allegation, and the allegation necessary to support the indictment, is that the land proponents were told to include the Sandlin Property in their draft legislation in order to guarantee Renzi's support for their proposed exchange. This does not require any impermissible inference regarding Renzi's legislative acts or motivation, although it does go to the motivation for RCC's and Aries' actions in including the property, buying the property, seeking out other sponsorship, *etc*., and the allegation by itself is sufficient to support the indictment. Looked at another way, inquiring into Renzi's motivation for telling the land proponents to include the property in their exchange packages, or Renzi's motivation for sponsoring the package, would draw an impermissible inference into Renzi's legislative acts, and would be privileged.[7] These inferences, however, are not

_____

[7]The Court acknowledges that it does matter not for what purpose a legislative act is being introduced, as the privilege is absolute, and no purpose can render such evidence constitutional. The distinction, however, is that acts which are not purely legislative are privileged if they are introduced for the purpose of, or require that, an impermissible legislative act be drawn into question. Conversely, the same act may be introduced when the impermissible reference is not drawn. As example, simple, everyday acts, such as being raised in poverty, or struggling in a family without health insurance, or being the victim of crime, or serving in the military, in fact a lifetime of many such acts, arguably, may serve as motivating factors behind a multitude of Congressional acts, yet no court could maintain that these acts are immune from query unless impermissible inferences were being drawn

- 23 -

necessary to support the indictment. Although Renzi may himself wish to raise these arguments in defense, it would be his privilege to waive. Likewise, whether or not Renzi informed RCC or Aries about his business relationship with Sandlin is not a legislative act, neither does the indictment require an impermissible reference be drawn from the allegation. If, on the other hand, Renzi is questioned about his relationship with Sandlin and his motivation for sponsoring or not sponsoring the land exchange acts, or including the property in the land exchange legislation, this would impermissibly make reference to his motivation for legislative acts. Again, the indictment does not rely on any reference to his motivation for including the Sandlin Property to support the charges.

Time and again courts have acknowledged that, outside of literal speech or debate, the power to investigate and conduct fact-finding is an integral part of the deliberative process. *See e.g. Gravel*, 408 U.S., at 504 (the power to investigate is inherent in the power to make laws). Preparation for an official hearing may also be a legislative act. See *Dowdy*, 479 F.2d at 223-224. What distinguishes this case from *Gravel* and *Dowdy*, however, is the absence in the indictment of the reliance on any legislative investigation or fact-finding conduct by Renzi, or the necessity of proof of a legislative act required to substantiate the charges in the indictment. It is not enough to simply state that a Member is participating in an investigation or fact-finding activity, the conduct must still be a privileged legislative act. There was no evidence presented of any legislative act of Congressman Renzi from which this Court could infer his activities might fall within the protected realm of information gathering and fact-finding; there is no evidence of Renzi "'delivering an opinion, uttering a speech or haranguing in debate'; proposing legislation; voting on legislation, making, publishing, presenting, or using legislative reports; authorizing investigations and issuing subpoenas; holding hearings or 'introducing material at Committee hearings.'" *See Fields*, 459 F.3d at 10-11. Despite Renzi's efforts to paint his activities with the same brush as *Miller* or *Gravel*, the demonstrative evidence submitted by Defendant Renzi clarifies that Renzi was

therefrom.

