1
2
3
4
5
6              IN THE UNITED STATES DISTRICT COURT
7                 FOR THE DISTRICT OF ARIZONA
8
9    UNITED STATES OF AMERICA,        )
                                      )   NO.   CR 08-00212-TUC-DCB (BPV)
10                    Plaintiff,      )
                                      )
11        vs.                         )   **REPORT AND RECOMMENDATION**
                                      )
12   RICHARD RENZI, JAMES SANDLIN,)
     ANDREW BEARDALL, and DWAYNE)
13   LEQUIRE,                         )
                                      )
14                    Defendants.     )
     _____ )
15

16        On October 15, 2008, Defendant Renzi filed a motion to suppress the Title III wiretap

17   and search warrant for Speech or Debate Clause violations  (Doc. No. 89), and a motion to

18   suppress evidence the Government obtained through (1) questioning Renzi's legislative aides

19   regarding legislative acts, (2) pen registers and trap and trace devices placed on Renzi's

20   cellular telephone, (3) Renzi's subpoenaed telephone toll records, and (4) consensually

21   recorded phone calls in which cooperating witnesses questioned Renzi at the Government's

22   direction regarding legislative acts, all in violation of the Speech or Debate clause (Doc. No.

23   90). The Government filed timely responses (Doc. No. 158 and 159) and reply memorandum

24   were filed (Doc. No. 194 and 195).

25        Both matters came on for Oral Argument before the Court on December 4, 2008.

26        The Court, having considered the briefing, arguments, and evidence presented,

27   recommends that the motions to suppress be DENIED for the reasons discussed below.

28

**BACKGROUND**

On October 26, 2006, the Government filed an application to intercept Renzi's phone communications through the use of a wiretap on a cellular telephone subscribed to by the Patriot Insurance Company. (Doc. No. 106, Sealed Ex. 1.) Special Agent Odom filed an affidavit in support of the application. (Id., Sealed Ex. 2.) On the basis of information obtained from, among other sources: interviews with cooperating sources ("CS's"); review of information obtained from pen registers, caller identification devices and toll records for telephones used by Renzi, Sandlin, and others, as well as review of consensually-monitored conversations, Special Agent Odom alleged that there was probable cause to believe that Renzi had committed conspiracy, bribery of a public official, honest services mail fraud, mail and/or wire fraud, money laundering, and aiding and abetting, all in violation of federal law. (*Id.*, Sealed Ex. 2, ¶ 5.)

**MOTION TO SUPPRESS THE TITLE III WIRETAP**

I.     Defendant Renzi's Position:

The Government interviewed Renzi's current and former congressional aides and secretly recorded phone calls between Renzi and Joanne Keene, his Legislative Director from late 2002 until December 31, 2005, and between Renzi and the proponents of land exchange legislation. Renzi asserts that both the interviews and phone calls involved discussions of privileged legislative acts, which the Government then relied on in its application for the wiretap. The Government also relied on the evidence of these legislative acts, as well as further evidence of legislative acts secured through the wiretap, in its application for the search warrant for Renzi's insurance business.

Renzi asserts that Title III requires suppression of the wiretap evidence on the following grounds: (i) The communication was unlawfully intercepted; and (ii) the order of authorization or approval under which it was intercepted is insufficient on its face. *See* 18 U.S.C. § 2518 (10)(a).

Renzi also asserts that the policy reasons that support the application of the exclusionary rule to violations of constitutional rights in other contexts apply with equal

force to violations of the Speech or Debate Clause, and call for suppression of evidence in this case.

II.    Government's Position

The Government takes the position that this case is distinguishable from the case relied upon by Renzi in support of a non-disclosure facet to the Speech or Debate privilege, *United States v. Rayburn House Office Bldg., Room 2113*, 497 F.3d 654 (D.C. Cir. 2007), and that the privilege "is one of nonevidentiary use, not of non-disclosure." *In re Grand Jury Investigation*, 587 F.2d 589, 597 (3rd Cir. 1978). Moreover, the Government argues that *Rayburn* was wrongly decided.

As to the evidence used to obtain the wiretap, the Government argues that Renzi has overstated the scope of the Clause and the meaning of "legislative acts."

Regarding the use of protected material to obtain the search warrant, the Government argues, first, that the affidavit does not contain legislative acts. Second, the Government submits that the Court would have issued the search warrant even if all references to the electronic surveillance had been removed.

**DISCUSSION**

I.    THE SPEECH OR DEBATE CLAUSE AND DISCLOSURE

This Court has already discussed its understanding of the basic contours of the Speech or Debate Clause in a previous Report and Recommendation in this case (*See* Doc. No. 387), and that discussion, found at pages 6-17 of the document under the heading "Speech or Debate Clause" is fully adopted here and will not be reproduced in this Report and Recommendation.

Pertinent to the issue before the court, and not fully addressed in this Court's previous Report and Recommendations, is the question of whether or not the Speech or Debate Clause extends its protections to the disclosure of legislative acts, and, if so, what the boundaries and limitations of that privilege encompass.

This Court has already ruled, in the context of Defendant's motion for a *Kastigar* hearing, that the privilege is one of use, not non-disclosure. (See Doc. No. 303.) The

District Court adopted this ruling, finding that the protections of the Speech or Debate Clause were designed to protect Congressmen from the consequences of litigation's results and from the burden of defending themselves, but that the privilege does not extend to being free from investigation into criminal conduct. (See Doc. No. 322.)

