IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | NO.   CR 08-00212-TUC-DCB (BPV) |
| Plaintiff, ) | |
| vs. ) | **REPORT AND RECOMMENDATION** |
| RICHARD RENZI, JAMES SANDLIN,) ANDREW BEARDALL, and DWAYNE) LEQUIRE ) | |
| Defendants. ) | |

Pending before the Court is Defendant Renzi's Motion to Dismiss the Indictment Based On The Government's Unlawful Recording Of Privileged Counsel Calls.  (Doc. No. 87.)[1]

Following an *in camera* submission by Defendant Renzi, the Magistrate Judge ordered an evidentiary hearing on the motion.

The Magistrate Judge, having considered the briefing, arguments, and evidence introduced and testimony offered at the evidentiary hearing, in light of the credibility and demeanor of the witnesses, as well as the *in camera* submissions offered by both parties, their post-hearing briefs and the entire record in this matter, RECOMMENDS that the motions to dismiss the indictment based on the Government's unlawful recording of privileged counsel calls be GRANTED IN PART and DENIED IN PART for the reasons discussed below.

---

[1] "Doc. No." refers to documents in this Court's file.

The Magistrate Judge FURTHER RECOMMENDS that the evidence obtained through the Title III wiretap be suppressed in its entirety.

## I.    PROCEDURAL BACKGROUND

The procedural background of this case has been throughly summarized in this Court's  previous order addressing the issue of severance. (*See* Doc. No. 557).  The memorandum and briefs relevant to this hearing are found in Defendant Renzi's Document Numbers 87, 165, 269, 301, 475, 478, 483 (sealed), 485 (sealed) and 543, and in the Government's Document Numbers 139, 282, 520 (sealed),  523, 524, and 526 (sealed).

Fifteen witnesses testified at the evidentiary hearing regarding their involvement in the investigation of Congressman Renzi, particularly in reference to the Title III intercept of a cell phone used by Congressman Renzi.  FBI Special Agents Tjernagel, Taylor, Wilson, Anderson, Morton, Gutierrez, and Middleton were assigned to monitor the wiretap in this case.  FBI Agent Tjernagel also became a member of the prosecution or investigative team.  FBI Special Agents Radtke and Dillender were the Supervisory Special Agent and Assistant Supervisory Special Agent on the wire, respectively.  FBI Special Agents Odom and Burris were case agents. AUSA Roetzel and FBI Special Agent Lightfoot were part of the taint team assigned to review the Maria Baier calls.  Barry Stewart, not a member of the FBI or prosecution, testified as to his knowledge of the Voicebox system used in the wiretap.  John Scott testified as a Trial Attorney with DOJ involved in the investigation and prosecution of Congressman Renzi.  Maria Baier, an attorney, also testified regarding the scope of her representation of Congressman Renzi.

## II.    FINDINGS OF FACT

### A.    The Wiretap Order and Minimization Protocol

On October 26, 2006, the government applied for an order to allow it to monitor the cellular phone used by Congressman Renzi.  Agent Odom was the lead investigator in this matter, and, in preparation for the Title III interception, prepared an affidavit which relied on consensual recordings, an analysis of pen/trap data, source interviews and

forensic review of bank records and public filings. The Title III application expressly asserted that probable cause existed to charge Renzi with misappropriation of insurance premiums. Agent Odom had previously drafted a report, in November 2005, stating that the financial investigation had revealed Renzi's misappropriation of several hundred thousand dollars to fund his campaign through a series of potential money laundering transactions. The Court disagrees with Renzi's assertion that, prior to the Title III intercept, the government had decided not to pursue the insurance fraud aspect of the case. The evidence submitted by Renzi demonstrates that, in June, 2006, Department of Justice Senior Trial Attorney Scott was going to present the information regarding the insurance fraud portion of the case for "case review" and seek an opinion as to whether the FBI should continue with this aspect of the investigation. There is no evidence that the government thereafter declined to pursue this aspect of the investigation. The Title III application and supporting affidavit submitted by TA Scott and Agent Odom in October, 2006, is a clear demonstration that the government had, contrary to Renzi's assertions, decided to continue with the investigation. Agent Odom acknowledged in his affidavit that the U.S. Attorney's Office for the Eastern District had declined prosecution of the insurance offenses, "[b]ased on the limited information then available" but that "based on the more detailed information currently available, these claims form part of the instant criminal investigation." At that time, the government had sufficiently developed the insurance aspect of the investigation through bank records and through statements attributed by sources to employees.

On October 20, 2006, Renzi called the Special Agent in Charge of the Phoenix Field Office of the FBI, to ask about the investigation, but did not indicate that he had obtained legal representation for purposes of the investigation. Nonetheless, when it applied for the Wiretap Order, the government identified the Patton Boggs law firm as publicly representing Renzi (from the FEC inquiry) and Grant Woods as a possible lawyer based on press reports. Agent Odom represented to the Supervising Court, in his affidavit, that privileged conversations would be minimized. The Court issued the

Wiretap Order directing the government to minimize all interceptions in accordance with Title III's minimization requirement.

The Wiretap Order contemplated the interception of communications that implicated the Speech or Debate Clause, and provided that the government could record such communications for later review by "an independent group of investigators and/or prosecutors," commonly referred to as a "taint team." The Wiretap Order did not authorize the government to record or review communications implicating the attorney-client privilege through the use of taint team review.

