1
2
3
4
5
6                  IN THE UNITED STATES DISTRICT COURT
7                      FOR THE DISTRICT OF ARIZONA
8
9   UNITED STATES OF AMERICA,        )
                                     )   NO.   CR 08-00212-TUC-DCB (BPV)
10            Plaintiff,             )
                                     )
11        vs.                        )   **REPORT AND RECOMMENDATION**
                                     )
12  RICHARD RENZI, JAMES SANDLIN,)
    ANDREW  BEARDALL, and DWAYNE)
13  LEQUIRE                          )
                                     )
14            Defendants.            )
    ─────────────────────────────────)
15

16        Presently pending before this Court is Defendant Renzi's motion to dismiss the Hobbs

17   Act charges (Counts 1, 26 and 27), filed on October 15, 2008 (Doc. 107).  The Government

18   filed a response to Renzi's motion (Doc. 136), and a reply memorandum (Doc. 173) and a

     notice of supplemental authorities (Doc. 331) were filed by Renzi.
19
          A superseding indictment was filed on November 13, 2008, and Defendant Renzi's
20
     arguments were incorporated and applied to the superseding indictment.  (Doc. 268, 304.)
21
          The Magistrate Judge heard argument on the motion on December 4, 2008, and took
22
     the matter under advisement.
23
          On September 22, 2009, the Government filed the second superseding indictment in
24
     this action ("SSI").  (Doc. 466.)  The parties were directed to file supplemental briefing
25
     addressing the relevancy, if any, that the filing of the second superseding indictment had on
26
     any matter under advisement before the Magistrate Judge.  (Doc. 479)  The supplemental
27
     briefing indicated that the SSI would not have any impact on the charges in Counts 1, 26 and
28
     27, or on the pending motion to dismiss.  (Docs. 511, 513.)

The Court, having considered the briefing, arguments, and evidence presented, recommends that the District Court enter an order DENYING the motion to dismiss (Doc. 107.)

## I.   BACKGROUND

### A.   Procedural

The procedural background of this case has been throughly summarized in this Court's order addressing the issue of severance. (*See* Doc. 557).  The relevant motions and memorandum can be found at Document Numbers 107, 136, 173, 268, and 331.

Count 1 of the SSI charges Renzi and Sandlin with conspiracy to commit extortion and wire fraud and Counts 26 and 27 charge Renzi and Sandlin with extortion.  The charges derive from the Government's allegations that Renzi and Sandlin engaged in an extortion scheme in which they attempted to induce an investment group and did induce an investment group to purchase real estate owned by Sandlin using the promise of Renzi's exercise of his official authority, in violation of 18 U.S.C. §§ 371 and 1951(a).  (SSI ¶¶ 5b, 16, 48, 50.)

### B.   Motion to Dismiss the Hobbs Act Counts (1, 26 &27)

#### 1.   *Renzi's Position*

Renzi alleges that, under the Supreme Court's decision, *Wilkie v. Robbins*, 551 U.S. 537 (2007), the Government's prosecution of Renzi fails as a matter of law because the Hobb's Act does not reach a federal employee's effort to acquire land for the benefit of the federal government.

Renzi further alleges that, even if the Hobbs Act applied, the SSI fails to state a violation of the Act because it does not allege that anyone was wrongfully deprived of property, and that Renzi was in fact owed the money that he allegedly received from Sandlin.

Finally, by failing to specify which of these alleged payments the Grand Jury relied upon to pass the SSI, the Hobbs Act charges provide constitutionally inadequate particularity.

#### 2.   *Government's Position*

The Government argues that *Wilkie* is inapplicable to this case, because the SSI alleges that Renzi acted to benefit himself and Sandlin, not the federal government.

The Government further argues that it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom. The Government also argues that, contrary to Renzi's assertion, there is no requirement under the Hobbs Act that the deprivation of property must entail a net loss to the wronged individuals or entity.

Finally, the Government submits that the charging document makes clear that Renzi and Sandlin both received money to which they were not entitled – Sandlin directly and Renzi derivatively. Both involved the same money, and therefore Renzi's attempts to create ambiguity by differentiating the proceeds of the Sandlin Property sale from the money paid under the note fails.