not participating in "fact-finding" or "investigatory" activity, and no amount of labeling it such will make it so. The evidence before the Court does demonstrate that, although originally Renzi did not want to see RCC representatives during a trip to D.C., in January, 2005, Renzi called Hegner and Glass into Renzi's office to speak privately with them, Renzi was very excited and interested about the Sandlin Property, and when Renzi was questioned about his association with Sandlin he became agitated and Glass agreed to try to put the property in the land exchange agreement. (Doc. No. 106, at. Ex. 7.) In February, 2005, a similarly "informative" meeting took place. (*Id.*, Ex. 8.) A similar exchange took place between Aries and Renzi in Flagstaff, in March or April, 2005, Renzi "directing" Aries to buy the Sandlin Property to include in the Aries land exchange package. (*Id.*, Ex. 22.) No stretch of the imagination renders these meetings Congressional "fact-finding" or "investigation." Neither is Renzi's conduct "indisputably legislative in nature, such as the actual drafting of legislation or negotiating with *other Members* over it." *See Jewish War Veterans,* 506 F.Supp.2d at 53. There is in fact no "gathering of information", but, even if there were, there is no allegation of any legislative act or any action taken within the legislative sphere or any act which is clearly a part of the *due functioning of the legislative process*, which would render potential information gathering protected. *Jewish War Veterans,* 506 F.Supp.2d at 53. What is left are informal, unprotected, non-legislative acts. *See e.g. Williams*, 644 F.2d at 952 (discussions which involve the possible future performance of legislative functions); *Helstoski*, 442 U.S. at 489-90 (promises to introduce a bill); *Bastien*, 390 F.3d at 1316 (informal information gathering that could affect Senator's votes or efforts to craft proposed legislation).

Renzi's reliance on *Miller* is misplaced. Even if Renzi's communications with the landowners in this case could be categorized as "gathering information" pertinent to potential legislation, and a reading of the disputed paragraphs in the indictment indicate that this would be an inappropriate label, not all gathering of information by a Member is protected. At its heart, the Ninth Circuit determined that the conduct in *Miller* involved a clearly legislative act - Congressman Steiger, on the House Select Subcommittee on Crime, placed an article

regarding misappropriation of union funds into the Congressional Record. *Miller*, 709 F.2d at 529. The Ninth Circuit found that this act met part one of the two part test because of the Record's role in the intra-Congressional communicative process. *Id*. The second part of the test was met because of the Congressman's membership on the Subcommittee. *Id.*, at 530. The Ninth Circuit went on to find that Steiger could not be questioned regarding the source's identity, concluding that the privilege extends to questions about a Congressman's sources of information because the mere assertion of the privilege would be tantamount to an answer that the Congressman's role had been active rather than passive, and would thus constitute impermissible "questioning" about a legislative act. *Id*., at 531.

This case is distinct from *Miller*, however, because Renzi has failed to demonstrate any protected legislative act alleged in the indictment that meets part one of the test that would allow him to extend the privilege to any possible "impermissible inference" required to prove the elements of the offense. In other words, there is no allegation in the indictment, nor is there any necessary element of proof, that would require intrusion into an area protected by the privilege. The Court concedes that the subject matter itself, land exchange legislation, is within the purview of Congress, and, in particular, the Natural Resources Committee, however, that is simply not enough. If that were the test, as noted by the court in *Brewster*, it would be hard to imagine conduct that would fall outside the clause's protection. The privilege is not without bounds. Renzi has failed to demonstrate activity that is alleged in the indictment, or any necessary element of proof, that meets the *Miller* two part test to qualify for the privilege. The Ninth Circuit in *Miller* did express concern over the possibility that public exposure of the source's identity could result in adverse consequences to the source, that it could, in the case of organized crime for example, even be life-threatening to the source, and the possibility of public exposure could constrain these sources. 709 F.2d at 530. These concerns as they relate to the possibility that they might deter constituents from candid communications with their legislative representatives, however important, are mere *dicta*, and do not implicate the Speech or Debate Clause. The Ninth Circuit acknowledged the real concern, that "more to the point, it would chill speech

- 26 -

and debate on the floor." *Id.*, at 531. The court was concerned that the Congressman might censor his remarks or forgo them entirely to protect the privacy of his sources if he contemplated that he could be forced to reveal their identity in a lawsuit. *Id.*

Renzi has not adequately demonstrated to this Court how allowing this prosecution to proceed would result in any chilling effect to speech or debate on the floor. No future Congressperson could plausibly assert that contemplation of this prosecution would cause him or her to temper candid remarks on the floor or in deliberation or to pursue investigations or future fact-finding, or committee participation for fear of prosecution by an unfriendly executive and conviction by a hostile judiciary. This prosecution may cause a Member to pause to consider that just because Members "generally perform certain acts in their official capacity as [Members] does not necessarily make all such acts legislative in nature." *Gravel*, 408 U.S. at 625. This may not be an undesirable result.