While the Court's prior rulings are implicated in this motion, the importance of the issue of the availability or unavailability of a non-disclosure privilege is paramount to the motions addressed in this Report and Recommendation, and thus merit an expansion of the Court's previous discussion.

As the Court has previously discussed, the Supreme Court, in its rulings in *Brewster*, *Gravel*, and *Helstoski*, refined the scope of the term "legislative act," but did not address the issue of a non-disclosure privilege. *United States v. Brewster*, 408 U.S. 501 (1972); *United States v. Gravel*, 408 U.S. 606 (1972); *United States v. Helstoski*, 442 U.S. 477, 490 (1979).

After remand in *Helstoski* the United States Court of Appeals, Third Circuit, specifically considered the extent of the privilege granted under the Speech or Debate Clause and found the privilege to be "not one of nondisclosure but of nonevidentiary use" as well as "testimonial in nature" such that a Congressman may not be required to testify to a legislative act even in third party cases. *United States v. Helstoski*, 635 F.2d 200, 203-04 (3rd Cir. 1980); *see also In re Grand Jury Proceedings (Cianfrani)*, 563 F.2d 577 (3rd Cir. 1977)("The privilege is not one of nondisclosure, but of nonevidentiary use . . . permit[ting] legislative actions, as well as free and unfettered legislative debate, without exposing the legislator to criminal liability."); *In re Grand Jury Proceedings (Eilberg)*, 587 F.2d 589 (3rd Cir. 1978)(in addition to testimonial privilege, the Speech or Debate Clause, unlike privileges such as attorney-client, physician-patient, or priest-penitent, the purpose of which is to prevent disclosure which would tend to inhibit the development of socially desirable confidential relationships, "the Speech or Debate privilege is at its core a use privilege.")

The D.C. Circuit rejected the Third Circuit's approach in *Brown & Williamson Tobacco Corp.*, 62 F.3d 408 (D.C. Cir. 1995). In *Brown & Williamson*, two Congressmen, the subjects of subpoenas *duces tecum*, but not parties, in a civil suit, filed a motion to quash

the subpoenas on the ground that the Speech or Debate Clause excused them from compliance. *Id.* at 412. The D.C. Circuit explained that the testimonial privilege included a privilege against responding to a civil subpoena. In doing so, the D.C. Circuit embraced the Ninth Circuit's holding in *Miller v. Transamerican Press, Inc.*, 709 F.2d 524 (9th Cir. 1983), that asserting the Clause in a purely testimonial context in no way limited its applicability; that "[o]nce the legislative-act test is met, the privilege is absolute." *Brown & Williamson*, 62 F.3d at 418 (citing *Miller, supra*; and *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503 (1975)). The D.C. Circuit clarified that once the legislative act test was met, the purposes behind the subpoena were irrelevant because the privilege was designed to protect the functioning of Congress. *Brown & Williamson*, 62 F.3d at 418-19. The court considered that a distinction between civil and criminal cases did not really square with the Supreme Court's statement's in *Eastland* that the Clause's prohibition, when applicable, is "absolute," but acknowledged that "*Gravel's* sensitivities to the existence of criminal proceedings against persons other than Members of Congress at least suggest that the testimonial privilege might be less stringently applied when inconsistent with a sovereign interest, but is "absolute" in all other contexts." *Id.* at 419-20. The real touchstone, the court held, is not the nature of the use to which documents will be put – testimonial or evidentiary – but interference with legislative activities; "documents or other material that comes into the hands of congressmen may be reached either in a direct suit or a subpoena only if the circumstances by which they come can be thought to fall outside 'legislative acts' or the legitimate legislative sphere." *Id.* at 421.

Approximately five months before the Government applied for the wiretap in the investigation of Congressman Renzi, the FBI raided the congressional office of Congressman William J. Jefferson. *Rayburn,* 497 F.3d at 657. Congressman Jefferson challenged the constitutionality of the search of his congressional office and moved for return of the seized property pursuant to Fed.R.Crim.P. 41(g), arguing, *inter alia*, that the issuance and execution of the search warrant violated the Speech or Debate Clause because they afforded Congressman Jefferson no opportunity to assert the privilege before the Executive "scoured

his records." *Id.* at 657, 662.  Although the District Court upheld the constitutionality of the raid, *In re Search of the Rayburn House Office Bldg. Room No. 2113*, 432 F.Supp.2d 100 (D.D.C. 2006), on review, the D.C. Circuit reversed.  The Circuit Court reiterated that "[t]he bar on compelled disclosure is absolute,... and there is no reason to believe that the bar does not apply in the criminal as well as the civil context.  *Rayburn*, 497 F.3d at 660 (citing *Eastland*, 421 U.S. at 503).  The majority in *Rayburn* held that the testimonial privilege under the Speech or Debate Clause extends to non-disclosure of written legislative materials. *Id.* at 660-61.