The government instructed the monitoring agents, via memorandum, that " [n]o conversation may be intercepted that would fall under any legal privilege." Monitoring agents were directed to never knowingly listen to or record a confidential legal conversation involving an attorney. The monitoring agents were directed to notify the supervising agent of the conversation, shut off the monitor and stop recording. The memorandum instructed the agents not to listen to any conversation involving the referenced attorneys, Grant Woods and Patton Boggs.

**B.    Maria Baier Calls**

On the first day of the wire (October 27, 2006), agents monitored four calls involving Maria Baier, an attorney licensed in Arizona (Call Nos. 1982, 1997, 2032 &2085). Agent Tjernagel and Agent Taylor listened to these calls over a speaker in the wire room.

The Court finds that, resolving any conflict in favor of the unique protections afforded the attorney-client privilege, *United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir. 1999), that all of the calls intercepted between Renzi and Baier were privileged.

1.    Call 1982

Call number 1982 lasted 15 minutes and was recorded in full without any minimization. Thereafter, the call was transcribed. The Court reviewed this call in

court.[2]

2.   Call 1997

Call 1997 was the second call that the government recorded between Renzi and Baier.  The government recorded the conversation in full without any minimization, and later transcribed the call.  Although Renzi mentions to Baier to "please put a note for our defense, for our legal defense" the monitoring agent, Agent Taylor, perceived Baier to be a member of Renzi's "day-to-day operations group" and not a member of Renzi's legal defense.  After recording the call, Agent Taylor played the call between 8 and 9 times.

3.   Call 2032

Call 2032 is the third call between Renzi and Baier that the government recorded on October 27, 2006.  The call was minimized after Grant Woods and Tyrone Mitchell (a member of Renzi's criminal defense team) joined the call.  Prior to minimization, Agent Taylor heard Renzi describe Baier as his "personal attorney"

4.   Baier Taint Review

Because of their content, the monitoring agents were concerned that the Baier calls were privileged.   They discussed the calls with the prosecutors, Senior Trial Attorney John Scott and Assistant United States Attorney Gary Restaino, and with the case agent, Daniel Odom.  Even though the Wiretap Order did not authorize the use of a taint team with respect to privileged calls, the prosecutors directed the agents to record all future calls between Renzi and Baier for subsequent taint review.  The prosecutors never sought the Court's permission to record these calls or to authorize the use of a taint team.

Although it is not clear who requested the inquiry, an agent accessed the Arizona State Bar's public website, and determined that Baier was a duly-licensed attorney.  On October 27, 2006, the agent printed a copy of Ms. Baier's profile from the website.  The

---

[2]  The presentation of putatively privileged calls took place in court, through the use of a government taint attorney.  These portions of the evidentiary hearing have been transcribed and sealed.  The Magistrate Judge will not discuss the specific content of these calls in this Report and Recommendation, but has considered them in full in making these findings and recommendations.

profile was placed in a folder labeled "Maria Baier," along with copies of her driver's license and motor vehicle registration. The profile was maintained in a file cabinet near Agent Odom's desk. The government did not disclose any of this information to Congressman Renzi or the Court until just before the start of the evidentiary hearing. The government explained that Agent Burris discovered the folder when she was preparing for the evidentiary hearing. The printout had never been conveyed to the prosecution team.

On October 30, 2006, Restaino asked his colleague, Assistant United States Attorney Danny Roetzel, to act as a taint attorney. Restaino advised Roetzel that Baier was a "long-time political operative," adding that "[a] review of the hard and electronic Bar directories shows that she is not a licensed attorney, although in a bio she claims that she is." Restaino then asked Mr. Roetzel to "decide whether the attorney-client privilege applies to conversations between [Renzi] and Baier alone." Roetzel advised Restaino, on November 6, 2006, that he had determined that an attorney-client relationship existed between Renzi and Baier, and that the calls were privileged. Roetzel sent a confirming memorandum dated November 24, 2006, stating that the conversations were privileged in whole or part and that the non-privileged portions were "not germane in any regard to the investigation." Despite Roetzel's findings, the government continued to record Renzi's calls with Baier. In fact, the prosecutors instructed him to continue reviewing recorded calls to determine if anything obviated the privilege, or for non-privileged material that was germane. Roetzel testified, however, he never heard anything undermining the privileged nature of Renzi's conversations with Baier.

Under the taint procedures established for calls involving Baier, the monitoring agents were supposed to: (I) record, but not to listen to, calls involving Ms. Baier; and (ii) alert Agent Radtke (the Supervising Special Agent) of any recorded calls so that he could ensure that they were copied and provided to the taint attorney. These procedures were memorialized on a handwritten sign posted in the wire room. While the procedures directed the agents to take off their headphones and turn down the volume, there is no way to verify that the agents in fact did this. It is evident from the minimization of calls

in which additional attorneys were conferenced into the calls after Baier's initial conversation with Renzi that the agents were likely listening to these calls or else they would not have known to minimize the conference calls when Renzi and Baier were joined by other counsel on the line.

Additionally, the monitoring agents preserved three conference calls, sessions 3238, 3508 and 3839 between Renzi, Baier and other lawyers.