3.    *Indictment*

The allegations in the SSI in support of the Hobbs Act charges are as follows:

Defendant Renzi was elected to the United States House of Representatives as Representative for Arizona's First Congressional District in November 2002, was reelected in 2004 and 2006, and served on the Natural Resources Committee ("NRC") throughout the relevant period. (Doc. 466, "SSI", ¶ 1.) From approximately 2001 to June 2003, Defendants Renzi and Sandlin were co-owners of Renzi Investments, which was principally engaged in developing real estate in Kingman, Arizona. (*Id.*, ¶ 7.) In 2003, Sandlin acquired the remaining interest in Renzi Investments (renamed Fountain Realy & Development, Inc. ("Fountain Realty"), by remitting a cashiers check for $200,000.00 to Renzi, and giving Renzi an $800,000.00 note, promising to pay Renzi that amount in the future. (*Id.*)

In 2004 and 2005, Resolution Copper Corporation[1] ("RCC") owned the mineral rights to a large copper deposit located near Superior, Arizona, known as the "Superior Property." RCC was preparing to extract the copper, but sought ownership of the surface rights. The United States Government owned the surface rights. (*Id.*, ¶ 12.) RCC sought a land

_____

[1]Resolution Copper Corporation is referred to as "Company A" in the SSI. The group of investors led by Philip Aries, sometimes also known as the Aries Group or the Preserve Petrified Forest Land Investors ("PPFLI") Group is referred to as "Investment Group B" in the indictment.

exchange with the federal government.  (*Id.*, ¶ 13.)  A federal public land exchange is a real estate transaction in which a property owner exchanges its privately owned land for federal public land. (*Id.*, ¶ 9.)   Both of the land exchanges at issue in this case required legislative approval, and, before the United States House of Representatives could take a floor vote on the legislation, the NRC would need to first approve the proposed legislation.  (*Id.*, ¶¶  10, 13.)

Congressman Renzi directed RCC to purchase property owned by James Sandlin ("the Sandlin Property") and include that in the land exchange proposal in order to obtain the Congressman's support for their proposal in Congress. (*Id.*, ¶ 19, 25(a).)  Neither Renzi nor Sandlin disclosed the fact that Sandlin owed Renzi $700,000.00 in principal on the $800,000.00 note. (*Id.*, ¶ 21, 25(b).)  On April 12, 2005, when RCC failed to purchase the Sandlin Property, Congressman Renzi told RCC "no Sandlin Property, no bill", meaning that Congressman Renzi would not sponsor RCC's legislative proposal unless RCC included the Sandlin Property in the land exchange.  (*Id.*, ¶ 19, 25(i).)

Shortly thereafter, on April 16, 2005, Renzi was approached by a separate group of investors (the Aries Group) to discuss the possibility of the Congressman sponsoring a federal land exchange on its behalf. (*Id.*, ¶ 14, 25 (j).)  Congressman Renzi directed the Aries' group to purchase the Sandlin Property and include that in the land exchange proposal in order to obtain the Congressman's support for their proposal in Congress. (*Id.*, ¶ , 20, 25(k).)   Congressman Renzi insisted that the group purchase the Sandlin Property as part of its land exchange proposal and told that group that it would receive a "free pass" through the NRC. (*Id.*, ¶ 25(k).)  Neither Renzi nor Sandlin disclosed to the Aries' group the fact that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 note.  (*Id.*, ¶¶ 21, 25(l),25(o).)  After Sandlin rejected the Aries Group's request for an option to purchase the property, the customary practice for federal land exchanges because of the uncertainty involved in the approval process (*Id.*, ¶ 11), the Aries Group contracted to purchase the property for $4.6 million, placing a $1 million escrow payment into Sandlin's bank account within a month.  (*Id.*, ¶ 25(n),25(p).)  Sandlin immediately wrote a $200,000.00 check,

payable to Renzi Vino, Inc., an Arizona company owned by Renzi.  (*Id.*, ¶ 25(q).)   Renzi deposited this check into a Patriot Insurance bank account, and used a substantial part of the proceeds to pay on a Promissory Demand Note entered into by Patriot Insurance.  (*Id.* ¶¶ 25 (r).)  In September, 2005, prior to closing on the property, a representative from the Aries Group sought reassurances from Congressman Renzi that the Sandlin Property was an important part of the land exchange and that the Congressman would introduce the investment group's legislative proposal. (*Id.*, ¶ 25(t).) On September 30, 2005, Renzi caused a Patriot Insurance letter, addressed to Sandlin, to be faxed to the Pioneer Title Company in Sierra Vista, Arizona, falsely stating in part:

> This letter is informing you of Mr. Renzi 'calling' in the note for the Kingman property.  It is his understanding you have recently sold this land, therefore the balance of the note plus interest, is due and payable.  Patriot Insurance Agency, Inc. is handling this part of the former Renzi Investments.