The government correctly notes that, of particular significance for this case, "it is clear from the language of the Clause that protection extends only to an act that has already been performed. A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate.' Likewise, a promise to introduce a bill is not a legislative act." *Helstoski*, 442 U.S. at 489; *Brewster*, 408 U.S. at 526-27; *see also United States v. McDade*, 28 F.3d 283, 293 (3d Cir. 1994) (Alito, J.) ("the Clause prohibits only proof that a member actually performed a legislative act" in the past). *Brewster*, 408 U.S. at 512 ("a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts"), *United States v. Myers*, 635 F.2d 932, 941-942 (2d Cir. 1980) ("Since the indictment alleges a promise to perform a legislative act and not the performance of the act, there is no reason to assume that at trial the Government will be unable to abide by the constitutional restriction upon its evidence").

Accordingly, the Magistrate Judge recommends that the District Judge, after his independent review and consideration, enter an order **DENYING** Defendant's motion to dismiss the indictment because the government based the charges in the indictment on

Renzi's legislative acts and must necessarily introduce evidence of legislative acts to prove its case at trial. (Doc. No 86)

Motion To Dismiss The Superseding Indictment For Speech Or Debate Clause Violations Before The Grand Jury (Doc. Nos. 264, 327.)

As this Court has previously determined (*see* Doc No. 303) and accordingly, will not further elaborate here, in some instances, it is necessary to look behind the face of an otherwise valid indictment to determine whether the presentation of evidence to a grand jury in violation of the Speech or Debate Clause resulted in a decision by the grand jury to indict. *See United States v. Swindall*, 971 F.2d 1531, 1549 (11th Cir. 1992) ("[A] Speech or Debate violation occurs only if the evidence causes the jury to indict.")

This Court must first determine if what transpired before the grand jury itself violates a constitutional privilege. The Court must then determine, if in fact evidence of legislative acts were presented to the grand jury, if they were an essential element of proof with respect to the affected counts. *See id.*, at 1549. If legislative acts were presented to the grand jury, and were an essential element of proof with respect to any count that cannot be excised, then such counts must be dismissed. *See id.*

Although this Court will address specific allegations individually, Defendant Renzi again advances the blanket assertion that "Renzi's negotiations, discussions, and correspondence with land exchange proponents to develop and investigate *their* legislative land exchange proposals" are entitled to full Speech or Debate Clause protection because these acts are an integral part of the process by which land exchange legislation is drafted. (Doc. No. 327 at 8)(emphasis added). As already discussed in some detail above, Renzi's discussions, negotiations, and correspondence with land exchange proponents in furtherance of the development of *their* land exchange proposal are not legislative activities; even if the grand jury heard testimony about Renzi's motivation for drafting and introducing legislation, the timing and content of the introduction of bills, strategies for the consideration and passage of bills, and communications regarding the content and passage of the bills, as asserted by *amicus* (Doc. No. 198, at 46.), the charges in the superseding indictment would

be sufficient with such testimony and exhibits excised.

*Grand Jury Testimony*

Specifically, Renzi cites to excerpts of the grand jury testimony from Bruno Hegner a Resolution Copper Company executive and Tom Glass, a consultant with Western Land Group. (Doc. No. 327, Exhibits B-D.) Hegner stated that he met Congressman Renzi in January 2005, at a hotel near Phoenix, along with his district representative Joanne Keene, and a woman named Mandy Metzger. (*Id*.) Hegner presented Congressman Renzi with a briefing book explaining the project and asked Congressman Renzi for input on what properties might be appropriate for inclusion in the land exchange. (*Id*., at 15.) Congressman Renzi responded by suggesting the Sandlin Property. (*Id*.) Ultimately, Hegner was seeking Renzi's sponsorship for the exchange. (*Id*., at 16.)

In another exchange, Hegner testified that he met with Congressman Renzi and his chief of staff in Congressman Renzi's office and reported to Congressman Renzi that he was having trouble getting the Sandlin Property under contract. (*Id.*, at 21-25.) Hegner testified that Congressman Renzi's indicated, directly and aggressively, that he would not be as enthusiastic about sponsorship as he would be if it were a part of the exchange package. (*Id.*, at 26.)