Circuit Judge Henderson, concurring in the opinion, but disagreeing with the majority's reasoning and dicta, stated that "to conclude that the Clause's shield protects against *any* Executive Branch exposure to records of legislative acts would jeopardize law enforcement tools "that have never been considered problematic." *Id.* at 671 (Henderson, concurring in judgment)(citations omitted)(emphasis in original).  Circuit Judge Henderson opined that the Executive Branch's execution of a search warrant on a congressional office - with its unavoidable but minimal exposure to records of legislative acts - does not constitute questioning within the meaning of the Speech or Debate Clause, and further commented that:

> If Executive Branch exposure alone violated the privilege, 'agents . . . could not conduct a voluntary interview with a congressional staffer who wished to report criminal conduct by a Member or staffer, because of the possibility ... that the staffer would discuss legislative acts in ... describing the unprivileged, criminal conduct.'  Such a rule would also 'presumably apply to surveillance of a Member or staffer who might discuss legislative matters with another Member or staffer.'  Furthermore, '[d]epriving the Executive of the power to *investigate* and prosecute and the Judiciary of the power to punish bribery of Members of Congress is unlikely to enhance legislative independence.'

*Id.* at 672-73. (citations omitted)(emphasis in original).

As this Court has previously stated, the majority in *Rayburn* erred by broadly defining the testimonial privilege to include a non-disclosure privilege.  While the Supreme Court has not addressed this issue specifically, the Court has extended the privilege to matters beyond pure speech or debate only when such use is consistent with the history and purpose of the Clause.  *See e.g., Gravel*, 408 U.S. at 624-25.

Specifically, the *Rayburn* Court erred by relying on its prior rejection in *Brown & Williamson* of the Third Circuit's conviction that "democracy's 'limited toleration for secrecy' is inconsistent with an interpretation of the Speech or Debate Clause that would permit Congress to insist on the confidentiality of investigative files." *Rayburn*, 497 F.3d at 660. The Supreme Court, however, has never held that the protections of the Speech or Debate Clause are grounded in the legislature's need for confidentiality. In fact, the very opposite is implied from the nature of the protections bestowed by the Clause, protections designed to encourage candor and openness in speech or debate "in either House." U.S. Const. Art. I, § 6, cl. 1.

The *Rayburn* court considered protection of confidential communications central to its reasoning that compelled disclosure resulting in even incidental review of legislative materials by agents of the Executive "clearly tends to disrupt the legislative process" because "exchanges between a between a Member of Congress and the Member's staff or among Members of Congress on legislative matters may legitimately involve frank or embarrassing statements; the possibility of compelled disclosure may therefore chill the exchange of views with respect to legislative activity." *Rayburn*, 497 F.3d at 661. The Supreme Court, however, has never extended the privilege under the Clause to the protection from discovery of communications merely because they are confidential.

The Supreme Court has considered the privilege of confidentiality and the very important role it plays in governmental functions, and balanced that with the legitimate needs of the judicial process in the context of a third party subpoena *duces tecum* served on the President in a criminal case in *United States v. Nixon*, 418 U.S. 683, 708 (1974). To the extent a privilege of confidentiality is required for the effective discharge of a representative's responsibilities, and that such privilege is rooted in the separation of powers under the Constitution, the Supreme Court has explained that such a presumptive privilege "must be considered in light of our historic commitment to the rule of law." *See Nixon*, 418 U.S. at 708. Privileges

designed by the Court to protect weighty and legitimate competing interests "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Id.* at 709-710. The Court weighed the importance of the general privilege of confidentiality of Presidential communications in performance of the President's responsibilities against the "inroads of such a privilege on the fair administration of criminal justice" and held that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice:

> [W]e cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution. On the other hand, the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts. A President's acknowledged need for confidentiality in the communications of his office is general in nature, whereas the constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a criminal prosecution may be totally frustrated. The President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases.

*Id.* at 711-13.

Together, the Supreme Court's holding in *Gravel*, that the Speech or Debate Clause does not provide a privilege to "violate an otherwise valid criminal law in preparing for or implementing legislative acts," 408 U.S. at 626, and in *Nixon,* that a generalized interest in confidentiality cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice, 418 U.S. at 713, unequivocally demonstrate that *Rayburn* got it wrong in concluding that the context of the case is irrelevant to the outcome.

Even if *Rayburn* was not wrongly decided, it is distinguishable from this case. Judge Henderson noted that the difference between a warrant and a subpoena was of critical importance;

- 8 -

> Answering a civil subpoena requires the individual subpoenaed to affirmatively act; he either produces the testimony/documents sought or challenges the subpoena's validity. In contrast, a search warrant requires that the individual whose property is to be searched do nothing affirmative....The FBI agents' execution of the warrant on Rep. Jefferson's congressional office did not require the latter to do anything and accordingly falls far short of the "question[ing]" the court in *Brown & Williamson* found was required of a Member in response to a civil subpoena.

*Id.* at 669.

Likewise, no affirmative action on Renzi's behalf is complained of here. There is no testimonial privilege implicated. The use of any recorded communications is protected by the Clause. The privilege reaches only as far as it must so that a member "may not be made to answer – either in terms of questions or in terms of defending himself from prosecution" for his legislative acts. *Gravel*, 408 U.S. at 616.