The prosecutors never advised the supervising court either that Baier was licensed or that the taint attorney had opined that the calls were privileged.

### C.     Glenn Willard Calls

The government knew that Patton Boggs' attorneys represented Congressman Renzi from the start of the wiretap. The government recorded a series of calls involving Glenn Willard, of Patton Boggs, including a 26-minute privileged conversation between Renzi and Willard on November 9, 2006. The government also transcribed portions of another conversation involving Willard, even though the monitoring agent minimized that call after concluding that it sounded like an attorney-client privileged communication.

#### 1.     Call Number 2997

The government concedes it should not have recorded Call 2997. Glenn Willard was not identified from his phone number as an attorney during the interception period because he used a personal phone. During the call itself, however, Renzi made repeated explicit references to Willard's role as his attorney in the FEC proceeding. It thus became obvious from the content of the call that the communication was privileged. Nonetheless, Agent Dillender recorded and monitored call 2997 in full and spent nearly an hour drafting a synopsis of the call, and designated the call as pertinent. When it came to Agent Odom's attention that the monitoring agents had intercepted a privileged call, the draft transcript was shredded and the synopsis deleted, although a copy of the call remained with Agent Tjernagel at his desk. It was not reported to the District Court that a privileged call had been monitored and recorded.

#### 2.     Call Number 3295

On the same day that Agent Odom directed Agent Morton to delete the synopsis of Call 2997, Agent Ward recorded another call between Willard and Renzi (Call 3295). Agent Ward did not know Willard's identity. After monitoring the call for several minutes, Agent Ward concluded that the call sounded privileged, so he minimized the remainder, but he nonetheless designated the call as pertinent.

Even though Agent Ward thought Call 3295 sounded privileged, it was not sealed or marked as privileged, and seven different agents accessed it from the master computer alone. Agent Tjernagel also copied the call onto a compact disk, making it impossible to know how many other agents accessed the call. The government transcribed the non-minimized portions of this call, which the prosecutors concede they have reviewed.

**D.     Kelly Kramer Calls**

The government learned on the first full day of the wire that Renzi had retained the law firm of Nixon Peabody. On the fourth day of the wire agents monitored a call in which Renzi made clear that he had retained Kelly Kramer, of Nixon Peabody. Again, on the next day, agents monitored another call in which Renzi identified Kramer as his lawyer.

1.     Call Number 3084

Ten days after being put on notice of Kramer's role, the government recorded Call 3084 between Renzi and Kramer. Renzi was calling Kramer to report on a call he had received from a cooperating witness. Agents Taylor and Tjernagel monitored Renzi's call to Kramer together, playing the call on the wire room's external speakers. Kramer's identity was clear; he answered the call by stating "Kelly Kramer." It was also clear from the content that the call was potentially privileged: Agent Taylor testified that Congressman Renzi seemed to be "confiding" "sensitive" and "important" information to Kramer, whom Agent Taylor thought to be either a lawyer or an accountant. Agent Taylor testified that he did not know at the time that Kramer was an attorney, that he thought it might have been an attorney call, but that Kramer might also have been an accountant.

Agent Taylor, who deemed the call pertinent, synopsized it for about an hour. During that time, an FBI agent confirmed that Kramer was an attorney at Nixon Peabody. Agent Taylor continued to work on his synopsis for at least another 35 minutes. More than an hour after the call was first monitored, Agent Odom instructed Agent Taylor to delete the synopsis. The call itself, however, was never sealed.

**E.    Failure To Protect Privileged Calls**

None of the privileged calls, including the "taint" calls, were ever sealed or marked as privileged, in violation of DOJ's own electronic surveillance manual. Although the traditional notion of "sealing" taped calls is not directly applicable to the Voicebox system utilized to monitor and record the Title III calls in this case, the Voicebox system had special password protections that could have been used to designate a call as privileged, and only agents with the required password access would have been able to access the calls.

When an agent accessed a previously recorded call, a notation in the session history report for that call was made. Although the call immediately begins playback when it is accessed, it is not possible to ascertain if the playback was stopped while agents opened the audio control panel for non-content information, such as information about minimization, or pen/trap data.

Several of the agents testified that they did not remember accessing the Baier calls (contrary to the Session History Report's notations), but added that they would have followed the rules by not listening to them. But, as Agent Radtke testified, the agents violated the rules every time they simply accessed one of these calls.

The evidence supports Renzi's contention that monitoring agents accessed 15 calls that had been recorded for taint review.

Agent Radtke maintained copies of all of these calls on compact discs that he stored, unlocked, at his desk. Agent Tjernagel maintained copies of some of the privileged calls (including Call 2997) on compact discs that he stored, unlocked, at his desk. Agent Radtke used these working copies to make a production set for the

defendants as part of discovery in this case. But because the privileged calls had never been sealed or even segregated, Agent Radtke included several privileged calls, including an hour-long legal conference call, on the discs that were produced to Renzi's co-defendants. As late as July 2009, Agent Radtke (who is not a member of the investigative team) listened to Call 2997 while preparing Agent Dillender to testify.