(*Id.*, ¶ 25(u).)  The SSI alleges that these were false statements regarding the sale of the Kingman property and the "calling" of the note, manufactured to hide the source of the money and thus the connection between Sandlin and Renzi.  (*Id.*, ¶ 36.)  On that same date Sandlin paid into a Patriot Insurance account the remaining $533,000.00 he owed to Renzi, which Renzi ultimately transferred to his personal checking account to pay for personal expenses and unpaid federal and state income taxes.  (*Id.*, ¶¶ 25(u)-(w), 25(y)-(aa).)

## II.   DISCUSSION

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed.R.Crim.P. 7(c)(1).  The sufficiency of the indictment on a motion to dismiss is tested by its allegations, not facts to be shown at trial. *Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732, 741 (9th Cir. 1954).  The allegations, for purposes of considering the motion, must be taken as true.  *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

### A.   The Hobbs Act

The Hobbs Act (or "the Act") criminalizes interference with interstate commerce by extortion, along with attempts or conspiracies.  18 U.S.C. § 1951(a).  Extortion is defined in the Act as "the obtaining of property from another, with his consent, induced by wrongful

use of actual or threatened force, violence, or fear, or under color of official right," 18 U.S.C. § 1951(b)(2).

B.     Hobbs Act Beneficiary

In *Wilkie v. Robbins*, a private property owner brought a civil suit against the Bureau of Land Management ("BLM") under the RICO Act, asserting that BLM employees violated the Hobbs Act when they used extortion in an attempt to force him to grant an easement to BLM.  551 U.S. 537, 563 (2007).  The Supreme Court concluded that Congress could not have intended for the Hobbs Act to apply when Bureau employees, acting in the name of the Bureau, sought to acquire land for the sole benefit of the federal government, despite their hard bargaining tactics, which may have been motivated by malice. *Id.* at 561, 563-565.  The Court's decision turned on the identity of the beneficiary of the extortion.  The Court found the beneficiary was the federal government, a fellow land owner entitled to negotiate with other land owners, and to seek benefits from others by insisting on valuable consideration for anything in return.  Because the language in the Act and the legislative history were little help in assisting the Court, the Court looked to the common law definition of extortion and observed that "the crime of extortion focused on the harm of public corruption, by the sale of public favors for private gain, not on the harm caused by overzealous efforts to obtain property on behalf of the [g]overnment." *Id.* at 564.

Renzi, citing *Wilkie*, argues that the Hobbs Act does not apply as a matter of law to his alleged conduct.  (Doc. 107, p.8.)  Renzi states that *Wilkie* stands for the proposition that the Hobbs Act does not apply when federal employees seek to acquire lands for the benefit of the federal government.  This is an oversimplification of *Wilkie*.  The Supreme Court considered the narrow issue in *Wilkie* of "efforts to obtain property for the Government *rather than* a private party," *Wilkie*, 551 U.S. at 563 (*emphasis added*); not efforts to obtain property for the Government  "in addition to," or "as well as," a private party.  Defendant Renzi asserts that "[s]ince Renzi was trying to obtain the [Sandlin[2]] Property for the benefit

---

[2] The Sandlin Property is also referred to at times by the parties as the San Pedro Property, but will be referred to throughout this Court's documents

of the federal government, the Hobbs Act does not apply as a matter of law to his alleged conduct." (Doc. 107, p.8.)  Defendant's conflation of Renzi's actions in seeking to acquire land for the government through the land exchange legislation, and Renzi's actions in seeking to obtain a source of funds through the extorted sale of the Sandlin Property, obscures the issues in this case.  While Renzi's argument seems to make some sense at first glance, the allegations in the SSI make clear that the charges are not based on Renzi's tactics in obtaining the Sandlin Property for the use of the government, rather, Renzi is alleged to have attempted and obtained "money not due" to him.  (SSI, ¶ 16-23, 48,50.)