Glass testified to meeting with Congressman Renzi and at a point in 2004 when it became clear that the bill would not move forward in that session of Congress, which Glass attributed to Congressman Renzi changing his mind about his reluctance to have the bill move forward without him being the prime sponsor of the legislation. (*Id.*, at 11.) Glass testified that he met with Congressman Renzi, Bruno Hegner, and Mandy Metzger, in a coffee shop at a hotel near the Phoenix airport in January 2005 to talk about moving the bill forward in the new Congress in 2005. (*Id.*, at 12-13.) At that time, Congressman Renzi asked them to take a look at acquiring the Sandlin Property, and that he would become very enthusiastic about their legislation if the Sandlin property could be included. (*Id.*, at 13-14.) The above three excerpts illustrate, much as the indictment, the error in Renzi's argument; the acts to which Renzi would draw the Court's attention are simply not legislative acts. At

most, the testimony demonstrates that, unlike the facts alleged in the indictment, an argument can be made that this is evidence of Renzi's participation in information gathering or fact finding. But even that argument doesn't carry the day because, unlike the protected acts in *Jewish War Veterans*, there is no evidence presented of any legislative act at the end of the information gathering venture here, there is no piece of legislation drafted by Renzi, a hearing before or investigation by a committee, a meeting to help push through a pending bill. *Id*. at 56-57 (Neither "method," formal or informal, information gathering, warrants protected status unless the information is being gathered as part of, in connection with, or in aid of a legitimate legislative act.) Neither has Renzi pointed this Court to a single case, precedential or otherwise, demonstrating that negotiations that occur between Members and the public, be they in the form of lobbyists or constituents or the Executive Branch, are granted constitutional immunity when no foundational legislative act is involved. The Court has carefully reviewed the excerpts submitted by Renzi in their entirety and finds no basis to dismiss the Superseding Indictment for Speech or Debate Clause violations.

*Grand Jury Exhibits*

Renzi submits that several categories of grand jury exhibits were used by the government in violation of Renzi's evidentiary privilege and requires dismissal of the Superseding Indictment. (Doc. No. 264, at 11-12.) First, Renzi notes are documents referencing, describing and directly involving the development of legislation. (GJ Exs. 7, 10, 13, 15-17, 28-29, 36-39, 41, 43, 48-49, 58, 91, 95.)[8]; documents describing Members' motivation for and performance of legislative acts (GJ Exs. 13, 29, 33, 37, 41, 60, 91, 96); documents discussing meetings about legislation (GJ Exs. 9, 91); drafting of legislation (GJ Exs. 21, 23), and documents involving the introduction of legislation (GJ Exs. 13, 44-45, 60).

As a preliminary matter, the government asserts that GJ Exhibits 7-8, 11-12, 14, 18, 20, 24-27 and 46 were removed from the Exhibit binder for the second grand jury, nor did the grand jury hear any testimony about any of these Exhibits, nor any testimony at all from

---

[8]The grand jury exhibits are found at Doc. No. 125, Sealed Exs. 28-64.

Keene or Lynch. (Doc. No. 287, at 7, Doc. No 297.)  Grand Jury Exhibits 13, 16, 23, 44-45, 55, 60 and 95-96 were available to the grand jury in the exhibit binders although there was no testimony about those exhibits presented to the second grand jury.  *Id.*  The Court will review the exhibits to determine which, if any, present privileged material.

*Documents alleged to reference, describe and directly involve the development of legislation:*

Renzi asserts that email correspondence from Joanne Keene, Congressman Renzi's former Legislative Director, with land exchange proponents on behalf of Congressman Renzi, notifying them of the progress of land exchange legislation and participating in negotiations and discussions over land exchange terms, sent from and to Keene using her U.S. House of Representatives' electronic mail account are protected under the *Helstoski* privilege.  Renzi asserts that they all contain explicit references to legislative acts and the government may not use them for any purpose, regardless of whether the emails are themselves legislative acts.