Although Renzi asserts that the Ninth Circuit in *Miller* also supports his position because the Ninth Circuit held that a Congressman could protect his sources of information from disclosure, the Ninth Circuit concluded that the privilege extended to "questions" about a Congressman's sources of information, clearly a protection falling within the testimonial privilege after it was first determined by the Ninth Circuit to concern matters falling within "the legitimate legislative sphere." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530-31 (9th Cir. 1983). Unlike, *Miller*, however, there is no testimonial privilege implicated by the wiretap in this case.

II.    THE WIRETAP APPLICATION DOES NOT CONTAIN *PER SE* VIOLATIONS OF THE SPEECH OR DEBATE CLAUSE

Renzi asserts that the Affidavit of Agent Odom specifically and improperly included, as an exception to the minimization procedures utilized, conversations related to the legislation referenced in the affidavit, which would be fully monitored and reviewed.

Renzi suggests that the Speech or Debate Clause is violated the moment the government "denie[s] the Congressman any opportunity to identify and assert the

privilege with respect to legislative materials before their compelled disclosure to Executive agents." (Doc. No. 89, at 9)(citing *Rayburn*, 497 F.3d at 662.) The Government asserts that this strict interpretation would allow for no interception of legislative conversations of a Member of Congress. This would make them, contrary to the purpose of the Clause, "super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516. Renzi responds that it is not the case that electronic surveillance can never be used in an investigation of a Member of Congress, but rather than when the government uses this investigative device against a Member, it must not target and seize legislative act evidence. (Doc. No. 194, Reply, at 2.) Renzi asserts that in future cases the government may need to enact special procedures or involve the district court in an early review of seized wiretap evidence to protect the Speech or Debate Clause privilege, but, nonetheless, this is not a case where the government in good faith tried to limit violations of the Speech or Debate Clause prior to and during the wiretap period. Rather, the violations were intentional. This Court disagrees.

The Title III application sought and received permission to intercept conversations related to the legislation referenced in the affidavit to be fully monitored and reviewed. (Sealed Ex. I, Title III App, Order Authorizing Interception of Wire Communications ("Title III Order")) The Government's minimization memorandum to the federal agents responsible for monitoring the wiretap instructed the agents that:

> Unlike the other privileges about which you have been advised, the Speech or Debate privilege does not prohibit monitoring agents from listening to or recording the conversation in which activities are discussed.

(Excerpt from USAO's minimization memorandum, October 25, 2006)

First, as discussed above, the passive interception of communications does not implicate the testimonial privilege of the Speech or Debate Clause. Even if it did, there is less support for this argument when the target telephone in this case was

subscribed to by the Patriot Insurance Agency, and was not an official line in Renzi's office, or a cell phone maintained by his office.

Second, even if it were found that the interception of communications implicated the testimonial privilege, the interception was not without prior judicial oversight. The District Judge who issued the Title III Order found probable cause to believe that the cellular telephone being intercepted was being used in the ongoing commission of the offenses of, among others, bribery of a public official, honest services mail fraud, and money laundering. The order was issued authorizing the interception of communications aimed in furtherance of the investigation, including conversations related to the legislation referenced in the affidavit, to be fully monitored and reviewed. Even if the Court were inclined to recognize a disclosure privilege it is an oversimplification to state that the wiretap application contained *per se* violations of the Speech or Debate Clause. While it is true that the possibility of exposure to legislative acts existed and was contemplated by both the order and memorandum, the possibility was minimal considering the minimization procedure in place for conversations that did not relate to the investigation, in conjunction with the Supreme Court's holding that the "protection extends only to an act that has already been performed. A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate." *Helstoski*, 442 U.S. at 489-90. Because the investigation contemplated communications concerning promises to perform legislative acts at a future date, it was highly unlikely that communications concerning legislative acts that had already been performed related to this investigation would be intercepted. The order was not overly broad, but contemplated communications expected to concern the specifics of the enumerated offenses, including: the scope of the illegal scheme being perpetrated by Renzi and Sandlin and others through *the promise* to introduce land exchange legislation in the past or in the future; the existence of business entities or accounts being used to facilitate the offense; the existence of records created in furtherance of the offense; the location of

sources of resources used to finance the offenses; and the nature and extent of the coverup. (Title III Order at 2)(emphasis added). The monitoring of conversations would be suspended if the conversation was not criminal in nature or otherwise related to the offenses under investigation. The Title III Order specifically did not include the monitoring of legislative acts themselves, but *the promise* to perform legislative acts - the crux of the Government's charges in this case; clearly not in violation of the Speech or Debate Clause.

Renzi provides examples of what he argues are the Government's use of protected legislative acts used in the Title III Affidavit.

### 1. Information obtained from Philip Aries

> Renzi, a member of the House Committee on Natural Resources, took an interest in possible land exchanges between investors and the federal government during his second term in office. On two occasions he pressured investors to include a portion of the Sandlin property in their land exchanges. On the first occasion, Renzi said "no Sandlin, no deal" to representatives from the Resolution Copper Company (RCC).

Title III Aff. ¶ 26(a).

> In December 2004, RCC met with Renzi and discussed Renzi sponsoring federal legislation in the United States Congress that would allow for the previously discussed land exchange. Renzi reviewed the lands acquired by RCC and advised he would introduce the legislation by March 2005. (Prior to December 2004 RCC had approached Congressman Jim Kolbe to introduce a Congressional bill that would authorize the land exchange, because RCC's consultant felt that Renzi would not have the political capital to introduce the bill. Due to the federal elections, RCC decided to ask Renzi to introduce the bill in 2005 because Renzi is the representative for the district where the proposed mining project would occur.) ... Renzi advised RCC to add an additional piece of property to the land exchange proposal.