After completing the synopsis of Call 2997, Agent Dillender designated the call as pertinent. Agent Dillender further testified that she ordinarily followed the practice of apprising the agents taking over the wire about new developments or significant calls. Consistent with that practice, the agents who came on duty after her would have accessed the phone call during the shift change. It is likely, therefore, that Agents Dillender, Taylor, Wilson, and Frank were exposed to this call on the evening of November 9. Agents Wilson and Frank testified that they would not have discussed with the prosecution team any privileged information learned through listening to the call.

In addition, the monitoring agents were directed to "[r]ead all the logs of interceptions on a continuing basis" to help comply with the minimization requirement. Accordingly, assuming compliance with the minimization memorandum's instructions, Agents Radtke, Tjernagel, Rubacalva, Gutierrez, Anderson, Garrison, Morton, Smith, Dillender, Taylor, Wilson and Frank were all exposed to the privileged materials contained in the synopsis.

Because Call 2997 was deemed pertinent, Agent Tjernagel copied it onto a compact disk and submitted it for transcription. A few days later, Agent Odom called Agent Tjernagel to tell him that the call did not need to be transcribed because it was no longer deemed pertinent, but said nothing about the call being privileged. According to Agent Tjernagel, Agent Odom instructed him to destroy the draft transcript. Agent Odom testified that it came to his attention, though he doesn't remember who brought it to his attention, that a call with Willard had been intercepted, and he directed Agent Morton to change the classification and delete the synopsis. Agent Tjernagel testified that he retrieved the compact disk and the draft transcript from the support personnel's outbox

and then shredded the transcript. He kept the compact disk at his desk in an unlocked drawer, where it remained as of the time of the hearing.

### F.    Prosecution Team's Exposure to Privileged Calls

The evidence and testimony demonstrate that the prosecution team reviewed at least five privileged phone calls, including four Maria Baier calls (Calls 1982, 1997, 2032 and 2035), a call with Renzi's defense counsel Kelly Kramer (Call 3084), the minimized portion of a call between Renzi and Willard (Call 3295), but not the call initially synopsized, then later deleted, between Renzi and Willard (Call 2997).  The Magistrate Judge finds the government's assertion credible that the substance of Call 2997 was neither conveyed to the prosecution team, nor was it used in the investigation.

Nonetheless, Agent Odom, aware that a privileged call had been inadvertently recorded, should have notified the supervising attorneys, who in turn would have been obligated to notify the supervising judge, as set out in the Electronic Surveillance Manual. But it is undisputed that the government never notified the Court about the intercepted Willard call, claiming instead it had "completely minimized" calls between Congressman Renzi and his out-of-state attorneys.

### G.    Government's Representations to the Supervising Court

The Wiretap Order required the government to file periodic reports regarding the conduct of the intercept.  In the first report, the prosecutors advised the Court that they were using a taint team to monitor calls involving Baier, but described her as an "unlicensed law trained political operative."  Moreover, the prosecutors failed to advise the Court that the government had monitored calls in which Renzi referred to Baier as his "personal lawyer" and in which she had confirmed that she was a licensed Arizona lawyer.

In the second report, the prosecutors repeated their claim that Baier was an "unlicensed law trained political operative," and also failed to disclose that Roetzel had already concluded that the calls involving her were privileged.

The prosecutors also claimed in their second report that the government had

"completely minimized calls between Renzi and Arizona or out-of-state attorneys." The government, however, hadn't "completely minimized" the Glenn Willard and Kelly Kramer calls; rather, multiple agents listened to them in their entirety. Further, by failing to disclose these intercepts, the government violated the DOJ's Electronic Surveillance Manual, which directs the government promptly to notify the supervising court whenever a privileged communication is intercepted.

Gary Restaino was the government attorney with principle responsibility for supervising the agents, implementing the taint procedures, and communicating with the taint attorney. The Court agrees with Renzi's assertion that it appears that Restaino personally concluded that Baier was a "political operative," as opposed to a licensed attorney, although it is not evident that anyone on the prosecution team knew, in the first few days of the wire, that Baier, listed on the Arizona State Bar website under the last name Kahn Baier, was licensed to practice law in Arizona. The Court agrees with Renzi's assertion that it appears that Restaino was also the driving force behind the government's decision to record the calls with Baier.

## III. CONCLUSIONS OF LAW

### A. Title III And Fourth Amendment

To protect citizens' legitimate privacy interests, Title III requires the government to minimize the interception of conversations that are "not otherwise subject to interception." 18 U.S.C. § 2518(5).

The government's compliance with Title III's minimization requirement is assessed "on the facts and circumstances of each case" based on a standard of objective reasonableness. *Scott v. United States*, 436 U.S. 128, 139-41 (1978). While bad faith is irrelevant to determining whether the government violated Title III (*see Id.*), courts may impose more significant sanctions upon finding bad faith. *See United States v. Turner, 528 F.2d 143, 156* (9th Cir. 1975) (recognizing that suppression of the entire wire may be an appropriate remedy when the minimization provision of the wiretap order is disregarded by the government throughout the entire wiretap period.). The standard for

minimization is reasonableness. *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990).