That the government may have benefitted from his actions does not negate the fact that Renzi is alleged to have personally benefitted, by acquiring a portion of the proceeds of the sale of the Sandlin Property.  As the Supreme Court clarifies in *Wilkie*, the term "benefit" is synonymous with the term "property."  As the Supreme Court stated in *Wilkie*, drawing a line between private and public beneficiaries "prevents suits ... against public officers whose jobs are to obtain property *owed to the Government*."  *Wilkie*, 551 U.S. at 566 (emphasis added).  The Supreme Court stated that it is not reasonable to assume that the Hobbs Act was intended to expose federal employees to extortion charges "whenever they stretch in trying to *enforce Government property claims*."  *Id.* (emphasis added, citations omitted).  Renzi is not charged with extorting the land exchange proponents for the benefit of the government, rather, he is charged with obtaining and attempting to obtain a benefit, specifically money not due him or Sandlin, through means of extortion.

It is also not relevant that the government may have benefitted in part from actions undertaken to allegedly benefit Renzi personally.  In *Wilkie*, the Court specifically noted that the extortion was undertaken for the "sole" or "exclusive" benefit of the Government. *Wilkie*, 551 U.S. at 565.  The Supreme Court did not hold that as long as the action is taken "in part" to benefit the government, it is not actionable under the Hobbs Act.  Specifically, the Court rejected the plaintiff's attempts in *Wilkie* to analogize to a case in which a charge of extortion against a justice of the peace was brought in which the justice wrongfully

as the Sandlin Property for consistency and ease of reference.

ordered a litigant to pay compensation to the other party as well as a small administrative fee to the court, stating that "[b]ecause the case involved illegally obtaining property for the benefit of a private third party, it does not stand for the proposition that an act for the benefit of the Government alone can be extortion." *Id.*, at 565 (citing *People v. Whaley*, 6 Cow. 661, 1827 WL 2284 (N.Y. 1827)). The Supreme Court noted that "[t]he importance of the line between public and private beneficiaries for common law and Hobbs Act extortion is confirmed by our own case law, which is completely barren of an example of extortion under color of official right undertaken for the sole benefit of the Government. *Id.* at 537 (citations omitted).

An argument could be made that many extortionate actions a public official takes "under color of official right" could also "benefit" the government. Keeping focus on the specific benefit, the specific property allegedly obtained, however, keeps the analysis honest. The property at issue in the Hobbs Act charges is not the Sandlin Property, as Renzi alleges. Had the SSI alleged that the Sandlin Property was unlawfully obtained *by the government* through extortion and a subsequent land exchange, this case would be more in line with *Wilkie*. The SSI alleges, however, that Renzi and Sandlin obtained money not due to either defendant. While the government was attempting to obtain an easement in *Wilkie*, there was no allegation that the government actors personally were trying to obtain anything from the plaintiff (outside of possible personal gratification through the harassment of the plaintiff). In this case, neither Renzi nor Sandlin are alleged to have been attempting to "obtain property owed to the Government" or "enforce Government property claims" when they obtained or attempted to obtain the *purchase price* of the Sandlin Property from Resolution Copper Company or the Aries Group for their personal use.

Renzi argues that the Supreme Court concluded in *Wilkie* that federal officials are entitled to protection from Hobbs Act charges even when they act with improper personal motives, such as personal malice, so long as they intended to benefit the government; that so long as the official acts "in part" to benefit the government, then the official's improper personal motives are irrelevant. (Doc. 173, p.3.) There is no need to sparse the decision on

motivational grounds.  Renzi's assertion is correct, but irrelevant.

In *Wilkie*, the Court was clearly cognizant of the employees' own personal motivation, specifically malice, in undertaking their actions, but did not consider such personally motivated gratification a "benefit."  As noted above, the Supreme Court framed the issue as one of an effort "to obtain property for the Government rather than a private party."  That the BLM employees may have been personally motivated by malice to undertake those same actions was irrelevant because they did not benefit personally from their actions. This is unlike the allegations in the SSI in this case.