In Grand Jury Exhibit ("GJ")10, Philip Aries informs Joanne Keene, via email, that he has funds available for the purchase of the Sandlin Property.  (Doc. No. 125, Ex. 31.)  In GJ Exhibit 13 Keene informed Philip Aries that she had sent a bill to staff working for Senators McCain and Kyl, and received positive feedback.  Aries responded that his investors could use the comfort of having companion legislation "dropped" at the same time.  (*Id.*, at Ex. 34.)  Grand Jury Exhibit 15 is an email exchange between Keene and Aries regarding a change in the title, a small change in the wording of the legislation, and request from Congressman Renzi that he would like a letter from the Nature Conservancy recognizing his work on the San Pedro.  (*Id.*, at Ex. 36.)  In GJ Exhibit 16,  Keene and Aries discuss Keene's submission to Legislative Counsel, Aries' inquiry regarding whether the bill would be introduced that week, and Renzi's insistence that he have a letter from the Nature Conservancy.  (*Id.*, at Ex. 37.)  Grand Jury Exhibit 17 is an email exchange between Aries and Keene discussing Sandlin's "gossiping".  (*Id.*, at Ex. 38.)  Grand Jury Exhibit 38 is an email from Keene to Hegner, with a document attached at Renzi's request.  The document is an AP article about an environment group planning to sue the military and the U.S. Fish

and Wildlife Service over the threatened San Pedro River.  (*Id.*, at Ex. 50.)

Several of the documents Renzi finds objectionable were generated internally by the land proponents, and do not involve communications between Renzi, or his aides.

Grand Jury Exhibit 28 is an email from Mandy Metzger to Bruno Hegner, with Metzger providing Hegner with Sandlin's phone number, per their discussion with Renzi the previous day.  (*Id.*, at Ex. 45.)  Grand Jury Exhibit 29 is a memorandum from Bruno Hegner of RCC to Leigh Clifford explaining that Hegner was forced to postpone introduction of the Resolution land exchange legislation until 2005 due to "an unfortunate combination of election year politics and personality challenges within the Arizona Congressional delegation."  The memorandum continued to explain that Renzi had told one of RCC's consultants and Congressman Kolbe "on the floor of the House of Representatives" that he would stand aside and let Kolbe carry the bill in the greater interest of getting it passed, but that over the course of the last two weeks was insisting that he be the primary sponsor, which would make the project a campaign issue and they would lose democratic support for the project.  (*Id.*, at Ex. 46.)  Grand Jury Exhibit 36 is an email exchange between Hegner and Con Englehorn discussing the appraisal of the proposed purchase of the Sandlin Property. A document titled the Appelton Amendment appeared to have been attached to the email exchange but was not attached to the exhibit.  (*Id.*, at Ex. 48.)  Grand Jury Exhibit 37 are Minutes of the Joint Venture Meeting from March 15, 2005 at the RCC offices, in Phoenix, Arizona.  The minutes note that the land exchange bill was sent to the Senate legislative drafting and was expected to be introduced between March 17 and Easter, 2005.  The minutes noted that Senators McCain and Kyl are to meet on March 16 to discuss the Bill. The Sandlin Property was discussed, and the early January meeting between Hegner and Congressman Renzi was noted, wherein Congressman Renzi suggested RCC should purchase the property, owned by Sandlin, appraised at $1.5 million, with an asking price currently $6 million.  (*Id.*, at Ex. 49)  Grand Jury Exhibit 43 is a memo from Hegner to John Rickus, explaining that Hegner hoped to have the bill introduced prior to the end of business that day, but that Renzi's office was dragging their feet.  (*Id.*, at Ex. 53.)  Grand Jury Exhibit 58 is a

memorandum from Hegner to the Western Land Group in response to a request by Hegner to prepare a range of options relative to meeting Renzi's interest in securing a conservation easement at the Sandlin Property. (Id., at Ex. 59.) Grand Jury Exhibit 95 is an email from Tom Glass to the Western Land Group to inform the group that Renzi would like RCC to send a letter to the San Carlos Tribe offering to, among other things, convert their hospital to a detox center, and, in return, Renzi would request a hearing. (Id., at Ex. 95.)