Title III Affidavit, ¶ 29-30.

> On or about April 16, 2005, the individual who became CS-4, a Tucson-based land developer, met with CS-1 and Renzi in Flagstaff, Arizona and discussed a land exchange proposal that CS-4 wanted Renzi to introduce in the United States Congress . . . . Renzi told CS-4 about the Sandlin property (mentioned above) and directed that CS-4 include the Sandlin property in his exchange package . . . . According to CS-1, the inclusion of the Sandlin property was very important to Renzi.

Title III Affidavit, ¶ 34.

> CS-4 advised that he had spoken with Renzi about sponsoring a land exchange package but CS-4 was in need of financial assistance. As part of the land exchange package, Renzi had directed CS-4 to include a 480 parcel of land near Sierra Vista, Arizona owned by Sandlin. CS-2[1] understood that the Sandlin property was important to the exchange because of some water issue concerning Fort Huachuca . . . .
>
> In addition, CS-4 was told by Renzi that Renzi had spoken with Congressman Richard Pombo, Chairman of the House Committee on Resources, and he had garnered Pombo's support for CS-4's land exchange proposal . . . .
>
> The reason CS-2 purchased the property was because Renzi reassured him that the Sandlin property had to be included in their land exchange before Renzi would support the legislation.
>
> CS-2 explained that once he and the other investors purchased the Sandlin property, Renzi lost interest in their land exchange proposal. Several months ago, CS-2 was told by his staff that Renzi did not want to sponsor his land exchange because the Sandlin property was in Congressman Kolbe's district.

Title III Affidavit, ¶ 61, 62, 66.

This information obtained from Philip Aries is not legislative act evidence for several reasons. This Court previously discussed, and fully adopts here, the reasoning and findings issued in its Report and Recommendation (Doc. No. 387) as they apply to Renzi's negotiations with the land exchange proponents. They apply with equal force in this context. The one exception to this finding is the excerpt from ¶ 62 in which Renzi informs Aries about his own past legislative act, *i.e.*, garnering support from Congressman Pombo, this information is protected.

The affidavit also asserts that "RCC's land proposal was eventually sponsored by Renzi, without the Sandlin property, in May 2005." The Court finds that this is protected legislative act evidence.

### 2. **Information Obtained From Joanne Keene.**

---

[1] Renzi states that "CS-2" is believed to be Guy Inzalaco, and asserts that Inzalaco had information about Renzi's legislative acts from having worked with him on legislation. Renzi does not expand on the nature of the relationship between Inzalaco and Renzi, or Aries, nor on the nature of the legislative acts Renzi "worked with him on."

CS-1 was shown a draft document pertaining to the proposed CS-4 land exchange legislation. CS-1 recognized the document as being a draft Bill proposal of the CS-4 land exchange from 2005, to be sponsored by Renzi. CS-1 explained that after she initially received this document from legislative counsel, CS-1 forwarded a copy to CS-4 for his review. CS-1 remembered Renzi requesting a copy of this document for his review as well. Based on the context of the interview with CS-1 and the date footer on the bottom of the draft legislation, I believe this was shown to Renzi in April 2005 . . . . Renzi to date has not introduced a land exchange package with the Sandlin property . . . . CS-1 recalled that Joe Galli (Renzi's former campaign manager) was also proposing a land exchange at this time, and had proposed that his exchange include the same property that PPFLI was to receive for their property exchange proposal . . . . CS-1 noticed that Renzi lost interest in the CS-4 land exchange proposal.

Title III Affidavit, ¶ 42-44.

On May 3, 2006, CS-1 learned from one of Renzi's staffers, Nick Strader, that Strader and Lucy Murfitt, Senator Jon Kyl's legislative counsel, would be meeting within a few days to discuss the CS-4 land exchange proposal.

On May 11, 2006, CS-1 received a telephone call from Strader and advised that he had spoken with Murfitt, and the CS-4 land exchange proposal was "dead." Strader did not understand why the proposal was not moving forward but would attempt to find out why.

Title III Affidavit, ¶ 48-49.

Renzi: Originally, I remember McCain's people saying that we were looking at maybe doing a land exchange and having different parcels involved, um my memory is pretty clear that . . . we needed a piece that would help solve the San Pedro water issue. It wasn't necessarily they said specifically that ranch, they said you know . . . we'd like to see something involved that's going to help the San Pedro. And that's when I said . . . we got that ranch down there doing alfalfa.

CS-1: Well I think that was brought up when we were looking at the um, the amendment for the, the lower San Pedro partnership when Kevin first came over. And as far as this land exchange, I don't remember McCain, we didn't' really even have McCain's involvement . . . But I remember this first came up . . . when we talked to Resolution about it and then we met with Phil about it and then that's kind of how, and Phil had already kind of had a land exchange package together, he was putting all the pieces together, and then, this was brought up that this would be a good piece for, you know, if the Nature Conservancy wanted this . . . .

Title III Affidavit, ¶ 54.