Contrary to Defendant's assertion, and the assumption of some courts, that privileged conversations are "not otherwise subject to interception" within the meaning of the statute, the language of the statute does not support such a reading. The statute requires minimization only for the "interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5); *contra United States v. Harrelson*, 754 F.2d 1153, 1168 (5th Cir. 1985)(interception of privileged communications must be minimized); *United States v.DePalma*, 461 F.Supp. 800, 821 (S.D.N.Y. 1978)(knowing interception of attorney-client communication unreasonable under Section 2518(5)).

Title III authorizes the interception of all pertinent communications. *See* 18 U.S.C. 2518(3)(a)-(b), (4)(c). In fact, the statute, by providing that no "otherwise privileged wire or oral communication intercepted in accordance with or in violation of the provisions of this chapter shall lose its privileged character," 18 U.S.C. § 2517(4), contemplates that privileged communications will be intercepted with appropriate limitations on use and disclosure. The legislative history of Title III supports the plain reading of the statute, that is, the provision was "intended to vary the existing law only to the extent it provides that an otherwise privileged communication does not lose its privileged character because it is intercepted by a stranger," S.Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968), U.S.Code Cong. & Admin.News 1968, p. 2189. In fact, the wiretaps were criticized as "indiscriminate" and, "as authorized by title III thus represent a sweeping intrusion in to private and often constitutionally protected conversations." *Id*. at 2229. "When the Government overhears clients talking to their attorneys, husbands to their wives, ministers to their penitents, patients to their doctors, or just innocent people talking to other innocent people, it is clearly playing an 'ignoble part.'" *Id*. at 2233. Thus, while the use and disclosure of privileged calls is addressed by the statute, there is no statutory requirement that attorney-client privileged calls be minimized, *per se*.

Section 2518(10)(a)(I), however, provides that a defendant may move to suppress the contents of communications intercepted under that chapter on the grounds that "the communication was unlawfully intercepted." The Supreme Court has opined that section (I) "must include some constitutional violations. Suppression for lack of probable cause, for example, is not provided for in so many words and must fall within paragraph (I) unless, as is must unlikely, the statutory suppression procedures were not intended to reach constitutional violations at all." *United States v. Giordano*, 416 U.S. 505, 525-26 (1974). The Court finds that the privileged communications were unlawfully intercepted, under § 2518(10)(a)(I), in violation of Renzi's Fourth Amendment protections.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMND. IV. Because our society recognizes a person's legitimate expectation of privacy when consulting with counsel, *see DeMassa v. Nunez*, 770 F.2d 1505, 1506-07 (9th Cir. 1985), the seizure of potentially privileged communications raises serious Fourth Amendment issues. *See, e.g., Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 960-62 (3d Cir. 1984) (requiring special procedures to protect the attorney-client privilege during the search of a law firm).

A search is unreasonable, and thus violates the Fourth Amendment, when it is performed without proper judicial authorization, *Groh v. Ramirez*, 540 U.S. 551, 562-63 (2004), when the government seizes evidence beyond that which is authorized in the warrant, *United States v. Mittelman*, 999 F.2d 440, 445 (9th Cir. 1993), or when the government executes the search in an unreasonable manner. *See San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005). Although the Wiretap Order did not address specifically the monitoring of privileged conversations between Congressman Renzi and his attorneys, Agent Odom's specifically represented to the Supervising Court in his affidavit in support of the application for the interception of wire communications, that the government would minimize privileged calls and carefully train the monitors to recognize calls between lawyers and clients. By

knowingly recording privileged calls, the government violated the Wiretap Order and seized evidence beyond that which was authorized. For these reasons, the government's seizure of privileged calls violated the Fourth Amendment.

The government also acted unreasonably in executing the search in violation of the Fourth Amendment. Clearly, it was not reasonable for the government to record calls between Congressman Renzi and lawyers the government knew (or should have known) to be representing him. Similarly, it was not reasonable for the government to fail entirely to seal any of those calls in violation of established Department procedure and despite the "inevitable, and reasonably foreseeable, risks to the privilege" that are created when the government seizes privileged information for taint review. *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006)[3].

The government demonstrated, generally, that it acted reasonably with respect to the minimization of privileged calls. The monitoring agents were instructed on the requirements for minimization. Agent Radtke, the supervising agent, kept a running tally of attorneys to guide the agents in the electronic surveillance room. When persons who sounded like they might be attorneys were intercepted, the agents moved quickly to protect Renzi's privilege. Laurie Miller was identified and minimized in her first conversation with Renzi, Grant Woods was identified and minimized in his first

---

[3] Section 2518(8)(a) requires prompt sealing of the recording of any taped conversation, and that the recordings be made available to the issuing judge for further direction regarding custody of the tapes. The presence of a seal provided for by section 2518(8)(a) is a prerequisite for the use or disclosure of the contents of the intercept. There is no evidence that the government made the recordings available to the Supervising Court, nor did the government seal any of the recordings. Although the Defendant has argued that the recordings were never sealed or turned over to the Supervising Court, this statutory provision was not raised by the Defendant as separate grounds for suppression. This provision, however, in addition to the Department of Justice's Electronic Surveillance Manual's requirements of the same, provides additional support for this Court's conclusion that it was unreasonable to not seal the recordings, especially those to which the attorney-client privilege attached.

conversation with Renzi.  As the Title III interception progressed, agents identified other attorneys, and, when known, caller identification information was entered into the Voice Box system to connect a number to a name.  The system was not without flaws, however, as some privileged calls were initially monitored due to the use of conference call numbers, and the use of personal phones.