The beneficiary, as discussed above, is the one who acquires, or is intended to acquire, the property.  Personal motivations of the alleged extortioner are irrelevant to that determination.  There is no end to consideration of the possible motivations Renzi may have had for directing the land proponents to include the property in their exchange packages, nor any practical, legal or constitutional way of ascertaining that motivation. For instance, as this Court has previously stated:

> the allowable allegation, and the allegation necessary to support the indictment, is that the land proponents were told to include the Sandlin Property in their draft legislation in order to guarantee Renzi's support for their proposed exchange. This does not require any impermissible inference regarding Renzi's legislative acts or motivation, although it does go to the motivation for RCC's and Aries' actions in including the property, buying the property, seeking out other sponsorship, etc., and the allegation by itself is sufficient to support the indictment. Looked at another way, inquiring into Renzi's motivation for telling the land proponents to include the property in their exchange packages, or Renzi's motivation for sponsoring the package, would draw an impermissible inference into Renzi's legislative acts, and would be privileged. ... the indictment does not rely on any reference to his motivation for including the Sandlin Property to support the charges.

(Doc. 387, p. 23-24.)  The relevant consideration is that he is alleged to have obtained, or attempted to obtain, a personal benefit not due him in the form of property.  The only motivation in question is that of the victims.  *See U.S. v. Nedza*, 880 F.2d 896 ("...it is the motivation for the payment which dictates whether the conduct falls within the Hobbs Act.")(citation omitted).

C.   Acquisition Of Property

The Ninth Circuit describes Hobbs Act extortion as a "larceny-type offense," which

"does not occur when a victim is merely forced to part with property." *United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009)(quoting *United States v. Panaro*, 266 F.3d 939, 943 (9th Cir.2001)).  "Instead, 'there must be an 'obtaining': someone--either the extortioner or a third person--must receive the property of which the victim is deprived.'"  *Id*.

Renzi argues that, according to the SSI, the only money that Renzi received was money due to him under the terms of the $800,000 note held in connection with Sandlin's purchase of Renzi's interest in Fountain Realty.  Thus, Renzi asserts, since the SSI does not allege that Renzi received any money to which he was not entitled, the Hobbs Act counts should be dismissed in their entirety.  (Doc. 107, p. 10.)  Renzi also asserts that Sandlin was entitled to receive payments from the Aries Group pursuant to a *bona fide* sales contract. (Doc. 173, p.5.)

Renzi argues that, in *Evans v. United States*, 504 U.S. 255, 268 (1992), the Supreme Court held that an indictment must allege that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts. Renzi asserts that the indictment fails in this instance because he is not alleged to have received anything to which he was not entitled.  (Doc. 107, p 9-10.)  Renzi further argues that, if the public official was entitled to the payment, or if the public official erroneously but in good faith believed that he was entitled to the payment, then there is no Hobbs Act violation.  (*Id.*, citing *Evans,* 504 U.S. at 268 & 277.)   Renzi asserts that he was entitled to the money due to him from Sandlin under the terms of the note executed in connection with Sandlin's purchase of Fountain Realty.

The Government insists that the existence of the prior debt is immaterial to the Hobbs Act analysis, because it was Renzi's extortionate conduct that ensured Sandlin's ability to satisfy the debt.  (Doc. 136, p.3-4.)

The first problem with Renzi's argument, very simply put, is that Renzi is not charged with extorting Sandlin.  That Renzi was entitled to a repayment of a debt from Sandlin does nothing to change the allegations in the indictment that Renzi and Sandlin, together as co-conspirators, obtained property or attempted to obtain property that they were not entitled to

from the land exchange proponents under color of official right.  Renzi and Sandlin are charged, as co-conspirators, with extortion and attempted extortion.  Neither Renzi nor Sandlin had any entitlement to RCC or the Aries' groups' money.  Even if Renzi was entitled to money from Sandlin[3], he was in no way "entitled" to obtain that money from the Aries Group or attempt to obtain the money from RCC, and neither was Sandlin.  Under Renzi's argument, the getaway driver of a bank robbery would have a valid defense to a conspiracy charge if the hold up man he was charged with conspiring owed him enough money from previous personal dealings to cover his split of the take.

Second, regarding Renzi's "entitlement" argument, Renzi again relies on the over-extension of a single case to support his position.  Despite the wording of the holding, entitlement was not even remotely at issue in *Evans*.  What *Evans* does stand for is the proposition that an explicit demand for payment for an official act is not required to convict under the *Hobbs Act*.  *Evans*, 504 U.S. at 268.