Grand Jury Exhibit 39 is correspondence from Sandlin to Hegner. Sandlin informed Hegner that he had received a call from Renzi's office informing him that they had the impression that he hadn't been very cooperative concerning the water issue. (Id., Ex. at 51.)

Grand Jury Exhibit 41 is Hegner's letter to himself commemorating his discussions with Renzi in April, 2005. Hegner wrote that Renzi informed him that unless the Sandlin Property were included in the exchange package, he would not sponsor the legislation "no Sandlin property, no bill." (Id., at Ex. 41.)

Grand Jury Exhibits 48 and 49 are notes taken by Tom Glass of Western Land Group during meetings with Renzi, and appear to be in reference to the Sandlin Property. (Id., at Exs. 57, 58.)

Exhibit 91 is handwritten notes from a meeting in Renzi's office. The notes indicate that Philip Aries, Joanne Keene, Renzi, Bruce Babbit (another Congressman from Arizona), and Dave (last name unknown) attended the meeting. It was discussed at the meeting that draft legislation had made it through legislative counsel. Renzi asked them to "front $ for Sandlin"and "Philip spoke to Sandlin 2x but doesn't want to get into negotiations." Other issues regarding the appraisal and water easement on the Sandlin Property were discussed.

*Documents alleged to discuss meetings about legislation:*

Grand Jury Exhibit 9 is an email communication between Joanne Keene, District Director for Congressman Renzi and Phillip Aries, establishing a meeting time and place on April 16, 2005. (Id., at Ex. 30) Grand Jury Exhibit 91 was discussed above.

*Documents alleged to involve the drafting of legislation:*

Grand Jury Exhibit 21 is a map showing the Sandlin Property entitled "Petrified

Foreset - San Pedro River Land Exchange Act" and Grand Jury Exhibit 23 a map, entitled "Hassayampa." (Id., at Exs. 41, 42.) The government asserts that the map was prepared by Aries. (Doc. No. 297, at 8.)

*Documents alleged to involve the introduction of legislation:*

Grand Jury Exhibit 13 was discussed above. Grand Jury Exhibit 44 is an email from Hegner to Rickus to inform Rickus that "Bill introduction will take place on Thursday." (Id., at Ex. 54.) Grand Jury Exhibit 45 is group email from Hegner stating that "the Southeast Arizona Land Exchange and Conservation Act of 2005 was introduced in the House of Representatives and the Senate today. The primary sponsors are Jon Kyl in the Senate and Rick Renzi in the House. (Id., at Ex. 55.) Grand Jury Exhibit 60 is an email from Tom Glass to Josh Penry with Western Land Group regarding Renzi acting to delay bill introduction. (Id., at Ex. 60.)

Initially, the Court notes that even if the Court were to accept Renzi's assertions, that all of the grand jury testimony and exhibits that he challenges in both motions to dismiss were fatally flawed, the only counts implicated by such a ruling would be the land fraud counts, or counts 1 - 27, and one of the predicate acts of the RICO charge in count 42.

Renzi raises several arguments that must be addressed. First, Renzi asserts that, "the sheer volume of protected documents relied on by the government requires dismissal." (Doc. 264, at 15) (citing *Helstoski II*, 635 F.2d 205.) As this Court has previously discussed, the volume of evidence presented is not the standard by which the Court determines the validity of the indictment, the proper query is whether evidence of Renzi's legislative acts are an essential element of proof with respect to the affected counts. *See Swindall*, 971 F.2d at 1549. This case is distinguishable from *Helstoski II* for two reasons. First, in *Helstoski II*, the Court of Appeals acknowledged that Helstoski, unlike Renzi, was questioned before the grand jury in violation of his privilege. *Id.*, at 204. Thus, unlike a case in which the grand jury considers evidence which itself is not constitutionally barred, since the privilege is not one of nondisclosure but of nonevidentiary use, the evidence in *Helstoski* directly contravened the Speech or Debate Clause, as the very act of questioning triggers the

protection of the clause. 635 F.2d at 202. Second, in *Helstoski*, the "infection" before the grand jury could not be "excised" as the improper introduction of privileged matter permeated the whole proceeding, and, in addition, the prosecutor's reading the transcripts of testimony, previously given to each of nine prior grand juries that considered the matter, had the effect of aggravating the original error of admitting the evidence. *Id.* The trial judge described any attempt to cull out single counts of the indictment as "unrealistic", thus the Court of Appeals distinguished the factual circumstances of *Helstoski II* from *Johnson* and *Brewer. Id.*, at 205.