CS-1: Which is what we met with Philip about up in Flagstaff and that's when we were talking about when you talked to [Representative] Pombo about the hearing and the land exchange hearing . * * *

Renzi: I know exactly how I got, uh, Philip going on, um, the San Pedro piece, because I remember somebody talking to McCain's people and we were saying, oh boy, you know, another uh, legislative land exchange . . . we need a Senate strategy, we need a McCain strategy . * * *

Renzi: You know what are we gonna do, and somebody came back to me, I'm not saying it was you, but somebody came back to me and said you know Mc, McCain wouldn't mind getting' behind you . . . but we need, he, he'd like to see something that solves the San Pedro issue, and that's when the light bulb went on to me and I said oh, ok well let's, let's, let's mention the Sandlin piece to uh, to Philip. * * *

Renzi: (UI) Philip, I mean, yeah if Phil had kept the package together, [Representative] Kolbe and Kevin were gonna move it and I would've shepherded it through resources for 'em. Um, but, supposedly the Florence package dropped out, I heard supposedly that they were moving to a better package over in, in Buckeye, then I heard that the, the Florence package had spotted owl issues.

Title III Affidavit, ¶ 55.

Renzi argues that these excerpts illustrate that the Government relied on improperly obtained legislative act evidence in the Title III Affidavit. The Government argues, correctly, that the material in ¶ ¶ 42-44 of the Odom Affidavit, referring to draft legislation from Aries, is not a legislative act. Keene was simply identifying a document prepared by the land exchange proponent, Philip Aries.

The material in ¶ ¶ 48-49 of the Odom Affidavit, referring to Keene's conversation with staffers, as well as the consensually recorded conversations at ¶ 54-55 between Keene and Renzi, does contain references to legislative act evidence.

Renzi argues that pursuant to Title III, exclusion is the remedy for an illegally obtained warrant. The Court finds, however, that the material that contains reference to legislative acts was of negligible significance in and immaterial to the determination of probable cause, and its inclusion in the affidavit does not warrant suppression of evidence obtained from the Title III wiretap. *See generally Giordano v. United States*, 416 U.S. 505 (1974); *United States v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985).

III.  THE EXCLUSIONARY RULE DOES NOT REQUIRE SUPPRESSION OF ALL EVIDENCE OBTAINED PURSUANT TO THE TITLE III WIRETAP AND SUBSEQUENT SEARCH WARRANT

Renzi asserts that the Government recorded hundreds of phone calls between Renzi and other Members of Congress, as well as between Renzi and his aides.  These phone calls often reflected legislative acts, and were not filtered out or withheld from the prosecution.  No calls were reviewed by a taint team for Speech or Debate Clause issues.

Renzi provides several examples of protected calls in his motion, including calls between Renzi and his congressional aide, Nicholas Strader (Call No. 2977 (Sealed Ex. 73, at 307 and Call No. 2995 (Sealed Ex. 74, at 2)); and between Renzi and his Chief of Staff Patty Roe (Call No. 2059 (Sealed Ex. 82, at 7)).  For purposes of this motion, the Court finds these calls are protected under the Speech or Debate Clause.

Renzi also refers to Call No. 2239 (Sealed Ex. 72, at 4, 7), a call between Renzi and Aries, which includes reference to a conversation Renzi had with Representative Jim Kolbe about draft legislation as well as his motivation for pursuing a particular legislative land exchange.  As this Court has already found, Renzi's negotiations with the land proponents are not protected, as fact-finding material or otherwise.  The reference to the conversation Renzi had with Kolbe's Chief of Staff, at page 7 of the transcription, the fact that the conversation occurred, and the fact that Kolbe was "elated to take this and run with it" is protected.  The rest of the conversation between Renzi and Aries is not protected.

Similarly, calls between Renzi and Brian Murray whom Renzi asserts was his *former* Chief of Staff, were partially minimized but spot checked and transcribed. (Call No. 3355 (Sealed Ex. 78, at 6);Call No. 3417 (Sealed Ex. 79, at 5-6)).  These calls contain protected legislative act evidence.

Calls between Renzi and various Representatives discussing legislative business, or even, for purposes of this motion, political business, this Court finds protected. (Call No. 3002 (Sealed Ex. 75)(Call No. 3065 (Sealed Ex. 76)).

A call between Renzi and Maria Baier (Call No. 1997) is not described here because Renzi has asserted an attorney client privilege over this call and the Government has agreed not to provide the transcript to co-defendants in discovery. The Court finds, however, for purposes of this motion, that the call is not protected Speech or Debate material.

The Government also recorded sixteen other calls between Renzi and other Members of Congress (Call's Nos. 2434, 2687, 2690 (Rep. Patrick Kennedy); 2778 (Rep. Eric Cantor); 2783 (Rep. Jack Kingston); 2793 (Rep. Tom Cole); 2871 (Rep's. Deborah Price and Tom Reynolds); 2876 ( Rep. John Carter); 2877 ( Rep. Trent Franks); 2902, 3058 (Rep. Adam Putnam); 2962 (Rep. Marsha Blackburn); 3125 (Rep. J.D. Hayworth); 3236 (Rep. Kay Granger; and 3240 (Rep. John Boehner)). Renzi asserts that in many of these conversation, Members discuss who they plan on voting for in upcoming election to fill House Republican leadership positions.  The Court finds that these calls are protected, as is the call between Renzi and an official of the Department of Homeland Security.  (Call No. 3345).