The Magistrate Judge finds, as to the non-Baier calls, the government adopted reasonable procedures to assure compliance with the minimization requirement.  The Magistrate Judge further finds that the government acted reasonably, and in good faith, to minimize all privileged calls with the following exceptions: the government acted unreasonably by:  1) failing to direct the minimization of the Baier calls after Renzi identified Baier as his "personal attorney" and government investigation revealed that she was a licensed attorney, 2) failing to direct the minimization of the Baier calls after Roetzel determined that the Baier calls were privileged, 3) Agent Dillender's failure to minimize Call 2997 with Glenn Willard, and, 4)  the failure to immediately minimize the call with Kelly Kramer, despite Renzi's identification of him in earlier calls as his attorney.

The Magistrate Judge finds that, in addition to failing to act reasonably to minimize those calls, the government also acted unreasonably by 1) failing to designate any of the  privileged calls as privileged, which would have restricted the number of agents who had access to those calls, 2) Agent Dillender's recording, monitoring, synopsizing and designation of Call 2997 as pertinent, when it was clearly privileged, 3) the failure to designate the recorded portion of Call 3295 as privileged and the review of this call by prosecutors, 4) the distribution of privileged calls to Renzi's co-defendants, 5) the failure to inform the Supervising Court of calls which were monitored and recorded in violation of Renzi's attorney-client privilege, and 6) the failure to seal all calls and seek direction from the Supervising Court at the conclusion of the intercept pursuant to 18 U.S.C. § 2518(8)(a).

The Magistrate Judge rejects the notion that the use of taint review is *per se*

unreasonable.  However, the use of taint review in this instance, however well-intentioned initially, was not authorized by Title III or by the supervising Court's Wiretap Order. Neither was the use of a taint team to monitor privileged calls contemplated by Agent Odom's affidavit in support of the Title III application. The government was put on notice, on the first day of the wiretap, that Baier was an attorney, licensed to practice in Arizona, and that Renzi considered her his "personal attorney."

As one district court has explained, Title III requires the government to minimize the interception of communications, but, as it noted, "an agent cannot minimize the interception of communications that should not be intercepted by intercepting all communications and sorting them out later." *See United States v. Simels*, No. 08-cr-0640, 2009 WL 1924746, *9 (E.D.N.Y. July 2, 2009). *Id*. at *9-10.  The court explained that the way to avoid intercepting privileged communications "is take reasonable steps not to intercept  them." *Id*.  "Automatically recording everything, even where that is followed by a post-interception minimization protocol, virtually guarantee[s] the interception of communications the government should not have seized.  The post-interception minimization may have closed the barn door, but the horse was already gone." *Id*.

Consistent with *Simels*, the Magistrate Judge finds that the government's use of a taint team to review calls with Baier was not authorized by Title III, was not authorized by the Supervising Court's Wiretap Order, and was not contemplated in Agent Odom's representations to the Court.  To the extent the Supervising Court implicitly approved of the use of taint review for the Baier calls, such implicit approval was premised on the government's incorrect representation to the Court that Baier was an "unlicensed law-trained political operative."

Apart from its decision to implement a taint team to review the Baier calls, the government independently violated Title III by breaching its duty of candor to the court. *See United States v. Lopez*, 300 F.3d 46, 55 (1st Cir. 2002) (Title III imposes on government a duty of candor "about the manner in which the wiretap will be conducted"). At the outset of the wire, the government failed to advise the Court that Congressman

Renzi was represented by multiple counsel, thus depriving that Court of the ability to craft appropriate protective measures in violation of Title III. During the wiretap, the prosecutors made false statements to the Supervising Court as to Baier's status and as to the minimization of calls with other attorneys. The prosecutors further failed to advise the Supervising Court that it had monitored calls in which Congressman Renzi referred to Baier as his "personal lawyer," and that its own taint attorney had concluded that an attorney-client privilege existed between Congressman Renzi and Baier.

Evidence derived in violation of the Fourth Amendment may not be introduced at trial to prove a defendant's guilt. *See Weeks v. United States*, 232 U.S. 383, 398 (1914) (in federal court, exclusionary rule applies to evidence obtained through Fourth Amendment violation), *overruled on other grounds by Elkins v. United States,* 364, U.S. 206, 108 (1960).

In conclusion, the Magistrate Judge recommends that the government's request for suppression of the unlawfully collected privileged evidence be GRANTED[4]. Further, the Magistrate Judge recommends, based on the government's insistence in pursuing the Maria Baier calls after they were deemed privileged, the imposition of a more significant sanction: the suppression of the entire wire. *See Turner*, 528 F.2d at 156.