Because Renzi is not asserting that he was entitled to the property allegedly obtained from the land exchange proponents, *Evans*, to the extent it requires the Government to allege Renzi received a payment to which he was not entitled, is inapposite.  Renzi also asserts that the indictment does not allege that Sandlin received money to which he was not entitled.  (See Doc. 173, p. 5.) This assertion is refuted by the very heart of the indictment.  Counts 26 and 27, both of the original, superseding, and second superseding indictments have always alleged that "RENZI and SANDLIN attempted to unlawfully obtain from Company A, with its consent, money not due to RENZI, RENZI's official office, or SANDLIN from Company A...," (Doc. 1, ¶ 49; Doc. 178, ¶ 51; Doc. 466, ¶ 48), and "RENZI and SANDLIN attempted to unlawfully obtain, and did unlawfully obtain, from Investment Group B, with its consent, money not due to RENZI, RENZI's official office, or SANDLIN from Investment Group B ...," (Doc. 1, ¶ 51; Doc. 178, ¶ 53, Doc. 466, ¶ 50).  Count One, the conspiracy charge, also alleges that Renzi and Sandlin obtained and attempted to obtain money not due "RENZI,

---

[3] Though the SSI suggests that at least some aspect of the note "called in" was in fact false. (SSI, ¶ 25(t), ¶ 36.)

SANDLIN or RENZI's official office."  (Doc. 466, ¶ 15(A).)  Renzi's assertion that the indictment does not allege that the Aries Group paid monies to Sandlin to which he was not entitled is plainly incorrect.  Renzi states that "Mr. Sandlin was entitled to receive the subsequent payments that Investment Group B allegedly made pursuant to this *bona fide* contract." (Doc. 173, p. 5.)  This argument presupposes a "*bona fide*" contract, which the SSI clearly alleges this was anything but, and regardless, would certainly be a question of fact for the jury.  Even if *Evans* adds an additional "lack of entitlement" element to the offense, which it does not, the Government has sufficiently pled that neither Renzi nor Sandlin was entitled to the land exchange proponents property.

Nonetheless, to the extent Renzi wishes to raise a factual dispute over entitlement to the property, it does not negate the allegations in the indictment, and thus render the indictment insufficient.  To the extent Renzi raises any "entitlement," or what might be better termed a "claim of right" defense[4], the Ninth Circuit, in accord with most other circuits, has declined to extend such a defense beyond the context of a labor dispute.  *See United States v. Daane*, 475 F.3d 1114, 1119 (9th Cir. 2007)(citing *United States v. Thordarson*, 646 F.2d 1323, 1326-27 (9th Cir. 1981)); *see also United States v. Martin*, 2009 WL 453185 (C.D. Cal. Feb. 20, 2009)(unpublished disposition); *accord United States v. Porcaro*, 648 F.2d 753, 760 (1st Cir. 1981); *United States v. Zappola*, 677 F.2d 264, 269 (2nd Cir. 1982); *United States v. Cerilli*, 603 F.2d 415, 419 (3rd Cir. 1979); *United States v. Castor*, 937 F.2d 293 (7th Cir. 1991); *United States v. French,* 628 F.2d 1069, 1076 (8th Cir. 1980).  To the extent it can be urged that the use of a legitimate economic threat to obtain property may, in some instances,

---

[4] Other than *Evans*, which does not, as discussed earlier, support Renzi's claim, Renzi has not cited any case where the extortion charges have been dismissed, on the face of the indictment, because the defendant claims an "entitlement" to property obtained through wrongful activity.  A so called "claim of right" defense was recognized by the Supreme Court in *United States v. Enmons*, and holds that the Act does not apply to the use of force to achieve legitimate labor ends in cases involving labor disputes; however, "when the objective of the picketing changed from legitimate labor ends to personal payoffs, then the actions became extortionate."  410 U.S. 396, 401, 406 (1973).

excuse the acquisition of property to which defendants are entitled, the indictment does not allege, and neither do defendants, that this is a case involving the use of legitimate economic threats. *See eg.*, *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989). Furthermore, any argument that either Renzi or Sandlin had a "claim of right" to the property would not be the proper subject of a motion to dismiss. *See United States v. Daane*, 475 F.3d 1114 (9th Cir. 2007)("The district court did not abuse its discretion in rejecting appellants' proffered "claim of right" instruction, because such an instruction was not supported by the law or the facts.").