There is no similar difficulty in this case - the few references in this case to legislative acts presented to the grand jury are easily excised. Even giving Renzi the benefit of the doubt, and construing the privilege broader than necessary, the indictment still stands. Despite Renzi's contentions, striking the few offending overt references to legislative acts in the exhibits does not result in any insufficiency of the indictment.

This Court finds, that Grand Jury Exhibit 45 clearly references a legislative act by Congressman Renzi and was presented to the grand jury in violation of Congressman Renzi's Constitutional privilege. Without any foundational or contextual basis presented by the parties, the court can only presume that Grand Jury Exhibit 15 refers to the land exchange legislation at issue, and in an abundance of caution finds that the Grand Jury Exhibit 15 could refer to motivation for legislative acts which were actually performed, and finds that for purposes of obtaining the indictment, it should have been privileged.

Out of an abundance of caution, the Court will consider, for purposes of this motion, all documents referencing the potential introduction of legislation, privileged. In the category of Keene emails, this includes Grand Jury Ex. 16. In the category of communications generated by the land proponents themselves, this includes Grand Jury Exhibit 29, 37, 43, 44, and 60. The Court will also consider the portion of the email from Keene to Aries, informing Aries that she had sent a bill to staff working for Senators McCain and Kyl and received positive feedback privileged. The rest of the email exchange, in which Aries responded that his investors could use the comfort of having companion legislation

"dropped" at the same time, is not privileged. None of the rest of the emails to or from Keene describe legislative acts or the motivation therefore. (GJ Exs. 10, 17, 38) Some of these emails "relate" to the legislative process, but communications relating to potential legislation do not constitute protected legislative factfinding. *See Brewster, supra.*

Preliminarily, the government instructed the grand jury on the Speech or Debate Clause prior to its deliberations on the Superseding Indictment. A copy of the November 13, 2008 speech or debate colloquy was filed under seal with the Court. The Clause itself was read to the grand jury, and the grand jury was told not to consider in its deliberations any communications solely between Renzi and his legislative staff that pertained to official legislative business, nor to consider any "legislative acts" in its deliberations. The grand jury was expressly told that the focus of its deliberations should be on statements and communications made to and involving the Aries Group and Resolution Copper, as well as financial transactions involving Sandlin and Renzi. The grand jury was warned not to consider the introduction of legislation or failure to introduce legislation.

Although the Court rejects the government's argument that the documents prepared or sent by Aries, Hegner or Glass are not privileged because they do not constitute "confidential congressional documents," (see Doc. No. 287, at 8), the Court finds that there is simply no evidence that the introduction of legislative acts before the grand jury was a factor in the issuance of the indictment. First, even if the grand jury were exposed to any incidental Speech or Debate Clause material, or made any impermissible inferences therefrom, any offending documents can be stricken and the counts would still be legally sufficient. *See Dowdy*, 479 F.2d at 224; *see also Johnson*, 383 U.S. at 185. Second, outside of Renzi's blanket assertion that the simple use of legislative act evidence before the grand jury, or the sheer volume of the legislative act evidence before the grand jury, requires dismissal, which this Court rejects, both factually and legally, Renzi has failed to demonstrate to this Court how any of the alleged legislative act evidence, if excised, would be fatal to the superseding indictment. The Court has considered the evidence that it finds to be legislative act evidence, as well as the additional evidence it will consider for purposes

of this motion, as stated above and finds that, the indictment is sufficient in the absence of these documents.    Accordingly, the Magistrate Judge recommends that the District Judge, after his independent review and consideration, enter an order **DENYING** Defendant's motions to dismiss the indictment for Speech or Debate Clause violations in the Grand Jury testimony  (Doc. Nos 264, 327).

DATED this 16th day of June, 2009.


_____
Bernardo P. Velasco
United States Magistrate Judge