Renzi argues that all of the policy reasons that support the application of the exclusionary rule to violations of constitutional rights in other contexts apply with equal force to violations of the Speech or Debate Clause.  Few courts have had occasion to consider the application of the Speech or Debate Clause in this context. Recently, the District Court for the Eastern District of Virginia considered former-Congressman Jefferson's motion to suppress all evidence seized from his congressional office. *United States v. Jefferson*, 615 F.Supp.2d 448 (E.D. Va 2009). Although the District Court found the reasoning of Judge Henderson in *Rayburn*, *supra*, "appealing," the District Court declined to reconsider the lawfulness of the search. *Id.* at 451.  The District Court, however, proceeded to reject the application

of the exclusionary rule in that case, finding persuasive *United States v. Leon*, 468 U.S. 897 (1984).

In *Leon*, the Supreme Court opined that "the exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered." 468 U.S. at 906 (citation and internal quotation marks omitted). Instead, the rule represents "a judicially created remedy designed to safeguard ... [constitutional] rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id*. (citation and internal quotation marks omitted). Based on these principles, the Supreme Court held that evidence obtained in objectively reasonable reliance on a warrant is admissible even if the warrant is determined subsequently to be invalid. *Id*. at 922.

Similarly, in this case, there is no indication that the Government did not act based on a good faith interpretation of the law, as reflected in the district court's prior approval of the Title III application. Renzi contends that concern expressed by Alice Fisher, the former Assistant Attorney General for the Criminal Division of the Department of Justice about the wiretap based in part over the "recent controversy concerning whether the Department of Justice was overaggressive in obtaining and executing a search warrant in U.S. Representative William Jefferson's Congressional office" (Doc. No. 89, Ex. D) amounts to an admission by the Government that the wiretap could be unconstitutional, and that the Department of Justice took a chance that the courts would uphold its efforts "to make an end run around the Speech or Debate Clause." First, its not clear that the concern that the Department of Justice was being overaggressive amounts to the same thing as a concern that the Department of Justice was operating outside the bounds of law. The decision to investigate and indict Renzi just weeks before a federal election continues, three years later, to reverberate politically, as evidenced by Defendant's own motion and exhibits. (See Doc. No. 451 and Exhibits) This Court cannot assume that Fisher was necessarily concerned with legal, rather than political, aggression. Second, there was no, and

continues to be no, binding precedent that would prohibit the issuance of the Title III

Order in this case. Finally, the decision in *Rayburn* wasn't final until the Supreme

Court denied the petition for writ of certiorari on March 31, 2008, well after the

application was submitted in this case. *United States v. Rayburn House Office Bldg.,*

*Room 2113*, 128 S.Ct. 1738 (March 31, 2008). Given the state of the law at the time,

the agents' reliance on the warrant issued by the district court was objectively

reasonable. Given this, there is no good reason to believe that the blanket suppression

in this case, of evidence not protected by the Speech or Debate Clause, would have

any deterrent effect, hence suppression of all evidence derived from the wiretap is

unwarranted.

Renzi submits that the Search Warrant affidavit relies on evidence of Renzi's

protected legislative acts. These allegations include: Renzi's representation "to

prospective buyers that the SANDLIN property had to be included in a proposed land

exchange package in order for Renzi to back the package in Congress. The

investigation also involves subsequent attempts to reinvigorate the land exchange."

Search Warrant Aff. ¶ 4(b). Renzi asserts that there are other similar allegations

throughout the search warrant. (Doc. No. 89, citing Search Warrant Aff. ¶ 9; ¶ 43; ¶¶

46; and ¶¶ 49-50.) The Court finds that these excerpts, as argued by the Government

and as previously discussed by this Court, are not protected legislative acts.

Renzi also asserts that the Government relies on improper wiretap evidence in

the Search Warrant Affidavit, *see* ¶¶ 6(a), 60 n.8, 66, 78, 87. These paragraphs do

include protected material, *per se*, but only refer to information gathered from the

wiretap, and as such, are not excludable under this Court's recommendation above.

The Search Warrant Affidavit contains neither protected legislative acts nor

other excludable evidence. However, even if the District Court were inclined to

disagree with this Court's recommendation above and suppress all evidence obtained

from the wiretap, Court finds that, based on the trivial role these references played in

the application, probable cause would still have existed to issue the warrant.

**MOTION TO SUPPRESS INTERVIEWS, CONSENSUALLY RECORDED PHONE CALLS, AND CELLULAR PHONE RECORDS FOR SPEECH OR DEBATE CLAUSE VIOLATIONS**

Renzi's second motion to suppress involves evidence the Government obtained through (1) questioning Renzi's legislative aides, (2) pen registers and trap and trace devices placed on Renzi's cellular telephone, (3) Renzi's subpoenaed telephone toll records, and (4) consensually recorded phone calls in which cooperating witnesses questioned Renzi at the Government's direction. (Doc No. 90)

The Government does not contest the basic facts of Defendant's motion. The government interviewed five of Congressman Renzi's aides during the investigation, including Joanne Keene ("CS-1"), Karen Lynch, James Jayne, Kevin Messner and Nicholas Strader. The government also procured from Keene, Lynch and Strader documents that taken from Congressman Renzi's office. The government then used these documents, which included draft legislation, internal congressional email, and Congressman Renzi's daily schedules, in its investigation and as grand jury exhibits.