**B.      Fifth and Sixth Amendments**

The Sixth Amendment grants criminal defendants the right to effective assistance of counsel, including the right to private consultation with counsel. *See McMann v. Richardson*, 397 U.S. 759, 771 (1970); *Daniels v. Woodford*, 428 F.3d 1181, 1196 (9th Cir. 2005); *United States v. Coplon*, 191 F.2d 749, 757 (D.C. Cir. 1951). Sixth Amendment rights do not attach until criminal proceedings are formally instituted against a defendant. *See Kirby v. Ill.*, 406 U.S. 682, 689 (1972) (plurality opinion); *United States v. Hayes,* 231 F.3d 663, 671-72 (9th Cir. 2000)(adhering to the bright line indictment rule,

---

[4]To clarify, the government has not contested the fact that calls between Renzi and Willard, Kramer, Woods or Miller are privileged. To the extent the government contends that the Baier calls, or some of the Baier calls, were not privileged, the Magistrate Judge rejects this contention, as discussed in the factual findings, Section II.B., above.

and refusing to apply the Sixth Amendment to a cooperator's consensual conversation with a represented defendant who admitted his intent to lie at trial); *United States v. McNeil*, 362 F.3d 570, 572 (9th Cir. 2004) (right to counsel attached at indictment). While some court's have found that pre-indictment interference with a suspect's attorney-client relationships can ripen into a Sixth Amendment violation upon indictment, s*ee United States v. Stein*, 541 F.3d 130, 152 (2d Cir. 2007) (affirming dismissal of indictments against former KPMG partners based on the government's pre-indictment interference with KPMG's ordinary practice of advancing legal fees to individuals, which "had post-indictment effects of Sixth Amendment significance"); *In re Grand Jury Proceedings (Goodman) v. United States*, 33 F.3d 1060, 1062 (9th Cir. 1994) ("The Sixth Amendment can apply when the government's conduct occurs pre-indictment."), the government's actions in this case did not result in the type of post-indictment consequences of "Sixth Amendment significance" contemplated by those court's decision.

Assuming *arguendo*, that the Sixth Amendment analysis is applicable, the Magistrate Judge finds, as discussed below, that the government's intrusions did not prejudice Defendant Renzi.

Dismissal of an indictment is warranted where outrageous law enforcement conduct violates due process. *United States v. Simpson*, 813 F.2d 1462, 1464-65 (9th Cir. 1987). To warrant dismissal on due process grounds, government conduct must be "so grossly shocking and outrageous as to violate the universal sense of justice." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991). Dismissal is a "drastic measure" and a court, when faced with prosecutorial conduct, should tailor relief appropriate in the circumstances. *United States v. Isgro*, 974 F.2d 1091, 1099 (9th Cir. 1992)(quoting *United States v. Morrison*, 449 U.S. 361, 365 (1982)).

The Fifth Amendment's due process clause guarantees a suspect's right to effective and substantial assistance of counsel. *See United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980); *see also United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000);

*Coplon*, 191 F.2d at 757. "[A] defendant's remedy for prosecutorial misconduct in the pre-indictment stage is provided in the due process protections of the Fifth Amendment." *See United States v. Marshank*, 777 F.Supp. 1507, 1518 (N.D. Cal. 1991).

"[A] claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to *actual and substantial prejudice*." *Haynes*, 216 F.3d at 797 (quoting *United States v. Voight*, 89 F.3d 1050, 1067 (3rd Cir. 1996))(emphasis added). The defendant bears both the burden of production and persuasion on his outrageousness claim. *Voight*, 89 F.3d at 1070.

Defendant cannot meet the heavy burden of a Fifth Amendment dismissal, which requires outrageous conduct and prejudice. "The defense of outrageous government conduct is limited to extreme cases in which the government's conduct violates fundamental fairness and is shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *United States v. Fernandez*, 388 F.3d 1199, 1238 (9th Cir. 2004) (affirming denial of dismissal in a case with a dirty informant), *modified on other grounds*, 425 F.3d 1248. Extreme cases in which the due process clause might merit dismissal are limited to entrapment scenarios in which the government engineers the crime and cases involving physical or psychological coercion of a defendant. *Id.* Indeed, in a case alleging misconduct for the delayed production of impeachment material, dismissal under the due process clause is inappropriate where, as here, "there is no evidence the government deliberatively withheld [material], lied about the material or failed to "own up" to the mistake once it was discovered." *United States v. Lopez*, 577 F.3d 1053, 1069 (9th Cir. 2009). Defendant cites to no cases of alleged improper electronic surveillance minimization that merits a dismissal on due process grounds. While this Court has concerns over the government's conduct in this case, it does not rise to the level of outrageousness.

Moreover, defendant cannot meet his burden under his cited attorney-client interference cases. Defendant is correct in his enunciation of the standard for an intrusion

into the attorney-client privilege in the due process context: 1) awareness of an ongoing attorney-client relationship; 2) *deliberate intrusion* into the relationship; and 3) prejudice. *E.g., United States v. Stringer*, 535 F.3d 929, 942 (9th Cir. 2008) (denying defendant's claim). Defendant's efforts fail by the second prong because deliberate intrusion is inapplicable in the setting of a taint team where the prosecution cannot access the material. "Most cases finding deliberate intrusion into the attorney-client relationship involve government informants who somehow penetrate the attorney-client relationship to obtain confidential or privileged information, *and then feed that information to the government*." *Id.* (emphasis added). The taint team did not feed any information back in the instant case, and as a result there was, simply put, no intrusion as to the Baier taint calls. The Court should therefore analyze the due process claim through the standard two-part test: outrageous conduct; and prejudice.