      D.    <u>Deprivation Of Property</u>

Renzi's contends that the Indictment fails because he is not alleged to have wrongfully deprived anyone of property, rather, the Aries Group purchased property which, within weeks of closing would have generated more than a million dollars in profits if the Aries Group accepted an independent third party offer to purchase the property.[5] Thus, Renzi asserts, the Indictment fails to allege a wrongful deprivation of property.

The Government argues that *United States v. Millet*, 123 F.3d 268 (5th Cir. 1997), cited by Renzi in support of his argument, does not stand for Renzi's proposition.

Renzi states that the Act has been read to criminalize kickback schemes in which public officials receive money through the sale of property at inflated rates, citing Millet, supra, but knows of no cases holding that the purchase price of property at a market price constitutes a wrongful deprivation within the ambit of the Hobbs Act. (Doc. 107 p. 10.)

On appeal from Millet's conviction for extortion, the Fifth Circuit court in *Millet* analyzed the transaction in question and determined sufficient evidence was presented at trial that a reasonable jury would characterize the land transaction as a sham or kickback transaction designed to convey a proceeds of a kickback scheme to the defendant. The court

---

[5] Renzi repeatedly asserts that the Aries Group is alleged to have purchased the property at a fair market price. While it is true that Renzi has made this allegation in many documents, it is not an allegation found in the indictment. For purposes of this motion to dismiss, the Court confines itself to the allegations of the indictment. *See Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732, 741 (9th Cir. 1954).

did not specifically hold that the Hobbs Act requires a net loss or net personal loss in cases involving land deals.  It did not even consider that issue.  *Millet*, at 275-76.

Renzi cites no case, and this Court finds none, that holds that an indictment must allege that in cases such as this, where the extortionate activity is directed towards a nominally legitimate activity, such as the execution of a purchase contract or a "land deal," that the indictment must allege that the contract was inherently "unfair, inflated, or in any way above-market."  (*See doc*. 10, p. 11.)  It is easy to see why Renzi cites to no such case; contracts between parties lacking evidence of "bona fide" negotiation, especially between parties that would typically be expected to actively negotiate terms of a contract, would almost always be an indication of some inherent unfairness in the negotiation process.  Thus, it would be the existence of the contract itself that is wrongful, and a deprivation to the victim.

Finally, Renzi points to *Viacom Int'l Inc. v. Ichan*, 747 F.Supp 205 (S.D.N.Y. 1990) in support of his assertion that other Hobbs Act cases have concluded that the Act does not reach payments when the putative victim obtains in return valuable property or services.  The *Viacom* case was not so straightforward, however.  The District Court explained that when a victim receives something in exchange for his property, a distinction is drawn between an exchange of property as a result of "hard-bargaining" and an exchange of property as a result of extortion.  *Id*. at 213.  The difference is that, in a "hard-bargaining" scenario, the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant; in contrast, in an extortion scenario, the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant.  *Id*.  The indictment clearly alleges the second scenario here.    The indictment makes clear that the land exchange proponents should have been entitled to pursue their legislation free of the fear of Renzi putting an end to it, *eg*., "[n]o Sandlin Property, no bill" that was quelled by receiving the Sandlin Property in return for the purchase price of the property.  To think about the situation another way, had the situation

- 14 -

simply been Sandlin and the land exchange proponents bargaining over the price of the property, without any ultimatum from Renzi, even though Sandlin had some knowledge that the piece was a component of the proponents land exchange package, that would have been a "hard-bargaining" tactic on Sandlin's behalf.  At some point, though, the land exchange proponents could have said, for example,  the price was too high, we can look elsewhere, we can buy different, but equally attractive environmental property for this price, etc.  But combined with the alleged ultimatum, that this legislation would never pass without this particular piece of property, the exchange of property as a result of "hard-bargaining" tactics becomes an exchange of property as a result of extortion, under the distinction described in *Viacom*.