The government also directed Keene and the proponents of legislative land exchanges to secretly record their telephone conversations with Congressman Renzi and to question him about his legislative acts. *See* Sealed Ex. 3 (Affidavit of FBI Special Agent Daniel E. Odom in Support of Search Warrant ¶¶ 48(e), 58) ("Search Warrant Aff."). The government used pen registers, toll records, and caller identification devices to gain additional information in its investigation.

Renzi concedes that the Executive Branch is not barred from approaching present or former congressional aides and seeking information about criminal activity, rather, the Speech or Debate Clause simply bars the government from questioning present or former congressional aides *about legislative acts*. (Doc. No. 195, at 2.) Renzi acknowledges that the Supreme Court, in *Gravel*, noted that the Speech or Debate Clause does not exempt aides from all questioning and only protects aides from answering questions about "services that would be immune legislative conduct if performed by the [Member] himself." *Id.* at 622.

There is no support, however, for Renzi's bald contention that the Court should suppress all evidence obtained by the government during these interviews. The scope of the Speech or Debate Clause is judicially determined. It is highly unlikely that in the criminal prosecution of a member, or former member, of Congress, especially for honest services violations, would there be no incidental divulging, or even questioning , about legislative acts. This was precisely Judge Henderson's concern in *Rayburn*, that, "if Executive Branch exposure alone violated the privilege, "agents ... could not conduct a voluntary interview with a congressional staffer who wished to report criminal conduct by a Member or staffer, because of the possibility ... that the staffer would discuss legislative acts in ... describing the unprivileged, criminal conduct." ... Such a rule would also "presumably apply to surveillance of a Member or staffer who might discuss legislative matters with another Member or staffer." *Rayburn*, 497 F.3d at 672. Renzi's assertion that all evidence obtained during these interviews should be suppressed offends this Court's notions of the principles of fair play and substantial justice. The scope of the clause is for the judiciary, ultimately, to determine. This Court has previously considered and rejected Renzi's contention that the Government cannot prove its case without relying on past legislative acts involving negotiations with proponents of land exchange legislation. Renzi's motion to suppress legislative act evidence that the government obtained through its improper questioning of Congressman Renzi's aides is more appropriately addressed in a motion *in limine* by the District Court in the first instance. This same rationale applies to the remainder of the motion, requesting suppression of evidence obtained from consensual recordings, the Government's use of pen registers, trap and trace devices, and toll records. The Court does not disagree with Renzi's contention that the use of each of these devices can result in Speech or Debate Clause violations, only with the contention that the appropriate remedy is suppression of all evidence derived from these legitimate investigatory tools. Accordingly, the Magistrate Judge recommends that the District Court order the Government to disclose to the Defendant

1) testimony the Government intends to elicit at trial from the legislative aides Joanne Keene, Karen Lynch, James Jayne, Kevin Messner and Nicholas Strader;  2) any documentary evidence obtained from these sources that the Government anticipates using at trial; 3) consensual recordings the Government expects to introduce at trial between Renzi and Keene, or Renzi and the proponents of land exchanges; and 4) records from obtained through the Government's use of pen registers, trap and trace devices, and telephone toll records , to allow Defendant in a timely manner, to move *in limine* to exclude such testimony or evidence as the Court determines is protected by the Speech or Debate Clause.

**RECOMMENDATION**

For the reasons outlined above, the Magistrate Judge recommends that the District Judge, after his independent review and analysis, **DENY** Defendant Renzi's motion to suppress the Title III wiretap and search warrant for Speech or Debate Clause violations  (Doc. No. 89), and **DENY** Defendant Renzi's motion to suppress evidence the Government obtained through (1) questioning Renzi's legislative aides regarding legislative acts, (2) pen registers and trap and trace devices placed on Renzi's cellular telephone, (3) Renzi's subpoenaed telephone toll records, and (4) consensually recorded phone calls in which cooperating witnesses questioned Renzi at the Government's direction regarding legislative acts, all in violation of the Speech or Debate clause (Doc. No. 90).

The Magistrate Judge further recommends that the District Judge direct the Government to disclose to the Defendant 1)  testimony the Government intends to elicit at trial from the legislative aides Joanne Keene, Karen Lynch, James Jayne, Kevin Messner and Nicholas Strader;  2) any documentary evidence obtained from these sources that the Government anticipates using at trial; 3) consensual recordings the Government expects to introduce at trial between Renzi and Keene, or Renzi and the proponents of land exchanges; and 4) records from obtained through the Government's use of pen registers, trap and trace devices, and telephone toll records,

1  to allow Defendant in a timely manner, to move *in limine* to exclude such testimony

2  or evidence as the Court determines is protected by the Speech or Debate Clause.

3        Pursuant to 28 U.S.C. §636(b)(1)(C) and Fed.R.Crim.P. 59, the parties have

4  ten (10) days from the date of this Report and Recommendation to file written

5  objections with the district judge. Failure to object in accordance with Rule 59

6  waives a party's right to review. Any objections filed should be filed as **CR**

7  **08-0212-TUC-DCB**.

8        DATED this 16th day of September, 2009.

9

10

11  _____
              Bernardo P. Velasco
          United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28