Nor has the defendant demonstrated substantial prejudice from the government's actions during the electronic surveillance. Prejudice in this context means actual prejudice, not some vague notion of unfairness. *E.g., United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007) (holding that dismissal for preindictment delay requires the defendant to establish that lost witnesses or evidence have meaningfully impaired his ability to defend himself); *Isgro*, 974 F.2d at 1098 (holding that dismissal for grand jury interference requires the defendant to prove that the interference substantially influenced the grand jury's decision to indict). Prior to the interceptions in the instant case, agents had already traced the insurance money into the campaign, and a subsequent warrant of Patriot Insurance was likely. The Baier calls remained with the taint team, and the Willard call remained with Agent Dillender. Agent Tjernagel heard a portion of the last non-taint Baier call (Session 2032) and a portion of the first identified Kramer call (Session 3084), without any recollection of the substance or use in the investigation. Furthermore, any prejudice analysis must be commensurate with the putative misconduct. Even to the extent Renzi can articulate some prejudice from the Kramer call, that prejudice must be weighed against the specific government actions that resulted in the

interception, and those actions reflect a careful, quick and reasoned analysis by the monitoring agents once they identified Kramer as an attorney. The government's protective measures protected Renzi's privilege and foreclose any prejudice.

The defendant's contention, that because the government deemed two of the Baier calls to be among the "most pertinent" in the case, that they clearly had some influence on its investigation, strategy and charging decisions, is mere speculation. Moreover, the testimony of the witnesses demonstrates that any influence these calls had on the investigation or prosecution was insubstantial.

Renzi further contends that he was prejudiced by the use of calls as evidence, because prosecutors "plainly believed [Call 1982] was inculpatory, as they considered using it to obtain a search warrant, and it clearly influenced their investigation and overall assessment of the case." This use, however, does not rise the level of actual and *substantial* prejudice required to demonstrate a due process violation. *Haynes*, 216 F.3d at 797.

Renzi contends that several calls containing core defense strategy were "either transcribed, accessed by monitoring agents, contextually minimized, or produced to Congressman Renzi's co-defendants." Renzi refers to Calls 1982, 1997, 2067, 3084, 3162, 3367, 3522, and 3839. As previously found, however, of these calls the prosecution team only had access to Calls 1982, 1997, and 3084. Of these, Agent Odom credibly testified that the government made no use of any information derived from Calls 1982, 1997 and 3084 in the insurance investigation, the search warrant or any other part of the investigation. Call 3084 was never transcribed, and an hour after the call was monitored, Agent Odom instructed Agent Taylor to delete the synopses. Agent Tjernagel had no substantive recollection of the contents of Call 3084, and he never shared any information from the call with Agents Odom or Burris.

As previously discussed, this Court finds that Call 2997 did not alter the nature and focus of the investigation. Agent Odom credibly testified that the insurance investigation was active before the wiretap, but that, because of the covert nature of the investigation,

he did not actively pursue potential witnesses at that time.

## C.     The Court's Supervisory Powers

Even where no due process violation exists, a federal court may dismiss an indictment pursuant to its supervisory powers. *Ross*, 372 F.3d. at 1107.  Reckless government conduct may be remedied under the Court's supervisory powers even when prosecutors act in good faith. *See United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008); *Barrera-Moreno*, 951 F.2d at 1091.  While "accidental or merely negligent governmental conduct is insufficient to establish flagrant misbehavior," a finding of "willful misconduct" in the sense of intentionality is not required. *Chapman*, 524 F.3d at 1085.  Rather, "reckless disregard" satisfies the standard for sanctions, including dismissal of an indictment. *Id*.  When the government acts with reckless disregard for a defendant's rights, dismissal is appropriate if the defendant would otherwise suffer "'substantial prejudice' and if 'no lesser remedial action is available.'" *Id*. (internal citation omitted); *Marshank*, 777 F. Supp. at 1519, 1521-22 (dismissal is appropriate where "continuing prejudice from the constitutional violation cannot be remedied by suppression of the evidence").

As discussed above, dismissal is not appropriate because defendant has not, and will not, suffer *substantial* prejudice.  The appropriate remedial action in this case is suppression of the privileged calls.  Disqualification of the prosecutorial and investigative teams is not warranted.   Furthermore, Agent Odom's testimony establishes there are no fruits from the privileged calls that would require further suppression.  The prosecution team had access to, at most, portions of six calls at issue.  No information from those calls appear in witness interviews or grand jury sessions.  The government was already actively investigating the insurance fraud aspects of the case.

///

///

///

///

**IV. RECOMMENDATION**

Accordingly, the Magistrate Judge recommends that the District Judge enter an order **GRANTING IN PART AND DENYING PART** Motion to Dismiss the Indictment Based On The Government's Unlawful Recording Of Privileged Counsel Calls (Doc. No. 87).

The Magistrate Judge recommends, for the reasons stated above, that Defendant Renzi's motion to dismiss the indictment be **DENIED**.

The Magistrate Judge further recommends that Defendant Renzi's alternative request, to suppress all evidence obtained from the wiretap, be **GRANTED**.

Pursuant to 28 U.S.C. §636(b)(1)(C), the parties have fourteen (14) days from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. **Any objections filed should be filed as CR 08-00212-TUC-DCB.**

DATED this 11th day of March, 2010.


_____
Bernardo P. Velasco
United States Magistrate Judge