   E. <u>Sufficiency Of The Indictment</u>

   Renzi's final argument is that the indictment fails to identify what money it is that was allegedly "not due" to Renzi or Sandlin, and, as a result it is impossible to determine whether the Grand Jury was led to believe that the "money not due" involved the alleged payments by Sandlin to Renzi under the note or, alternatively, whether the "money not due" was the payments, or proposed payments, by the private parties to Sandlin for the Sandlin property.

   The Supreme Court has held that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Chenaur*, 552 F.2d 294, 301 (9th Cir. 1977) (*citing Hamling v. United States*, 418 U.S. 87, 117-18 (1973)).  While an indictment need not recite exact statutory language, *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004), the statutory language "may be used in the general description of the offense, but it must be accompanied with such a statement of facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.*  Renzi asserts that because counts 26 and 27 track the language of the statute does not insulate the charges from constitutional scrutiny.  While this may be true, the cases cited by Renzi also instruct that if the language of the statute fully, directly and expressly sets

forth all the elements necessary to constitute the offense intended to be punished it will be sufficient. *United States v. Carll*, 105 U.S. 611, 612, (1881); *Ornelas v. United States*, 236 F.2d 392, 393-94 (1956). What remains indispensable to the indictment is that it allege all the essential elements of the offense, whether through use of statutory language or factual allegation. "In the Ninth Circuit, '[t]he use of a "bare bones' information - that is one employing the statutory language alone - is quite common and entirely permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime to be punished.'" *United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995) (quoting *United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987). The Ninth Circuit has held that "the test of the sufficiency of the indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir. 2000).

A complete failure to recite an essential element of the charged offense is not a minor or technical flaw, but is fatal to the indictment, and requires dismissal. *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005)(quoting *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). The fact that an indictment that fails to contain additional information beyond the essential elements, however, does not constitute a fatal defect. *United States v. Godinez-Rabadan*, 289 F.3d 630, 634 (9th Cir. 2002).

As discussed above, Hobbs Act extortion is defined in the Act as "the obtaining of property from another, with his consent, induced . . . under color of official right," 18 U.S.C. § 1951(b)(2). Additionally, the Ninth Circuit describes Hobbs Act extortion as a "larceny-type offense," which "does not occur when a victim is merely forced to part with property." *United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009)(quoting *United States v. Panaro*, 266 F.3d 939, 943 (9th Cir.2001)). "Instead, 'there must be an 'obtaining': someone--either the extortioner or a third person--must receive the property of which the victim is deprived.'" *Id*.

Renzi states that:

> [t]he risk of a roving prosecution is palpable here. To secure a conviction, the government must prove that the Congressman extorted or attempted to extort

money.  But the indictment does not specify whether the Grand Jury based the Hobbs Act charges on the money involved in the purchase of the [Sandlin] Property, or whether the Grand Jury based the charges on the money involved in satisfying the note.  As a result, the Indictment creates a risk that the defendants could be convicted 'on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.'"

(Doc. 107, p. 13-14)(citing *Russell v. United States*, 369 U.S. 749, 770 (1962).

Without going into great detail, because this was thoroughly discussed above, the Aries Group was allegedly forced to part with any payments they paid on the property as well as the contract - the promise to make further payments; Defendants allegedly attempted to obtain this same property from RCC (SSI, ¶¶ 19-25) The indictment alleges that the "obtaining" piece of it occurred when Sandlin accepted the cash and promise for future payments, (money "not due" Sandlin as discussed above) from the Aries Group (SSI, ¶ 25(p)-(x)), this money was allegedly split between Renzi and Sandlin when Renzi allegedly received a portion of the Aries Group money ($733,000.00) from Sandlin (money also "not due" Renzi) (SSI, ¶¶ 25 (q)-(bb)).  Sandlin's note is irrelevant because the money was not due either Sandlin or Renzi, and a portion of it allegedly went to both.    The SSI is sufficiently clear on this point.

## III.   RECOMMENDATION

Accordingly, the Magistrate Judge recommends that the District Judge enter an order **DENYING** Defendant Renzi's motion to dismiss the Hobbs Act Charges (Doc. 107).

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  If objections are filed, the parties should use the following case number:  **Any objections filed should be filed as CR 08-00212-TUC-DCB.**

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 19th day of October, 2010.

Bernardo P. Velasco
United States Magistrate Judge